1                    IN THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF ARKANSAS
2                             WESTERN DIVISION

3

4   UNITED STATES OF AMERICA,      .
                                   . Case No. 4:17-CR-00293-BSM-22
5   PLAINTIFF,                     .
                                   .
6   VS.                            . Little Rock, Arkansas
                                   . May 30, 2019
7   TIFFANY L. PARKER,             . 2:16 P.M.
                                   .
8   DEFENDANT.                     .
      .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

9

10

11                            TRANSCRIPT OF

12                         DETENTION HEARING

13                 BEFORE THE HONORABLE J. THOMAS RAY

14                   UNITED STATES MAGISTRATE JUDGE

15

16

17  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Tenesha Brown

18

19

20  Transcription Service:            Robin Warbritton
                                      Post Office Box 262
21                                    Vilonia, AR  72173

22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

```
1    APPEARANCES:

2    For the Government:      Ms. Liza Jane Brown
                              U.S. Attorney's Office
3                            Eastern District of Arkansas
                              Post Office Box 1229
4                            Little Rock, AR  72203-1229

5    For the Defendant:       Mr. Lott Rolfe, IV
                              The Rolfe Law Firm, P.A.
6                            1920 North Main Street
                              Suite 107
7                            North Little Rock, AR  72114

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                              I N D E X

2                        DIRECT    CROSS   REDIRECT    RECROSS

3   DEFENDANT'S WITNESSES:

4   John Antonovich           5       11

5   Kyle Chronister          19       21

6   Cynthia George           34       37

7

8   EXHIBITS:                         IDENTIFIED        RECEIVED

9   Defendant's Exhibit                  10                10
```

4

P R O C E E D I N G S

1

2      (Call to order of the Court.)

3              THE COURT:  You may be seated.

4              Good afternoon, Mr. Rolfe and Ms. Brown.

5              MR. ROLFE:  Good afternoon.

6              MS. BROWN:  Good afternoon.

7              THE COURT:  We're are here on what initially was

8   scheduled as a detention hearing.  It's my understanding, Ms.

9   Brown, that the United States has now agreed to a release plan

10  for Ms. Parker; is that correct?

11             MS. BROWN:  No, Your Honor.  I've never agreed to a

12  release plan on her.  No.

13             MR. ROLFE:  Oh, I apologize, Judge, I --

14             THE COURT:  No.  That's -- that's fine.  Sometimes

15  miscommunications take place.

16             In that case, Ms. Brown, you may call your first

17  witness.

18             MS. BROWN:  Your Honor, this is a presumption case.

19             THE COURT:  All right.

20             MS. BROWN:  And it's not less than ten years, so it

21  would be Mr. Rolfe's.

22             THE COURT:  Mr. Rolfe, you may call your first

23  witness.

24             MR. ROLFE:  All right.  Thank you, Your Honor.

25             Your Honor, we would first call John Antonowich

1    [sic].

2              MS. BROWN:  Antonovich.

3              THE COURT:  If you would please stop about right

4    there and face my Courtroom Deputy to be administered the

5    oath.

6         JOHN ANTONOVICH, DEFENDANT'S WITNESS, SWORN.

7                           DIRECT EXAMINATION

8    BY MR. ROLFE:

9    Q    All right.  Can you please state your name for the record?

10   A    John William Antonovich, Sr.

11   Q    Antonovich.  All right.  And so, what is your current

12   address?

13   A    4213 West C Street, Russellville, Arkansas, 72801.

14   Q    And how long have you resided there?

15   A    This -- I've resided there five years, going on my sixth

16   year.

17   Q    Okay.  And do you know Tiffany Parker?

18   A    Yes, I do.

19   Q    Okay.  How long have you known Tiffany?

20   A    I've known the family approximately five years.

21   Q    Okay.  And are you here today to offer yourself as a third

22   party custodian for Tiffany?

23   A    Yes, sir.

24   Q    Okay.  And you stay, I guess, close to Tiffany's mother;

25   is that correct?

1  A    Yes.  She lives on the next block.  I live right behind

2  the office where she works -- her mom works.

3  Q    Okay.  Does she have other family members that stay

4  reasonably close to her -- or reasonably close to you?  I

5  apologize.

6  A    The mom and her daughter.

7  Q    Okay.  Who else resides in your home?

8  A    Just me and my three cats and a dog.

9  Q    Okay.  Would there be any problems with living

10  arrangements if Tiffany was allowed to move in with you?

11  A    No, sir.

12  Q    Okay.  If there were any conditions imposed by the Court,

13  such as electronic monitoring or something to that effect,

14  would that be a problem for making sure whatever is required

15  is put in place at your home?

16  A    No, sir.

17  Q    Okay.  Do you consider -- or would you believe Tiffany

18  would be a flight risk to any -- a flight risk if she was

19  allowed to be released into your care?

20  A    No, sir.

21  Q    Okay.  Do you believe that she would be a threat to

22  anyone, as far as physical violence in any way, if she was

23  allowed to be released in your care?

24  A    No, sir.

25  Q    If it ever came to a point where it was determined that

Antonovich - Direct                                    7

1  she could possibly evade jurisdiction or be a threat to

2  someone, would you be willing to report any violation to the

3  Court?

4  A   Yes, sir.

5  Q   All right.  Okay.  Are you aware of the charges that she's

6  dealing with here in federal court?

7  A   Yes, sir.

8  Q   All right.  Does the nature of her charges give you any

9  pause in the role that you'll be playing here if the Court was

10 to allow you to serve as a custodian here?

11 A   No, sir.

12 Q   I guess you are aware that Tiffany has had some drug

13 issues in the past, correct?

14 A   Yes, sir, but the -- it's -- I don't get into their

15 personal business, her personal business or anything.

16 Q   Okay.  If there were other conditions, such as her

17 reporting to drug treatment or anything of that nature, would

18 you be willing to make sure she does what she's --

19 A   Yes, sir.

20 Q   -- supposed to do?

21 A   Yes, sir.

22 Q   Are you working anywhere?

23 A   No, I'm disabled, sir.

24 Q   Okay.  So, would there be -- there would not be any issues

25 regarding monitoring her and doing what she's --

Antonovich - Direct                                    8

1   A    No, sir.

2   Q    Okay.  Now, have you had some issues in the past yourself?

3   A    Yes, sir.

4   Q    Okay.  Why don't you, I guess, give the Court a little bit

5   of information of what you've dealt with in the past?

6   A    Back when I was a juvenile, I was arrested in Sarasota,

7   Florida for impersonating a police officer, a misdemeanor.

8        Then, to the best of my recollection, I went to Louisiana

9   and I got involved -- I lit a fire, burned some brush, and the

10  fire got onto the -- onto the store and burnt the store down,

11  and I got convicted of that.  And after I was convicted of

12  that, and paroled out, they violated me under no grounds and

13  stuff and sent me back to the county jail to wait -- to be

14  transferred back to the penitentiary.  And I escaped from the

15  county jail -- or parish jail is what it's called, and was

16  picked up in Georgia.  After I lived in Florida again for a

17  little while, then I went to Georgia to where my oldest

18  daughter's mom lived, and she decided she didn't want nothing

19  to do with me, so she called the police and said that I was a

20  fugitive from Louisiana, that I escaped, and they picked me up

21  there and also filed some charges on me for forgery and credit

22  card fraud, which I went to court, I stayed a year at county

23  jail over there, then they transferred me to the penitentiary

24  in Georgia under an alias of Michael Sheehan, and turned

25  around and I was there for like two weeks, and they had a

1   hearing of commutation of sentence to time served to release

2   me to go back to Louisiana to finish out my time, which I did.

3   And was released in 1994 to -- just released.  And I moved up

4   to Arkansas, Russellville, Arkansas.

5       And '96, I got in trouble writing some checks and stuff

6   that I was unable to pick up, and I got charged with hot check

7   violation, which was a misdemeanor, and I paid them off, and

8   that was supposed to be removed my record also.

9       And, since then, in 2016, I filed for my clemency, seeing

10  it's been over 40 years, with the state of Louisiana, and they

11  did an extensive background check on me and stuff, and there

12  was nothing, and went down there and my kids with me and

13  presented myself to the pardon board, and the pardon board

14  granted me, four to zero, approval for me have a pardon.

15  Q   Okay.  So you've had some issues in the past, I guess,

16  going way back to '96 was the most recent?

17  A   The most recent, yes, but never anything to do with any

18  drugs or anything like that, sir.

19  Q   Okay.  And so, you then subsequently, I guess, applied for

20  a pardon --

21  A   Yes, sir.

22  Q   -- in Louisiana, and that pardon was subsequently granted?

23  A   Yes, sir.

24  Q   All right.  And you provided some documents to me

25  regarding that pardon, and also, I guess, some character

Antonovich - Direct                                    10

1   letters that were attached to that?

2   A    Yes, sir.

3           MR. ROLFE:  If I may approach the witness, Your

4   Honor?

5           THE COURT:  Yes, sir.

6           MR. ROLFE:  I've supplied opposing counsel with a

7   copy.

8           MS. BROWN:  Lott, I don't have a problem with your

9   introducing them.

10          MR. ROLFE:  You don't.  Oh, okay.

11          MS. BROWN:  Your Honor, I have no objection to these

12  records.

13          THE COURT:  All right.  They'll be introduced without

14  objection.

15      (Defendant's Exhibit identified and received.)

16          THE COURT:  Thank you, Mr. Rolfe.

17          MR. ROLFE:  Thank you, Your Honor.

18  BY MR. ROLFE:

19  Q    Despite your past, do you feel that -- that, in any way,

20  you would be unfit serving as a third party custodian?

21  A    No, sir.  I raised my three children.  I ended up getting

22  custody of my three children.  I was married for 20 years --

23  almost 20 years.  And my wife, she got involved in drugs, I'm

24  going to be honest, and I told her that I don't do drugs, I

25  don't want drugs in my house, I don't want drugs around my

1  kids, and told her she had to leave.  And she left.  And I

2  turned around and took custody of my kids, filed for divorce,

3  got custody of them.  They graduated high school and

4  everything else.  And now they're living on their own.

5  Q    Okay.

6  A    So, I feel I'm a pretty good parent.

7  Q    Okay.  All right.

8          MR. ROLFE:  I'll pass the witness, Your Honor.

9                      CROSS EXAMINATION

10  BY MS. BROWN:

11  Q    Good afternoon.  So, you say you've known the family for

12  five years?

13  A    Yes.

14  Q    Okay.  What's the mom's name?

15  A    Cindy.  I call her Cindy.

16  Q    Last name?

17  A    George.

18  Q    Okay.  And who else lives with her?  Her other daughter?

19  What's her name?

20  A    Melissa.

21  Q    Kizer?

22  A    Yes.

23  Q    Okay.  So, and you say that you -- it's just you, three

24  cats, and a dog that live there?

25  A    Yes, ma'am.

Antonovich - Cross                                    12

1    Q    Okay.  So, tell me about your sons and where are they
2    living now?
3    A    My son -- one of my sons is engaged to a manager that
4    works at McDonald's.
5    Q    And what is his name?
6    A    John, Jr.
7    Q    Okay.  And is John, Jr. currently out on bail right now
8    for a felony arrest -- oh, is that Nicolas?
9    A    That's Nicolas.
10   Q    Okay.  So, one of the other kids that you have raised,
11   went to school, he's now under a state offense for a felony,
12   correct?
13   A    Yes.
14   Q    Okay.
15   A    But I have nothing to do with that, ma'am.  He did that on
16   his own.  He -- when he was 18 --
17   Q    Uh-huh.
18   A    -- he left the home.  I told him he shouldn't leave the
19   home and stuff --
20   Q    Uh-huh.
21   A    -- but there was too many conflicts with me and him, and
22   the police said if he wants to leave, just let him leave.
23   Q    Okay.
24   A    And so, I let him leave.  And now, what he does to himself
25   and stuff is on him.

Antonovich - Cross                                            13

1   Q    And are you -- are you aware about John, Jr.'s run-ins

2   with the law here lately?

3   A    The only thing I know is he got a traffic ticket and he

4   had his motor -- his scooter stolen.

5   Q    Okay.  Would it surprise you to know that he has other

6   issues that they -- that the Russellville Police Department

7   have been dealing with him on here recently?

8   A    No, ma'am.

9   Q    Okay.  So, two of your three -- now, you have another son;

10  is that correct?

11  A    I have a daughter.

12  Q    Oh, you have a daughter?

13  A    I have two more daughters.

14  Q    And what's your other -- what's your daughter's name?

15  A    My daughter is Anna-Marie Paige Antonovich.  Anna --

16  Q    Uh-huh.

17  A    Anna-Marie.

18  Q    Okay.  And what does she go by?

19  A    Anna Antonovich.

20  Q    Anna Antonovich?

21  A    Yes.

22  Q    Okay.  And has Anna Antonovich been in trouble with the

23  law?

24  A    Just traffic tickets.

25  Q    Okay.  All right.  And how long did you spend in prison

1  for -- what was your sentence on the arson?

2  A    15 years, ma'am.

3  Q    Okay.  And what was the sentence on the escape?

4  A    Three years, ma'am.

5  Q    Okay.  And now you say you live right behind them; is that

6  correct?

7  A    I live up the road from Ms. Cindy.

8  Q    Up the road from Cindy?

9  A    Yes.  In other words, when the road -- the road, it comes

10 down the hill --

11 Q    Uh-huh.

12 A    -- and there is one cul-de-sac and then goes down a little

13 further, and there's a second cul-de-sac, she lives on the

14 second cul-de-sac.

15 Q    Okay.  And would it surprise you that in the arrest

16 records of both of your sons that they put down their address

17 as 4213 West C Street?

18 A    That's where they send their mail.  They -- I had my son's

19 probation officer, Nicolas's, come over there, and I told him

20 that he doesn't live there.  None of my kids live with me.

21 Q    But they get their mail there?

22 A    They get their mail there.  That's it.

23 Q    And how many bedrooms is your house?

24 A    Three bedroom.

25 Q    How many baths?

1  A   Two and a half.

2  Q   Now you say you don't get into and you know -- you're

3  aware of the nature and circumstances surrounding what Ms.

4  Parker is charged with, correct?

5  A   Yes.

6  Q   Okay.  And how often, when you were -- when Ms. -- before

7  Ms. Parker had been to prison, how often would you see her?

8  A   Five/six times a month, over at mom's, visiting with mom,

9  if not more.

10  Q   Okay.  And are you aware that she absconded from her

11  parole at one point?

12  A   No, ma'am.

13  Q   Okay.  Are you aware of her drug history and abuse?

14  A   No, ma'am.

15  Q   Okay.  Are you aware that she's charged -- and he said

16  nature and circumstances of the charges, but I want to be

17  specific.  Are you aware that she's charged with possession

18  with intent to distribute and distribution of methamphetamine

19  not less than 500 grams, which carries a not less than ten

20  year mandatory minimum sentence?

21  A   No, ma'am, I didn't.

22  Q   Okay.

23  A   Because that's not my -- that's their personal business.

24  Q   I understand that.

25  A   Yeah.

1   Q    But you said that you were aware of her charges and the

2   nature of her charges?

3   A    By -- by what I've read in the newspaper.  That's it.

4   Q    Okay.  So not from her --

5   A    No.

6   Q    -- and not from her family?

7   A    No.

8   Q    Okay.  Are you familiar with who Troy Loadholt is?

9   A    Who?

10  Q    Troy Loadholt?

11  A    No, ma'am.  Not by that name.

12  Q    Heath Kizer?

13  A    No, ma'am.  I think Heath Kizer is her ex-husband or --

14  Q    Who is her?

15  A    -- or -- Melissa.

16  Q    Melissa's ex-husband?

17  A    Yeah, I think that's Melissa's ex-husband.

18  Q    Okay.  And it's also Tiffany Parker's ex-boyfriend after

19  her husband --

20  A    Oh, I didn't know about that.

21  Q    -- are you aware of that, too?

22  A    No, I was not aware of that.

23  Q    Okay.  Are you aware of any of her ties or affiliations to

24  the New Aryan Empire and people who are members of the New

25  Aryan Empire?

1  A    No, ma'am.

2  Q    Are you familiar with the New Aryan Empire in

3  Russellville, Arkansas?

4  A    I -- I have heard about them, ma'am.

5  Q    How can you not, right?

6  A    You're right.

7  Q    If you live in Russellville --

8  A    Yeah, if you live in Russellville --

9  Q    -- how can you not, right?

10  A    -- you've got to hear about them.

11  Q    Okay.  So, I'm just -- I want to make sure that you're

12  clear on who -- how she is and who she is and how she fits

13  into this case before you want to accept this role.

14  A    I understand.

15  Q    And you're familiar with the nature of the charges of --

16  she's not included in that part of it, but the RICO; have you

17  heard of that?

18  A    I have heard of the RICO Act.  Yes, ma'am.

19  Q    Okay.  And those are members and associates of the New

20  Aryan Empire, and she's -- through the course of this

21  investigation, the allegations are that she has associated

22  with several of them in her distribution of methamphetamine;

23  are you aware of her ties to them?

24  A    I'm not aware of her ties to them, but one thing I do

25  know, I run a very strict household.

1  Q   Okay.

2  A   And if I have any problems, I'm not afraid to do what I

3  have to do to turn around and justify the cause of me

4  contacting whoever I have to contact.

5  Q   Okay.  I want to make sure that you understand that.

6  A   Yes.

7  Q   Because these people are still out there and they're still

8  around.

9  A   Okay.

10  Q   Okay?

11  A   Yes.

12  Q   All right.

13          MS. BROWN:  Your Honor, I have no further questions

14  of Mr. Antonovich.

15          MR. ROLFE:  No additional questions of the witness,

16  Your Honor.

17          THE COURT:  Okay.  Thank you, Mr. Antonovich.  You

18  may stand down.

19          THE WITNESS:  Thank you, sir.

20      (Witness stands down.)

21          MR. ROLFE:  Your Honor, my next witness will be Kyle

22  Chronister.

23          THE COURT:  Mr. Chronister, if you'd please face my

24  Courtroom Deputy for the oath.

25      KYLE CHRONISTER, DEFENDANT'S WITNESS, SWORN.

1                      DIRECT EXAMINATION

2    BY MR. ROLFE:

3    Q    All right.  Can you state your name for the record?

4    A    Kyle Chronister.

5    Q    Okay.  And, Kyle, what is your current address?

6    A    205 Southwest 5th Street, Atkins, Arkansas, 72823.

7    Q    And how do you know Tiffany Parker?

8    A    I was with her niece for four or five years.  We have a

9    kid together.  We share joint custody of our kid.

10   Q    Okay.  How old is the child that the two of you have

11   together?

12   A    She's almost two.

13   Q    Okay.  And you are here today to offer yourself, I guess,

14   as a secondary option for third party custodian?

15   A    Yes, sir.

16   Q    And you're willing to serve in that role?

17   A    Yes, sir.

18   Q    Okay.  Are you aware of the charges that Ms. Parker is

19   currently dealing with in this court?

20   A    Yes, sir.

21   Q    Okay.  You understand that if you were to serve as a third

22   party custodian, that there are certain things that you would

23   have to do that would be required, you know, as far as serving

24   in that capacity --

25   A    Yes, sir.

Chronister - Direct                                    20

1   Q   -- right?

2   A   Right.

3   Q   And are you willing to do whatever is necessary to fulfill

4   those obligations?

5   A   Yes, sir.

6   Q   Okay.  Some things that might be required of you would be

7   to report any violations of the law or any violations of

8   conditions of release; would you be willing to report that?

9   A   Yes, sir.

10  Q   Even if it meant her getting incarcerated again?

11  A   Yes, sir.

12  Q   Okay.  If there were certain things that were required,

13  such as electronic monitoring or transporting her to drug

14  treatment programs, would you be willing to assist with that?

15  A   Yes, sir.

16  Q   Who all stays in the home with you?

17  A   Me and my daughter.

18  Q   Okay.  It's just the two of you?

19  A   Yes, sir.

20  Q   How many bedrooms in the home?

21  A   Two.

22  Q   Okay.  Do you consider Ms. Parker to be a flight risk of

23  any sort?

24  A   No, sir.

25  Q   Okay.  Do you believe that if she was released she would

1   be a danger to anyone?

2   A    No, sir.

3   Q    Are you currently employed?

4   A    Yes, sir.

5   Q    Where do you work?

6   A    For Benton-Georgia, it's a gas company.

7   Q    Okay.

8   A    Put in gas pipe.

9   Q    You put in gas pipe?

10  A    Yes, sir.

11  Q    How long have you been working in that capacity?

12  A    I just recently switched companies, but doing the same

13  work for a different company for almost two years now.

14  Q    Okay.  Are your hours generally during the day, in the

15  evening?

16  A    From about 6:00 in the morning until 6:00 in the

17  afternoon.

18  Q    Okay.  All right.

19          MR. ROLFE:  I'll pass the witness, Your Honor.

20                      CROSS EXAMINATION

21  BY MS. BROWN:

22  Q    Mr. Chronister, you said you've known her for four to five

23  years; is that correct?

24  A    Yes, ma'am.

25  Q    Okay.  And, I'm sorry, what was your address that you live

Chronister - Cross                                          22

1    at?

2    A    205 Southwest 5th Street, Atkins, Arkansas, 72823.

3    Q    Okay.  And how long have you lived there?

4    A    Almost two years.

5    Q    All right.  And where did you live before that; do you

6    remember the address?

7    A    1232 Simba Road.

8    Q    Simba Road?

9    A    Yes, ma'am.

10   Q    And when did you live there?

11   A    Prior to when I moved to the house I live in now.

12   Q    So, if we're at 2019, it would be like 2016/2017?

13   A    Yes, ma'am.

14   Q    Okay.  And who did you live there with?

15   A    Myself and my daughter's mother.

16   Q    Your daughter's mother is?

17   A    Paige McWilliams.

18   Q    Is who?

19   A    Paige McWilliams.

20   Q    So, Tiffany is not the mother of your daughter?

21   A    No.

22   Q    Okay.  I'm sorry.  I -- all right.  So, I'm so confused.

23   Sorry.  I thought I heard --

24   A    No.

25   Q    -- that you live there with your daughter.

Chronister - Cross                                    23

1   A    That's --

2   Q    So, you live with your daughter, but that's not -- that's

3   not -- Tiffany is not the mom?

4   A    No.  Correct.

5   Q    Okay.  Sorry.  I just wanted to clarify that.  Okay.  So,

6   who lives at your house right now?

7   A    Me and my daughter.

8   Q    And that's it?

9   A    Yes, ma'am.

10  Q    Okay.  All right.  And you said that Tiffany is not a

11  flight risk, correct?

12  A    No, ma'am.

13  Q    All right.  Did you ever live with Tiffany?

14  A    At one point.

15  Q    When did you live with Tiffany?

16  A    Between -- before I lived at Simba Road, I lived -- we

17  lived on Gum Log Road together.

18  Q    Okay.  And for how long did you live with Tiffany?

19  A    Not real sure.  Probably six months.

20  Q    Six months?

21  A    Yes, ma'am.

22  Q    Okay.  Do you know who Troy Loadholt is?

23  A    I -- I don't know him personally, but I've heard of him.

24  Q    Okay.  Kyle, I --

25            MS. BROWN:  I want to make sure, Your Honor, there's

Chronister - Cross                                    24

1  -- this needs to come out, but I want to make sure he's very

2  clear.

3  BY MS. BROWN:

4  Q   You are clear that you are under oath right now?

5  A   Yes, ma'am.

6  Q   And that if you say something that is not truthful, that

7  later on the Government can come back and they can prosecute

8  you for your untruthful statements --

9  A   Yes.

10 Q   -- do you understand that?

11 A   Yes, ma'am.

12 Q   I'm going to ask this again.  Do you know Troy Loadholt?

13 A   Yes, I know him.

14 Q   Thank you.  Okay.  Let's go with this.  So, back in 2017,

15 you all were living at 1232 Simba Road; is that correct?

16 A   Me and Paige and -- yeah.

17 Q   You, Paige, and Tiffany, correct?

18 A   No.  Tiffany lived at Gum Log Road with me.  We lived on

19 Gum Log Road together before I lived at Simba Road -- on Simba

20 Road.

21 Q   Okay.  And while you lived with -- while you lived at 1232

22 Simba Road, did you receive a package from FedEx on behalf of

23 Troy Loadholt containing methamphetamine?

24 A   Not that I'm aware of.

25 Q   Okay.

Chronister - Cross                          25

1   A   I didn't receive one, no, ma'am.

2   Q   All right.  So, you have a Facebook page; is that correct?

3   A   Yes, ma'am.

4   Q   Okay.  And you go by Kyle Chronister on there --

5   A   Yes, ma'am.

6   Q   -- is that correct?

7   A   Yes, ma'am.

8   Q   Okay.  And your daughter's name is Paige?

9   A   No.  My daughter's name is Askim [phonetic].  Paige is her

10  mother.

11  Q   Okay.  So, you and Paige lived together, right?

12  A   Yes, ma'am.

13  Q   Okay.  Sorry I keep thinking your daughter's name is

14  Paige.  And you lived at 12 -- 1232 Simba Road, right?

15  A   At the --

16  Q   At the time, during 2016 and 2017?

17  A   Yes.

18  Q   All right.  We're going to go through some stuff and this

19  may be hard for you.

20  A   Okay.

21  Q   But, this is around the Appleton area?

22  A   Yes, ma'am.

23  Q   In Arkansas, right?

24  A   Yes, ma'am.

25  Q   Okay.  During this time in 2017, did Troy Loadholt ask you

1  to -- to receive a package of methamphetamine at your house?

2  A   Did he ask me?  No, ma'am.

3  Q   Excuse me?

4  A   No, ma'am.

5  Q   No?  Okay.

6  A   It wasn't -- it wasn't actually my house, it was Paige's

7  mom's boyfriend's house.

8  Q   But you went over there to get this package, correct?

9  A   What do you mean?  I never -- I never -- no, I never

10  touched or received or did any kind of thing with any package

11  for Troy Loadholt, no, ma'am.

12  Q   Okay.  So, let's go through.  So, on 2/27, when Troy

13  Loadholt sends you a text message that says:

14              "You got it?"

15      And you say:

16              "Got what?"

17      And he goes:

18              "You in Appleton?"

19      You say:

20              "You already know."

21      And he asks:

22              "Who all is there?"

23              "Just me, Curt, Ty.  Paige is

24              snoozing.  She gotta work a double

25              today."

Chronister - Cross                                          27

1     And he says:

2          "I'll be there in a couple hours."

3     I'm going to show you some records that we've received

4  from FedEx regarding a shipment of methamphetamine that was

5  sent to that residence.

6          MS. BROWN:  Your Honor, may I approach?

7          THE COURT:  Yes.

8          MS. BROWN:  These are all the records that I've

9  provided you.

10 BY MS. BROWN:

11 Q   To 1232 Simba Road.  I show you what I'm going to mark as

12 Government's Exhibit No. 1, this is a FedEx, correct, and the

13 address listed there is to Mary Wells.  Do you know who Mary

14 Wells is?

15 A   No, ma'am.

16 Q   But it's -- the address is 1232 Simba Road, correct?

17 A   Correct.

18 Q   And that was on 2/26/2016, correct?

19 A   Correct.

20 Q   All right.  Let me show you what I've marked as

21 Government's Exhibit No. 2.  The tracking label on this one,

22 on Government's Exhibit 1, ends in 1472.  The shipment date

23 was on -- time stamp when it arrived was 2/27/2016.  These are

24 the weights.  Would it surprise you that this package weighed

25 six pounds, the package that was delivered to your residence

1  where you were living?

2  A    No.  I mean, I have no --

3  Q    You have no idea?

4  A    No, I have no idea about a package.

5  Q    Okay.

6            MS. BROWN:  And, Your Honor --

7            THE COURT:  Ms. Brown --

8            MS. BROWN:  -- I'm going to underline this --

9            THE COURT:  Ms. Brown, I --

10           MS. BROWN:  I'm sorry.

11           THE COURT:  I'm -- this -- as far as I know, this

12 witness has not been charged with any crime, and you're going

13 way further here than we need to go.  You're not establishing

14 a proper foundation, really, to conduct this cross

15 examination.  He's denied anything about a package, doesn't

16 know what you're talking about.  So, unless you start to lay

17 proper foundation --

18           MS. BROWN:  Yes, sir.

19           THE COURT:  -- and bring this pretty quickly to a

20 close, I'm not going to allow any further questioning on this

21 subject.

22           MS. BROWN:  Yes, Your Honor.  I understand.  But, I

23 have also asked the defense counsel if I could proffer

24 information.  I'm just asking to see if he remembers these

25 things.

Chronister - Cross                                        29

1          THE COURT:  And he's -- he's pretty clearly answered

2    he does not.

3          MS. BROWN:  Yes, Your Honor.

4    BY MS. BROWN:

5    Q   During that time, during 2016 and 2017, did you get

6    methamphetamine from Troy Loadholt?

7    A   Maybe.  I mean, just -- like, from -- in the mail from

8    him?  No, I didn't.

9    Q   No.  Purchase methamphetamine from Troy Loadholt?

10   A   Yes.

11   Q   Did he front you methamphetamine?

12   A   Yes.

13   Q   Okay.  Now, you are not a convicted felon, correct?

14   A   No, ma'am.

15   Q   Okay.  Did you try to sell several guns during that time?

16   A   No, ma'am.

17   Q   Do you know what an SKS is?

18   A   I'm familiar.

19   Q   What is an SKS?

20   A   It's a gun.

21   Q   Okay.

22         MS. BROWN:  Your Honor, may I approach?

23         THE COURT:  Yes, ma'am.

24   BY MS. BROWN:

25   Q   On 4/8/2016, there is a message from you to Troy Loadholt.

Chronister - Cross                                        30

1   Would you please read the message?

2   A    Right here?

3   Q    Yes.

4   A                     "So what time?  You know

5                         anybody needing a SKS?"

6   Q    Okay.  And an SKS refers to a?

7   A    Gun, I assume.

8   Q    A gun?

9   A    I assume, yes.

10  Q    You assume.  Okay.  And you --

11  A    But -- but --

12  Q    -- were you --

13  A    But it wasn't mine, and if there was, it was never my --

14  never my gun or anything.  I might have been trying to sell it

15  for someone else or something, but it was never -- I never had

16  an SKS that I was.

17  Q    Okay.

18           MS. BROWN:  Your Honor, may I approach again?

19           THE COURT:  Yes, ma'am.

20  BY MS. BROWN:

21  Q    On 4/9 of 2016, again, right here, Kyle Chronister,

22  there's a message to Troy Loadholt.  Could you please read

23  that message that happened on, for the record, 4/9/2016 at

24  3:22 UTC?

25  A    This right here?

Chronister - Cross                              31

1    Q    Yes.

2    A              "Hey, bro.  This guy Phillip threw

3                   on buying this gun, so I only got

4                   like 125 right now, but I'll bring

5                   the rest back quick.  Is that

6                   cool?"

7    Q    And then, you have another message which says, below that?

8    A    Right here?

9    Q    Uh-huh.

10   A              "Let me see if I can't get a

11                  little more."

12   Q    Okay.  Is the more -- do you remember what the more is

13   referring to?

14   A    No, ma'am.

15   Q    No?

16   A    Probably money.

17   Q    Probably money?

18   A    Yes, ma'am.

19   Q    Did you owe Troy Loadholt money at that time?

20   A    Obviously.

21   Q    I'm sorry?

22   A    Obviously.

23   Q    Obviously?

24   A    Yes, ma'am.

25   Q    Okay.  Was that for a drug debt?

1  A   No.

2  Q   What was it for?

3  A   I'm not sure.

4  Q   But it was not for drugs?

5  A   I don't remember.

6  Q   Okay.  Could it have been for drugs?

7  A   It could have --

8        THE COURT:  I'm going to stop the questioning right

9  here.  This is way beyond anything that's relevant to this

10 detention hearing.  And there are not going to be any further

11 questions allowed along those lines.

12 BY MS. BROWN:

13 Q   Regarding the nature and charges of circumstances

14 regarding Ms. Parker, are you aware of the -- what she is

15 charged with, prior to my discussing it with Mr. Antonovich,

16 of the actual charges in this case?

17 A   Yes, ma'am.

18 Q   You are?

19 A   Yes.

20 Q   Okay.  And are you aware of her ties to the people in the

21 New Aryan Empire as well?

22 A   No, ma'am.

23 Q   You're not?

24 A   No.

25 Q   Okay.  And are you familiar with the methamphetamine that

1    Troy Loadholt was bringing into --

2             THE COURT:  I'm not going to allow any more questions

3    along these lines.  He's been put forward as a third party

4    custodian.  You can ask him questions relevant to that, but

5    nothing else.

6             MS. BROWN:  Yes, Your Honor.

7    BY MS. BROWN:

8    Q    Now, you discussed that she was -- she is not a flight

9    risk.  During June of 2017, was she living with you or were

10   you around her during that time?

11   A    I could have been.

12   Q    You could have been?

13   A    Yes, ma'am.

14   Q    Okay.  And were you aware that she absconded from parole

15   at that time?

16   A    That wasn't brought to my attention, no, ma'am.

17   Q    Okay.  And so, from 6:00 a.m. to 6:00 p.m., you are gone

18   out of the house; is that correct?

19   A    Yes, ma'am.

20   Q    And your daughter is --

21   A    At a babysitter.

22   Q    At a babysitter?

23   A    Yes, ma'am.

24   Q    Is the babysitter at that house?

25   A    No, ma'am.

Chronister - Cross                          34

1  Q   Or is she somewhere else?

2  A   She's across the street.

3  Q   Okay.  Okay.  And there is nobody else that lives in the

4  house?

5  A   No, ma'am.

6  Q   All right.  And are there any firearms in the house?

7  A   No, ma'am.

8  Q   Okay.  Because you're not a convicted felon, and I just

9  want to make sure there's no firearms.

10 A   There's no firearms in the house.

11 Q   Okay.  All right.

12         MS. BROWN:  Your Honor, I have no further witnesses.

13 I'll pass him at this time.

14         MR. ROLFE:  No other additional questions of this

15 witness.

16         We have one other witness, Your Honor.

17         THE COURT:  All right.  Very well.  You may call your

18 last witness.

19         MR. ROLFE:  Thank you, Your Honor.

20         THE COURT:  You may stand down.  Thank you.

21    (Witness stands down.)

22         MR. ROLFE:  Call Cindy George, Your Honor.

23    CYNTHIA GEORGE, DEFENDANT'S WITNESS, SWORN.

24                         DIRECT EXAMINATION

25 BY MR. ROLFE:

1  Q   All right.  Can you please state your name for the record?

2  A   Cynthia George.

3  Q   Okay.  And, Ms. George, what is your current address?

4  A   309 North Tacoma Avenue, Russellville, Arkansas, 72801.

5  Q   Okay.  And how do you know Tiffany Parker?

6  A   She's my daughter.

7  Q   And how long have you resided in the Russellville area?

8  A   18 years.

9  Q   And you're not able to offer yourself up as third party

10 custodian in this case because you're already serving as one?

11 A   Yes, sir.

12 Q   Is that yes?

13 A   Yes.

14 Q   Okay.  And who are you serving as a custodian for?

15 A   My other daughter, Melissa Kizer.

16 Q   Okay.  And she's charged in the current -- current case as

17 well?

18 A   Yes.

19 Q   Okay.  Tiffany is -- how long has she been incarcerated

20 waiting charges for this -- in this current case?

21 A   It's just almost two years.

22 Q   Almost two years.  What was the reasoning for us waiting,

23 having to delay so long on having a bond hearing here?

24 A   Well, she did some time for a state parole violation, and

25 she has set that out, flattened it out.  The rest of the time

1    has been on this federal charge, and we've not been able to

2    get in for a possible release for her.

3    Q   Okay.  So, now, you've gotten word that she's finally been

4    released, I guess, from ADC custody?

5    A   Yes.

6    Q   And is able to move forward with the bond hearing?

7    A   Yes.

8    Q   Okay.  Have you had a chance to visit with her on a -- on

9    a regular basis since she's been detained?

10   A   I try to at least every two to three weeks.

11   Q   Okay.  Do you believe that if she was given an opportunity

12   to be released, do you think that she could keep her conduct

13   in line and follow all laws and regulations while she is

14   awaiting trial on this matter?

15   A   Yes.

16   Q   Do you believe that she would be a flight risk if she was

17   allowed to be released?

18   A   No.

19   Q   Okay.  Do you believe she would be a threat to anyone?

20   A   Oh, no.

21   Q   Okay.  We know we offered two individuals to the Court

22   today.  Who was your preference on who you would like to serve

23   as a custodian for her?

24   A   If I could, my preference would be Mr. Antonovich because

25   he's in the center of Russellville and he's close to me, so I

George - Direct/Cross                                           37

1   could kind of monitor her also.

2   Q    Okay.  So you kind of wanted to be able to monitor them

3   both; is that right?

4   A    Yes, I would.

5   Q    All right.  But you just can't have them both in the same

6   house?

7   A    No, sir.

8   Q    If it was necessary, for whatever reason, would you be

9   available to transport her to anything that might be required,

10  such as drug treatment programs or anything of that nature

11  that might be necessary?

12  A    Yes, I can do that.  My job is flexible, so I can do that.

13  Q    Okay.  Where do you work?

14  A    I'm a property manager.  I manage two residential

15  properties, one in Russellville and one in Clarksville.

16  Q    Okay.

17            MR. ROLFE:  I will pass the witness, Your Honor.

18            THE COURT:  Ms. Brown, you may cross.

19                        CROSS EXAMINATION

20  BY MS. BROWN:

21  Q    When is the last time Ms. Parker lived with you?

22  A    Oh, I really don't know.

23  Q    Okay.

24  A    My children have lived with me off and on pretty much

25  their entire lives, even adult lives.

George - Cross                                              38

1    Q    So, you can't tell, back in 2017 when she had the parole

2    violation, where she was living -- where she absconded from

3    parole; you don't remember?

4    A    No.

5    Q    Okay.

6           MS. BROWN:  All right.  Your Honor, no further

7    questions for this witness.

8           THE COURT:  All right.  Thank you, Ms. George.  You

9    may stand down.

10          THE WITNESS:  Thank you, sir.

11      (Witness stands down.)

12          MR. ROLFE:  Your Honor, we have no other testimony to

13   present.  We'll rest at this time.

14          THE COURT:  All right.  I'll now hear arguments of

15   counsel, beginning with you, Mr. Rolfe.

16          MS. BROWN:  Your Honor, can I proffer some evidence

17   that I would like to proffer it to the Court, that I asked if

18   I could, because he had --

19          THE COURT:  Certainly.

20          MS. BROWN:  Okay.

21          THE COURT:  Certainly.  I was unaware you had any

22   evidence to proffer.

23          MS. BROWN:  No.  I just had evidence to proffer of

24   the nature and circumstances regarding around Ms. Parker and

25   how she's involved in this case, because I think it's

1   important for the Court to understand it's not just a simple

2   500 grams worth of methamphetamine that were involved here.

3           Ms. Parker, the records would reflect, that during

4   the time of this conspiracy, that drugs were coming in via a

5   FedEx account, and that's why that was important that we go

6   through that.  So, the FedEx account was used from a Denny's

7   out in Los Angeles, California.  Troy Loadholt, who formerly

8   resided in Russellville, Arkansas, he was shipping it through

9   there.  And during the time of this conspiracy, she, along

10  with Heath Kizer, who is Melissa's former husband, her former

11  boyfriend, received over 15 pounds of methamphetamine in those

12  packages into the Russellville area during this time.

13          And the way we know that, Your Honor, is through

14  these Facebook messages between Ms. Parker, Mr. Loadholt, as

15  well as Mr. Chronister and Mr. Loadholt, and that's how the

16  packages are.  He would -- it's very clear on there, he would

17  say it's coming the next day.  He would say church -- get

18  ready for church, it's coming.  And then the packages were

19  received --

20          THE COURT:  Ms. Brown, let me -- let me just stop

21  you.  There is no way I can assign any weight.  This -- this

22  -- I -- I can't use you as a vessel, for a case that you may

23  be presenting, that this is what you think your facts are

24  going to be.  But, I can't qualitatively evaluate that for

25  purposes of a detention hearing and whether this defendant

40

1   should be released or detained, Ms. Brown.  It's just not

2   possible.

3           MS. BROWN:  And I understand that, Your Honor.  We

4   have proffered in -- in other courts and we have proffered

5   evidence, and a lot of other jurisdictions do proffer the

6   evidence.

7           THE COURT:  Yes, ma'am, but I --

8           MS. BROWN:  My -- my --

9           THE COURT:  I'm just explaining to you, for purposes

10  of how far you're trying to go here, connecting dots that I'm

11  not even hearing this defendant's name with, that's way too

12  far afield for me to try to assign any kind of weight to it

13  for purposes of the narrow issue that's before me with regard

14  to release or detention.

15          MS. BROWN:  And I understand that, Your Honor.  I was

16  just giving you the basis of what -- and it's actually

17  evidence.  It's not -- it's her words that are on there.  But

18  I understand the Court's position.  And the Government would

19  proffer the evidence that's there.  I have records that are

20  there.  I have her statements.  I have her words that are --

21  were in the Facebook records.  I understand the Court's

22  position on that.

23          THE COURT:  But, doesn't -- wouldn't all of that just

24  go to the weight of your case?

25          MS. BROWN:  It goes -- but it also goes, Your Honor,

41

1  under the factors that you have to consider, because the

2  Government is not asking for detention, we're asking that she

3  go to residential treatment, but this goes to show that it's

4  not just --

5        THE COURT:  Ms. Brown --

6        MS. BROWN:  -- she --

7        THE COURT:  Ms. Brown, I really would have

8  appreciated your letting me know that you think she needs to

9  go to residential treatment at the beginning, as opposed to 40

10  minutes into this, because I agree with you, that's where she

11  needs to go.  That's what I plan to do with her.

12        MS. BROWN:  And I wasn't going to until the Court

13  said this is not the basis for the evidence, so that's why I

14  changed the position at this point.  I was going to do it,

15  until the Court said that's not the basis for the detention of

16  the records that we have, so I changed -- I apologize.

17        THE COURT:  I'm just -- okay.

18        MS. BROWN:  At the beginning, I was seeking

19  detention, Your Honor, but I'm changing the position based

20  upon --

21        THE COURT:  I mean --

22        MS. BROWN:  -- these are not factors.

23        THE COURT:  -- to cut to the chase here, I've got a

24  defendant in front of me who has one prior felony conviction

25  in her life, and that was committed back in 2015.  She's got a

42

1    terrible drug problem.  But, as far as the factors I have to

2    consider to make my decision in this case, it's not -- it's

3    not even close.  There's nothing here that suggests that there

4    are not conditions that I can impose to reasonably assure the

5    safety of the community or that she won't flee.  And I've

6    heard absolutely nothing in the way of evidence that's really

7    relevant to the narrow issue that I have here.  She's a

8    terrible drug addict.  She's got to be in inpatient drug

9    treatment and Chem-Free living until these charges are worked

10   out.  That's the bottom line here.  And that's what I'd like

11   to go to if that's acceptable with the Government.  If it's

12   not, I'll order it, because that's what I'm going to do.

13          MS. BROWN:  No, Your Honor, that's -- that's what the

14   Government, aside from the evidence, yes, that --

15          THE COURT:  Okay.

16          MS. BROWN:  -- I think that's more appropriate, if we

17   could have one request not to go into Russellville.  We would

18   ask --

19          THE COURT:  Absolutely.

20          MS. BROWN:  -- she not go to Russellville.  There's a

21   treatment facility here that I -- but I don't know if they

22   have a bed available.

23          THE COURT:  No.  No.  That's in my -- I've been doing

24   this job for 19 years, there's very little you're going to

25   think of here that I've not already thought of.  And I'm

1    putting her in Crowley's Ridge.

2            MS. BROWN:  Thank you, Your Honor.

3            THE COURT:  That's in Jonesboro.

4            MS. BROWN:  Thank you, Your Honor.

5            THE COURT:  Okay.  But, when I started this whole

6    thing by saying, you know, the -- it's my understanding from

7    talking to the Pretrial Services Officer that I think that

8    there is an agreement here.  It's the fact that there's just

9    no facts here that would support locking this woman up.

10   There's an abundance of evidence she's got to be in inpatient

11   drug treatment, followed by Chem-Free living, and certainly,

12   out of the Russellville area.  And that's what I intend to do.

13           So, Ms. Parker, if you and your attorney would please

14   come forward to the lectern.

15           MR. ROLFE:  And, Your Honor, would you allow me to

16   make a brief argument, I guess, on, I guess, what we're

17   requesting here?  I understand the Court's position.  I would

18   like to say something additionally, if that's okay.

19           THE COURT:  I don't ever want to cut you off from --

20   from saying what you want to say.  But, since I've fairly well

21   laid out what I'm going to do in the case, let's try to make

22   it brief.

23           MR. ROLFE:  I sure will, Your Honor.

24           Your Honor, what she and the family is hoping that

25   the Court would consider, and obviously, we're requesting that

1   there would be a consideration that she be allowed, you know,

2   to be on conditions of release.  And I know her sister, who is

3   in a similar situation, was given that opportunity to do so.

4   And she's hoping that the Court will grant her that same

5   opportunity as well.  I know there is some concern by the

6   Government and by the Court regarding her -- her history.

7   But, she just wants that opportunity to show that she can do

8   better.  She's been locked up close to two years now, awaiting

9   these charges, and has had a whole lot of time to think about

10  her situation, and does not want to do anything that would

11  violate any of the Court's conditions.  And so, she's wanting

12  the Court to give her one opportunity, at least to show that

13  she can keep her conduct in line while she's awaiting trial on

14  these charges.

15          In the alternative, if the Court just does not

16  believe that she can do better, she's hoping that the Court

17  will allow her at least to go in inpatient in Russellville, so

18  that she can be around her family.  She has two minor children

19  she has not really been around for the past few years, and she

20  just wants to be able to be around her family while we're

21  waiting on this.

22          Jonesboro is going to be a tremendous burden for the

23  family if she is housed and kept there.

24          THE COURT:  You know, Mr. Rolfe, I'm disappointed in

25  your argument in this sense, having shared with me everything

1  she wants, it really is pretty reflective of just how detached
2  from reality your client is.  And she clearly doesn't get it.
3  And that suggests to me that I might just really want to send
4  her directly to jail and not give her a chance at all.  The
5  notion that she, who admits, from the age of 13 -- let me
6  repeat that, 13, "I use meth every day."  She's been a daily
7  meth user for 20 years.  She's done all of that in the
8  Russellville area.  She's chosen to associate and affiliate
9  herself with about the worst human beings in the world.
10         Now, that kind of person, who is now standing in
11 front of me, who is trying to convince me of the inane
12 proposition that the reason she really wants to stay in
13 Russellville is to be close to her kids, after she's chosen to
14 use meth every day since she's had those kids, I don't think
15 that's why she wants to stay in Russellville every day.  I
16 think it's because she wants to be around that group of people
17 she's associated with her whole life and used meth with daily.
18 And those are people she's not going to be near or around and
19 stay free on this bond.  So, all that makes me think I've been
20 really naive about what I was thinking about Ms. Parker, and
21 that I thought she really wanted to get off drugs and stay off
22 drugs and maybe turn her life around and maybe, for once in
23 her life, be a real momma to her children.  But, I'm not
24 hearing that at all now from what you're arguing.
25         MR. ROLFE:  And, Your Honor, don't take my arguments

1   to mean that she --

2          THE COURT:  I mean, I'm looking at a woman who -- who

3   is completely detached from reality about her situation here,

4   and saying I want to stay in Russellville so I can be around

5   all my -- my -- my friends that are meth users and -- and live

6   the kind of life I've always lived, and, boy, it's going to be

7   a burden on my family to go to Russellville [sic].  Like I

8   care.  I'll just lock her up.

9          MR. ROLFE:  And we're hoping that the Court --

10          THE COURT:  Okay.  Because -- because, again, your

11   chances of being successful, Ms. Parker, with the attitude

12   you've got, is just -- is remote.  And I'm going to explain to

13   you, when -- when I see defendants in your situation, I always

14   tell them, "Be careful what you wish for."  That's a Chinese

15   proverb.  You may get it.  If you go on this bond, which you

16   say you want to go on in inpatient drug treatment, and I have

17   to see you again, I'm locking you up.  That's 18 months/two

18   years you're going to be locked up.  That's the tip of the

19   iceberg for your problem.  Your sentencing judge, if you plead

20   guilty or you're found guilty to these charges -- these are

21   lengthy federal charges, it's not like state court.  It's not

22   like state sentences.  There's no early release.  If you get

23   ten years in this case, you flatten it.  If you get 20, you

24   flatten it.

25          If you go on this bond and I have to revoke you, your

47

1    sentencing judge, if you plead guilty or you're found guilty
2    on these charges, looks at the fact you violated this OR bond,
3    they can use that under the guidelines to impose additional
4    years of imprisonment on you.  The BOP will hold that against
5    you in deciding what level security facility you should be
6    locked up in and what kind of privileges you should have.
7    There are a mountain of bad consequences.
8          I'm looking at someone who has used meth since she
9    was 13 every day, who is not interested enough in staying off
10   meth, that she wants to try to make sure she stays in
11   Russellville around all of her buds she's done meth with her
12   whole life.
13         What kind of confidence does that suggest you have
14   that you really want to stay off drugs and not use meth?  It
15   suggests to me somebody that's ready to get out so she can
16   continue to use meth maybe.  In which case, you get revoked.
17   In which case, this mountain of bad consequences cascades on
18   you.
19         You sure you want to get out?  You sure you want all
20   those adverse consequences to fall on your head with the
21   position you find yourself in in this case?  Or do you just
22   want to be safe about this and say, you know, I don't want to
23   take that risk, I really don't seriously want to get off
24   drugs, I just want to be free?  And so, you use drugs again,
25   and then all those bad consequences attach.  What do you want

48

1  here?

2          THE DEFENDANT:  I really want -- I want to go get

3  help.

4          THE COURT:  Why do you want to go get help?

5          THE DEFENDANT:  So I can get off and stay off drugs.

6          THE COURT:  And it's okay to go to Jonesboro to get

7  that help?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Get you out from that environment and all

10 those people that you've been involved with using meth since

11 you've been 13 years old?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  Think if you really want to get off

14 drugs, that would be a good idea?  Think that might outweigh a

15 little imposition on your momma or your friends that might

16 want to come see you in Jonesboro?  Think that would be little

17 more important than that?  Think it would be?

18         So, you want to get out, understanding what the risks

19 are?

20         THE DEFENDANT:  Yes.

21         THE COURT:  If you can't successfully stay in

22 inpatient, if you can't successfully go into Chem-Free living,

23 if you can't stay off drugs, I'm going revoke you, and then

24 all those bad consequences are going to -- are going to fall

25 down on you.  Are you sure you want to take that risk?

1          THE DEFENDANT:  Yes.

2          THE COURT:  You're ready for that risk?

3          THE DEFENDANT:  Yes.

4          THE COURT:  You really want to stay off drugs?

5          THE DEFENDANT:  Yes.

6          THE COURT:  All right.  I'm going to let you out, but

7  understand, I went through this carefully with you, this is

8  what you said you wanted.

9          THE DEFENDANT:  Yes.

10          THE COURT:  I'm granting you your wish.

11          THE DEFENDANT:  Thank you, Your Honor.

12          THE COURT:  These are going to be the conditions of

13  your bond.  I want you to listen carefully to these

14  conditions.  They're all going to be marked in your bond

15  papers.  You're going to have a copy of those papers with you,

16  so you -- you can remind yourself, you'll know exactly what

17  they are.  I'm going over these with you now because I want to

18  make sure you understand them.

19          First, while you on this OR bond, you must not commit

20  any offense in violation of federal, state, or local law.  I'm

21  going to explain to you a little later just how serious the

22  penalties would be if while you're on this OR bond you engage

23  in new federal criminal conduct.  You must immediately advise

24  your probation officer if you have any contact of any kind

25  with state or federal law enforcement.  It doesn't matter how

1  incidental or minor the contact is.  If you have contact with

2  law enforcement, it has to immediately be reported.  Any law

3  enforcement you have contact with is going to take your

4  driver's license and they're going to run it through their

5  computer.  They're going to see that you have a current

6  pending federal indictment.  That law enforcement officer will

7  contact your Pretrial Services Officer to let them know

8  they've had contact with you.  You have to do it immediately.

9  If the officer contacts your Pretrial Services Officer before

10 you, you failed to give that report immediately, the

11 Government is going to ask that you be revoked, and I'm going

12 to have to lock you up.  So, if you have contact with law

13 enforcement, no matter what the circumstances, immediately let

14 your Pretrial Services Officer know that.

15          You must immediately advise the Court, your attorney,

16 and the United States Attorney if there is going to be any

17 change in your address or phone number.  We have to know at

18 all times where you're living and how to get a hold of you.

19 Obviously, because you're going to be in inpatient drug

20 treatment, followed by Chem-Free living, there should not be

21 any issue about your address.  You're going to be at the

22 Crowley's Ridge facility, first in inpatient treatment for 30

23 days, then in Chem-Free living until all charges are resolved.

24 That's where you must be at all times.  If you're not there,

25 absconder status, you will be revoked.  Are we clear on that?

1          THE DEFENDANT:  Yes.

2          THE COURT:  You must appear at all proceedings in

3    this case and voluntarily surrender for imposition of any

4    sentence.

5          While you're in the Chem-Free living part of the

6    program, you have to maintain employment.  They'll help you

7    get a job.  That money will be used to defray the costs of

8    your living expenses and your bed while you're in the chemical

9    free living program.

10         You must report to your Pretrial Services Officer at

11   all times that he or she directs for you to report.  You'll

12   have a Pretrial Services Officer right there in Jonesboro.  We

13   have federal courts in Jonesboro.  That officer will be

14   checking on you, making sure you're doing what you're supposed

15   to do, right there in Jonesboro where you're going to be in

16   inpatient drug treatment.  So, be aware, you will have an

17   officer right there in the same city where you're located, so

18   it will be convenient for you.

19         You must refrain from possessing any firearm,

20   destructive device, or ammunition for a firearm.  That would

21   be a new federal offense committed while on OR bond.  And I'll

22   explain to you a little later, should you have the

23   catastrophically bad judgment to do that, just how much time

24   that would lead you to receive in federal prison.

25         You must refrain from any use of alcohol.  You must

1  refrain from any use or unlawful possession of narcotic drugs
2  or other controlled substances unless they're prescribed by a
3  licensed physician.  You're going to be randomly screened,
4  both by the treatment facility as well as by your Pretrial
5  Services Officer.  If you're found positive for drugs, I am
6  going to revoke you.  You cannot use drugs and stay on this
7  bond.  You have to use this as an opportunity to get off drugs
8  and stay off drugs.
9          You must maintain regular contact with your attorney,
10 which means you must be in contact with Mr. Rolfe no less
11 often than once every two weeks.
12         While you're on this OR bond, I don't want you to
13 have any contact of any kind with co-defendants.  Let me be
14 clear about this, no contact means no phone calls, no text
15 messages, no Facebook, no Twitter, no Instagram, no contact of
16 any kind with any of your co-defendants.  Are we clear on
17 that?
18         THE DEFENDANT:  Yes, sir.
19         THE COURT:  If you have contact, I will revoke you.
20 Those are people who need to be dead to you now.
21         THE DEFENDANT:  Yes, sir.
22         THE COURT:  They need to be out of your life.  Are we
23 clear on that?
24         THE DEFENDANT:  Yes, sir.
25         THE COURT:  And again, I'm going to place you in

53

1   inpatient treatment at Crowley's Ridge, followed by chemical

2   free living until all charges have been resolved.  You have to

3   report to Crowley's Ridge by 2:00 p.m. on Friday, May the

4   31st.  Because it's this late in the afternoon, I'm going to

5   give you until tomorrow at 2:00 p.m.  Now --

6           Yes, ma'am?

7           MS. BROWN:  Your Honor, two things.  One, her sister

8   is a co-defendant.

9           THE COURT:  I understand that.

10          MS. BROWN:  Her sister lives at her mom's house, so I

11  just don't -- in case she contacts her mom and her sister

12  accidently picks up the phone.

13          THE COURT:  She can talk to her momma.

14          MS. BROWN:  You see what I'm saying?  I just don't

15  want --

16          THE COURT:  She can talk to her mother.

17          MS. BROWN:  Okay.

18          THE COURT:  She can't talk to her sister.

19          You're the third party custodian for your daughter.

20  You need to understand, you've heard what I just said.

21          MS. GEORGE:  Yes, sir.

22          THE COURT:  She can't talk to the sister, but she can

23  talk to you.

24          MS. GEORGE:  Yes.

25          THE COURT:  That's the only person she can talk to at

1    that house.  Okay.

2          At any rate, you need to report by 2:00 p.m.

3    tomorrow.  Now, can you -- Ms. George, can you get her to

4    Crowley's Ridge tomorrow by 2:00 p.m.?

5          MS. GEORGE:  Yes, sir, I can.

6          THE COURT:  And I'm going to let her leave today with

7    you.  Okay?

8          MS. GEORGE:  Okay.

9          THE COURT:  And I'm going to let them, just for

10   tonight, spend the night together in that house.  In the

11   morning, you need to load her up and get her to Crowley's

12   Ridge.  If she's not there by 2:00, the Marshals are going to

13   have an arrest warrant and they're going to arrest her.

14         MS. GEORGE:  Oh.

15         THE COURT:  Are we clear on that?

16         MS. GEORGE:  Yes, sir.

17         THE COURT:  All right.  Now, do you understand all

18   those conditions I've just gone over with you?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  All right.  By signing these bond papers,

21   you're promising to comply with all those conditions.

22         All right.  The last thing I'm required to do is

23   inform you of some very serious penalties and sanctions that

24   are going to come into play if while you're on this OR bond

25   you -- you decide to engage in certain kinds of prohibited

1   conduct.  I want to make sure that you listen very carefully

2   to these sanctions and penalties, because they are severe, Ms.

3   Parker.

4           As I've explained to you, if you violate any of my

5   conditions, you're going to be revoked, you're going to be

6   locked up until all charges have been resolved, which can be

7   18 months to two years or even longer sometimes in an

8   indictment of this level of complexity.

9           In addition to losing your liberty, your sentencing

10  judge, if you later plead guilty or you're found guilty, will

11  look back at the fact you violated conditions of your bond,

12  and under the sentencing guidelines, your judge will use that

13  as a basis for -- for entering a sentence that involves more

14  time in the federal prison.  The BOP will also hold that

15  against you if you are incarcerated, and they'll use that as a

16  basis for increasing the level security facility you should be

17  incarcerated in and the kind of privileges you should receive

18  once you are incarcerated.

19          So, there's just a whole host of really bad

20  consequences if you violate these conditions.  That's why it's

21  so important that you go into this with your eyes wide open,

22  telling yourself I know I can comply with these conditions.

23  Because if you can't, there are lots of harsh consequences.

24          Yes, Ms. Brown?

25          MS. BROWN:  Sorry, Your Honor, I was just informed by

1  the Marshals Service that she has a warrant for her arrest out

2  of Conway County.

3          THE DEFENDANT:  Oh.

4          THE COURT:  Well, fellows --

5          MS. BROWN:  The U.S. Marshals just said she has a --

6          THE COURT:  -- you took your time.  Look, they're

7  both worried because they're afraid I'm going to hold them

8  individually -- I know you all didn't know.  I know you all

9  didn't know.

10          MS. BROWN:  No, and I -- like I just -- like hopped

11  up --

12          THE COURT:  What are the charges?  What are those

13  charges?

14          MS. BROWN:  He said Ms. Parker has a warrant for

15  contempt of court in Conway County.

16          THE COURT:  And will they -- I'm assuming that that's

17  a charge that they would -- I mean, they'll -- they'll take

18  her into custody on?

19          MS. BROWN:  That's --

20          THE U.S. MARSHAL:  It's in-state pick up for

21  possession of marijuana, 16 -- 15 cash bond.

22          THE COURT:  All right.  If -- if there's an

23  outstanding warrant, this is what I'm going to do.  I'm going

24  to go ahead and finish with the bond papers.  But, understand

25  -- and that may be something that you can get bond on.  I

1    don't know.

2              THE DEFENDANT:  Yeah.

3              THE COURT:  If you -- if you can get into a position

4    where you're out on those charges, at that point you'll be

5    released on the state charges, and then, Ms. George --

6              MS. GEORGE:  Yes.

7              THE COURT:  -- you need to transport her to inpatient

8    drug treatment at Crowley's Ridge.  That may take a day or

9    two.  Okay.  Do you -- I'm assuming those have got to be --

10   are those felony charges, Ms. Brown?

11             MS. BROWN:  Your Honor, I believe they're

12   misdemeanor.

13             THE DEFENDANT:  They're misdemeanors.

14             MS. BROWN:  When you have contempt of court, it'll be

15   a misdemeanor.

16             THE COURT:  Okay.

17             MS. BROWN:  It's marijuana, so I think it would be a

18   misdemeanor.  And it looks like it's a cash bond, according to

19   --

20             THE COURT:  All right.

21             MS. BROWN:  -- what the Marshal said.

22             THE COURT:  All right.  I'm going to go ahead and set

23   bond.  But, understand, our Marshals have no discretion here.

24   There is an outstanding detainer.  That's a hold.  They're

25   obligated to turn you back over to the state authorities in

1 Conway County.

2          Mr. Clodfelter, are you -- are you finding out

3 something here I need to know about?

4          MR. CLODFELTER:  I think they're still going to have

5 to hold her and verify, but they -- they may not extradite

6 outside of Conway County, but that's something that they'll

7 have to check on.

8          THE COURT:  Okay.  If they don't -- if they don't

9 extradite outside of Conway County, we don't have a problem.

10          THE DEFENDANT:  Okay.

11          THE COURT:  They'll go ahead -- you can go ahead and

12 leave with your mother, go home, and be in Crowley's Ridge in

13 the morning.

14          THE DEFENDANT:  Okay.

15          THE COURT:  If that's something that is a hold, the

16 Marshals will have to turn you over to Conway County, you and

17 your family will have to handle whatever the bail is on those

18 charges.

19          THE DEFENDANT:  Okay.

20          THE COURT:  Once you've done that, then I'll want her

21 transported, as soon as that happens, directly from there to

22 Crowley's Ridge to go into inpatient drug treatment.

23          MS. GEORGE:  Yes, sir.

24          THE COURT:  Okay?

25          MS. GEORGE:  Yes, sir.

1            THE COURT:  Now, the other thing, so I've explained

2    to you all the bad things that are going to happen if you

3    violate any of these conditions of bond that I've just

4    imposed.  The second thing that I want to make sure you

5    understand is, and I emphasize this to everybody who has never

6    had federal charges brought against them, because it's so

7    different than the state system where you've previously been

8    charged, there is a specific federal statute that says if

9    while you're on an OR bond you engage in new federal criminal

10   conduct, that statute provides that the minimum sentence for

11   that is ten years.  That ten year sentence has to be imposed

12   consecutive to any sentence you receive on these underlying

13   charges.  And if you're later convicted on the underlying

14   charges, your sentencing judge can look at the fact that you

15   engaged in new federal criminal conduct while on OR bond to

16   enhance your sentence by decades.  If you engage in new

17   federal criminal conduct while you're on this bond, it

18   literally can lead to 20 to 30 years of time in federal

19   prison.  We're not like the state system.  Ten years means ten

20   years.  You flatten it.  There is no early -- there is no

21   parole.  There is no early release.  There is no good time

22   credit.  So, take seriously here the fact that when you're on

23   this bond, no matter what else you do, don't do anything that

24   could give rise to new federal criminal charges against you,

25   because the penalties for that would be so severe.

1          Finally, if you don't -- if you don't show up when

2    you're supposed to show up, if you don't appear in court, if

3    you don't appear for matters that are scheduled in your case,

4    you can be prosecuted for that failure to appear as a separate

5    federal felony.

6          And finally, there's a federal statute that provides

7    if while you're on an OR bond you attempt to intimidate,

8    tamper with, or retaliate against a witness, juror, informant,

9    or Officer of the Court, the penalty for that is up to ten

10   years of imprisonment, a fine of 250,000 dollars, or both.

11         Now, do you understand those penalties and sanctions?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  And all of those penalties and sanctions

14   are on the last page of your -- of your bond papers.

15         The last thing I want to state for the record, Mr.

16   Antono [sic] --

17         MR. ANTONOVICH:  Yes, Your Honor.

18         THE COURT:  What's your last name?

19         MR. ANTONOVICH:  Antonovich.

20         THE COURT:  I find that you would have been a

21   suitable third party custodian, but I feel like she needs

22   inpatient drug treatment more than anything else, and so

23   that's what I'm going to do with her.

24         And, Mr. Chronister, there was just too much baggage

25   for the train to pull as far as you being a third party

1  custodian.  You sound like you're a good father to your

2  daughter.  Keep -- keep doing that.

3          Anything further for the Government in this matter?

4          MS. BROWN:  No, Your Honor.

5          THE COURT:  For the defense?

6          MR. ROLFE:  No, Your Honor.

7          THE COURT:  Very well.  Court is adjourned.

8          MR. ROLFE:  Thank you.

9          MS. BROWN:  Thank you, Your Honor.

10      (Adjournment at 3:11 p.m.)

11            ELECTRONIC SOUND RECORDING CERTIFICATION:

12  I, court approved transcriber, certify that the foregoing is a

13  correct transcript from the official electronic sound

14  recording of the proceedings in the above-entitled matter.

15

16  /s/Robin Warbritton            June 7, 2019
    Signature of Approved Transcriber    Date

17

18  Robin Warbritton
    Typed or Printed Name

19

20

21

22

23

24

25