```
 1            IN THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF ARKANSAS
 2                    WESTERN DIVISION

 3

 4  UNITED STATES OF AMERICA,    .
                                 . Case No. 4:17-CR-00293-BSM-17
 5  PLAINTIFF,                   .
                                 .
 6  VS.                          . Little Rock, Arkansas
                                 . November 29, 2017
 7  ROBERT CHANDLER,             . 10:48 A.M.
                                 .
 8  DEFENDANT.                   .
    . . . . . . . . . . . . . . .
 9

10

11                    TRANSCRIPT OF

12                  DETENTION HEARING

13         BEFORE THE HONORABLE J. THOMAS RAY

14            UNITED STATES MAGISTRATE JUDGE

15

16

17  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Tenesha Brown

18

19

20  Transcription Service:          Robin Warbritton
                                    Post Office Box 262
21                                  Vilonia, AR  72173

22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

```
 1   APPEARANCES:

 2   For the Government:        Ms. Liza Jane Brown
                                U.S. Attorney's Office
 3                              Eastern District of Arkansas
                                Post Office Box 1229
 4                              Little Rock, AR  72203-1229

 5   For the Defendant:         Ms. Misty Wilson Borkowski
                                Cross, Gunter, Witherspoon & Galchus,
 6                              P.C.
                                Post Office Box 3178
 7                              Little Rock, AR  72203-3178

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                              I N D E X

2

3                    DIRECT   CROSS   REDIRECT   RECROSS   BY THE
                                                           COURT

4  DEFENDANT'S WITNESS:

5  Brenda Campbell       7      13      19                  20

6

7  GOVERNMENT'S WITNESS:

8  John Hensley         26      48      52                  54

9

10 EXHIBITS:                      IDENTIFIED       RECEIVED

11 Defendant's Exhibit No. 1         12              12

12 Government's Exhibit No. 1        53              53

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          P R O C E E D I N G S

2     (Call to order of the Court.)

3          THE COURT:  Our next case is *United States of America*

4     *v. Robert Chandler*, case number 4:17-CR-293.

5     (The Court excuses counsel in case just prior to the

6     calling of this case.)

7          THE COURT:  Good morning, Ms. Borkowski.

8          MS. BORKOWSKI:  Good morning, Your Honor.

9          THE COURT:  We are here this morning for a bond

10    hearing for Mr. Robert Chandler in the case of *United States*

11    *of America v. Chandler*.

12          Ms. Gardner -- I'm sorry -- Ms. Brown, is the

13    Government prepared to proceed?

14          MS. BROWN:  Yes, Your Honor, but I -- I just got the

15    bail report, and I'm finding inconsistencies with his -- with

16    his criminal history with regard to this, and I think -- I

17    think it needs -- there needs to be corrections made, because

18    I've had the prior convictions.  And I wanted -- if I may have

19    a moment, Your Honor, to look at this further?

20          THE COURT:  Oh, yes, ma'am.

21          MS. BROWN:  But there are --

22          THE COURT:  Why don't we --

23          MS. BROWN:  -- there are several.

24          THE COURT:  Why don't we do this, why don't we -- how

25    much time do you think you'll need?

5

1          MS. BROWN:  Maybe five minutes.  I want to make sure
2    Ms. Borkowski and I agree on these before we bring it to the
3    Court's attention.
4          THE COURT:  And you might also -- where is our
5    Pretrial --
6          MS. BROWN:  She's -- yes.
7          THE COURT:  -- yeah, you might also consult with our
8    Pretrial Services Officer.
9          MS. BROWN:  Yes, sir.
10          THE COURT:  To be sure that we're all in agreement on
11    the criminal history.
12          MS. BROWN:  Okay.
13          THE COURT:  I'll be -- the Court will be in recess
14    for -- I don't want to press -- this is important, so I don't
15    want to unnecessarily pressure everybody.  Let's -- we'll take
16    a ten minute recess.
17          MS. BROWN:  Okay.  Thank you, Your Honor.
18          THE COURT:  And resume court at 11 o'clock.  Court is
19    in recess.
20          MS. BROWN:  Thank you, Your Honor.
21      (Recess.)
22                          AFTER RECESS
23      (Call to Order of the Court.)
24          THE COURT:  All right.  Ms. Brown, are we now
25    prepared to proceed?

1        MS. BROWN:  Yes, Your Honor, we are.  I believe there

2  is one modification to the bail report.  It is on page 4.  And

3  it is the 1/4 of 2000, January 4th, 2000.

4        THE COURT:  Yes, ma'am.

5        MS. BROWN:  The Defendant was sentenced to 60 months

6  with an additional 36 months suspended imposition of sentence

7  to the Regional Correctional Facility.

8        THE COURT:  So, instead of 12 months probation, it

9  was 60 months incarceration?

10        MS. BROWN:  Yes, sir.

11        THE COURT:  Okay.  With 36 months suspended?

12        MS. BROWN:  Yes.

13        THE COURT:  Okay.  And that's the only -- only change

14  we need to make?

15        MS. BROWN:  Yes, sir.  I just wanted to confirm all

16  of the rest of them.

17        THE COURT:  Yes.

18        MS. BROWN:  I wanted to make sure it was correct.

19        THE COURT:  Yes, ma'am.

20        And, Ms. Borkowski, are you prepared to proceed?

21        MS. BORKOWSKI:  Yes, Your Honor.

22        THE COURT:  All right.  This, I believe, is a

23  presumption case?

24        MS. BROWN:  That is correct, Your Honor.

25        THE COURT:  Do you want to rely on the presumption

Campbell - Direct                                  7

1  and allow the Defendant to call his witnesses first, or does

2  the Government want to call its witnesses?

3          MS. BROWN:  Your Honor, we'll let Ms. Borkowski call

4  her's first.

5          THE COURT:  All right.  Ms. Borkowski, you may call

6  your first witness.

7          MS. BORKOWSKI:  Your Honor, I call Brenda Campbell.

8          THE COURT:  Ms. Campbell, please come forward to be

9  sworn.

10     (BRENDA CAMPBELL, DEFENDANT'S WITNESS, SWORN.)

11          THE COURT:  Ms. Campbell, if you'll walk around the

12  front and go over here to the witness box.

13                     DIRECT EXAMINATION

14  BY MS. BORKOWSKI:

15  Q   Ms. Campbell, can you please state your name for the

16  Court?

17  A   It's Brenda Campbell.

18  Q   And where do you live?

19  A   410 Lake Loop, Hattieville, Arkansas.

20  Q   Do you know the defendant in this case, Robert Chandler?

21  A   Yes.  He's my --

22  Q   And how do you know him?

23  A   -- my son.

24  Q   And do you understand why we are here today?

25  A   Yes.

Campbell - Direct                                                     8

1  Q    Okay.  Do you understand that we are here today, Mr.

2  Chandler has been charged in a federal case?

3  A    Yes.

4  Q    A criminal case?

5  A    Yes.

6  Q    And do you understand that we're here today to see if this

7  Court will allow Mr. Chandler to be released while he is

8  awaiting a trial in the case?

9  A    Yes.

10 Q    And are you here today to offer yourself to the Court as a

11 third party custodian?

12 A    Yes, I am.

13 Q    Can you move the microphone closer to your -- thank you.

14 And do you know what it means to be a third party custodian?

15 A    I'm responsible for him.

16 Q    So, if he is allowed to come home with you, do you

17 understand that if he were to violate any of the terms this

18 Court sets, that you would be required to notify the Court and

19 his probation officer?

20 A    Yes.

21 Q    Do you understand that if you notify the Court that he has

22 violated a term of conditions of release, that he will most

23 likely go back into custody?

24 A    Yes.

25 Q    And what does that mean to you?

Campbell - Direct                                                9

1   A    It means if he violates it, I'd rather him be where he

2   cannot get in any kind of trouble.   I mean --

3   Q    Okay.

4   A    -- I love my son and I don't want him in any trouble.

5   Q    Okay.  And tell me about your home, where you live.  Who

6   lives there with you?

7   A    It's just me.

8   Q    Okay.

9   A    And I have a little Maltese dog.

10  Q    I'm sorry?  You have what?

11  A    A Maltese.  A little dog.

12  Q    Okay.  And do you work?

13  A    I work two days a week, Friday and Saturday, at a resale

14  shop.

15  Q    Is that in the same town where you live?

16  A    It's in Morrilton, which is about 12 miles away.

17  Q    Okay.  And those are two days a week that you work.  Do

18  you work all day, or what are your hours those days?

19  A    From 9:30 to 5:30.

20  Q    Okay.  Are you aware, generally speaking, that Mr.

21  Chandler has been in trouble with the law?

22  A    Yes.

23  Q    Are you aware that he has served some time in jail or in

24  prison?

25  A    Yes.

Campbell - Direct                                    10

1  Q   And have you, during those times, visited him and kept in

2  contact with him?

3  A   Yes.

4  Q   And most recently, in 2016 and into 2017, have you been in

5  contact with Mr. Chandler?

6  A   Yes.

7  Q   Have there been times when he has not been in contact with

8  you?

9  A   A few times, but we worked side by side, I can't remember

10  exactly, just before all this started.  And, well, while it

11  was going on for a while, we worked side by side at Little

12  John's Transportation.

13  Q   Okay.  What did you do there?

14  A   I was a dispatcher.

15  Q   And what did -- what did Mr. Chandler do when he worked

16  there?

17  A   He was a dispatcher.

18  Q   Are you -- is it your understanding that if -- if Mr.

19  Chandler is released, that he has an offer of employment?

20  A   Yes.

21        MS. BORKOWSKI:  Your Honor, may I approach the

22  witness?

23        THE COURT:  Yes, ma'am.

24     (Ms. Borkowski and Ms. Brown confer regarding document.)

25        MS. BROWN:  Your Honor, I'm sorry, I haven't read

Campbell - Direct                                11

1   this yet, so.

2       (Ms. Brown reads document.)

3           MS. BROWN:  Okay.

4   BY MS. BORKOWSKI:

5   Q   I'm showing you a letter.  Can you tell me who wrote that

6   letter -- or who appears to have written the letter?

7   A   Chris Dale.

8           THE COURT:  Who?

9           THE WITNESS:  Chris Dale.

10  BY MS. BORKOWSKI:

11  Q   And do you know who Chris Dale is?

12  A   Yes, I do.

13  Q   Who is -- who is Chris Dale?

14  A   He's the owner of Little John's Transportation -- or part

15  owner, him and his brother, Steven Dale.

16  Q   Okay.  And have you seen this letter before?

17  A   He e-mailed me this letter.

18  Q   Okay.

19          MS. BORKOWSKI:  Your Honor, we are asking to

20  introduce this letter as an exhibit.

21          THE COURT:  Any objection?

22          MS. BROWN:  No, Your Honor.

23          THE COURT:  And that will be marked as Defendant's

24  Exhibit 1?

25          MS. BORKOWSKI:  Okay.

Campbell - Direct                                    12

1   BY MS. BORKOWSKI:

2   Q   And does this letter appear --

3            THE COURT:  Let me -- that's going to be marked as

4   Defendant's Exhibit 1 and it will be received into evidence

5   without objection.  Let's be sure to put an exhibit label on

6   there, mark that as Defendant's Exhibit 1.

7        (Defendant's Exhibit No. 1 identified and received.)

8            THE COURT:  I'm sorry, Ms. Borkowski.

9            MS. BORKOWSKI:  Thank you.  Sorry, Your Honor.

10  BY MS. BORKOWSKI:

11  Q   And does this letter appear to offer Mr. Chandler a offer

12  of employment when he -- if this Court releases him?

13  A   Yes.

14  Q   Are there references to the employer saying that he will

15  not tolerate any problems out of Mr. Chandler?

16  A   Yes, it does.

17  Q   Does it seem to state that he will not tolerate Mr.

18  Chandler being in contact with people who has been part of his

19  problem?

20  A    Yes.

21  Q   Okay.  And are you -- are you, again, offering to this

22  Court that if Mr. Chandler is released, if he violates the

23  terms and conditions, that you will contact the Court and

24  contact his probation officer?

25  A    Yes, I will.

Campbell - Cross                                                13

1   Q   And you will have no reservations in doing that?

2   A   No.

3           MS. BORKOWSKI:  Your Honor, I have nothing further.

4           THE COURT:  May I please see that letter?

5           THE WITNESS:  All right.

6           THE COURT:  Thank you, ma'am.

7           All right.  Ms. Brown, you may cross.

8           MS. BROWN:  Thank you, Your Honor.

9                        CROSS EXAMINATION

10  BY MS. BROWN:

11  Q   Good morning.

12  A   Good morning.

13  Q   Now, you say your residence is 410 Lake Road, Hattieville?

14  A   Lake Loop?

15  Q   Lake Loop?

16  A   Uh-huh.

17  Q   Okay.  And where is that exactly -- that located; what

18  county are we in?

19  A   Conway County.

20  Q   Okay.  So, you're close to Morrilton?

21  A   Yes.  About 12 miles out.

22  Q   When is the last time Robbie lived with you?

23  A   It's been a while.  He left home at 18 and he hasn't been

24  back other than a few months at the time.

25  Q   Okay.  So, and 18 -- so, in 1997, he'd be 18, correct?

Campbell - Cross                                              14

1    A    Correct.

2    Q    And that's the first time that he was convicted of a

3    felony offense; is that correct?

4    A    Correct.

5    Q    All right.  And you're familiar with his criminal history;

6    are you or are you not?

7    A    Pretty much.

8    Q    Pretty much?  In all of the arrests that he's had and the

9    trouble that he's had ever since he was 18 with the law, has

10   he ever paroled out to your house?

11   A    Yes.

12   Q    And what -- when was the last time he paroled out to you?

13   A    I can't remember the dates.  I mean, he did come and stay

14   with me then, but.

15   Q    You don't remember what year it was --

16   A    No.

17   Q    -- or what offense it was?

18   A    I --

19   Q    Okay.  But he came to stay with you for a little bit?

20   A    He came and stayed, yes.

21   Q    All right.  Are you aware of his drug problem?

22   A    I wasn't until -- as far as I know, he had never had a

23   drug problem until -- it was around 2015 maybe, 2016.

24   Q    And what happened?

25   A    Well, we were working at Little John's.  I worked side by

Campbell - Cross                                    15

1  side with him.  And I worked there for four years.  And I know

2  he had a accident and he got -- he went to the doctor and they

3  prescribed him some pain pills.

4  Q    Uh-huh.

5  A    And I know I fussed at him about taking those, you know,

6  but he said his back was hurting him.  And when he quit Little

7  John's, I felt he was -- I could tell a change in him.  I

8  mean, at work, he was wonderful.

9  Q    Uh-huh.

10 A    He was doing really great.  For eight years, he was doing

11 great.  He was making good money and he was --

12 Q    But then he started using drugs?

13 A    And then he started -- I didn't know he was, until

14 afterwards, he was using the meth.  And I heard, and it's

15 through hearsay, that he started using meth.  I know he

16 changed whole sets of friends.

17 Q    Uh-huh.

18 A    I know he came to my house and he was trying to get off

19 the drugs for a couple of weeks, and --

20 Q    What was that couple of weeks like?  Did you -- were you

21 able to control him or get him off drugs or anything like that

22 during that time?

23 A    He didn't take drugs while he was at my house.

24 Q    That you know of?

25 A    No.

Campbell - Cross                                    16

1    Q    Okay.

2    A    And I don't allow it.

3    Q    Uh-huh.

4    A    He was very -- he wanted to sleep a lot.  He would break

5    out in sweats.

6    Q    Uh-huh.

7    A    He -- he couldn't function.  I mean, it's like even simple

8    tasks, he -- he just -- his mind wasn't -- I'd never seen him

9    like that.

10   Q    So, during that time that he worked at Little John's

11   Trucking, do you know why Little John's filed a lawsuit

12   against your son?

13   A    Yes.

14   Q    Why did they file a lawsuit against your son?

15   A    He quit Little John's and he went to work for Southern

16   Drawl.

17   Q    And what's that?

18   A    It's another trucking company.  He actually was like, I

19   guess, a consultant.  But, anyway, and I quit and worked there

20   because Chris Dale was interrogating me and -- and just --

21   well, actually, at one time, he had tried to quit one other

22   time, and he threatened me, if I didn't make him come back to

23   work for him, because Robbie was doing real well.  He made him

24   a lot of money.

25   Q    Uh-huh.

Campbell - Cross                                    17

1  A    And he said if I didn't make my son come back to work for

2  him, that consider my job terminated the next day.  And I told

3  him that, you know, me working there should have no effect on

4  my -- you know, on me, because my son quit.

5  Q    And this is the same guy who is offering to hire your son

6  back?

7  A    Right.

8  Q    Correct?

9  A    He is good at that job.

10  Q    Yeah.  But he's also been sued by the company, correct?

11  A    Right.  But he was -- he wanted him to come back to work

12  for him.

13          THE COURT:  What is the disposition of that lawsuit;

14  was it later dismissed or is it still pending?

15          THE WITNESS:  It was dismissed, as far as I know.

16  There was a no compete clause --

17          THE COURT:  Right.

18          THE WITNESS:  -- is why he sued him, is because there

19  was a no compete clause.  And the lawyer -- I talked to a

20  lawyer, because I eventually quit a few weeks -- you know, a

21  couple of weeks later, I quit, and went to work over there as

22  a receptionist.

23          THE COURT:  At the other company?

24          THE WITNESS:  At the other company.  And then Chris

25  filed lawsuits on Robbie, on me, on my other son, because he

Campbell - Cross                                    18

1   had went to work there, and on BNSF, which was Robbie's --

2            THE COURT:  All I need to know is that suit has been

3   dismissed?

4            THE WITNESS:  Yeah.

5            THE COURT:  There is no longer any pending

6   litigation?

7            THE WITNESS:  As far as I know, it's dismissed.

8            THE COURT:  Okay.

9   BY MS. BROWN:

10  Q   So, can you tell me why -- why would Mr. Chandler, your

11  son, be using your address in 2016 on a police report if he

12  hadn't lived at your residence in quite some time?

13  A   He gets his mail there and he knows I'll give it to him.

14  He has came and stayed there a few weeks, and then, you know.

15  Q   So, is it fair to say that since two -- since he was 18

16  years old, he's never really lived with you full time?

17  A   Well, a month or so at a time, but, no.

18  Q   Not years, not consistently?

19  A   Not consistently.

20  Q   And now he's also married to Elizabeth, is that correct,

21  Chandler?

22  A   He's married to Elizabeth Chandler.  Yes.

23  Q   And what ever happened -- where is Elizabeth?

24  A   As far as I know, she's in Dallas.  And the only reason I

25  know that is on Facebook.

```
                    Campbell - Cross/Redirect                    19
```

1  Q   Are they still married?

2  A   No.

3  Q   Okay.  But, she was living here when -- when Robbie was

4  arrested not too long ago; is that correct?

5  A   Yes.

6  Q   So, she just recently moved to Dallas, correct?

7  A   I don't know when she -- it's been since he's been

8  incarcerated.

9  Q   Okay.  And nobody else lives at your house?

10 A   No, ma'am.

11        MS. BROWN:  Your Honor, I'll pass the witness.

12        THE COURT:  Any questions, Ms. Borkowski?

13        MS. BORKOWSKI:  If I can just have a few follow up?

14                   REDIRECT EXAMINATION

15 BY MS. BORKOWSKI:

16 Q   Ms. Campbell, you talked about the effect that you

17 observed in Robbie when he was using drugs.  Have you -- since

18 he's been incarcerated, have you visited him while he's in

19 jail?

20 A   Yes.

21 Q   How frequently do you visit?

22 A   At least once a month.

23 Q   And while he's in jail and is not using drugs and does not

24 have access, what change, if any, have you seen to Mr.

25 Chandler?

Campbell - Redirect                                       20

1  A   A lot.  I mean, he acts like his old self, where he can

2  function and think straight.  I mean, he was not even thinking

3  straight.

4  Q   And what do you view as his commitment to change his

5  behavior?

6  A   I think he's very committed, because he didn't -- he told

7  me he didn't even realize he was on drugs.  He -- he -- during

8  my visitation with him, while he was incarcerated, he said,

9  "Mom," he said, "I would have swore I was not on drugs."  He

10 said, "But," he said, "I've never had a drug problem," and he

11 said, "this had me."  Just, and he gripped his hands.  He

12 said, "It just grabbed me like that and I didn't realize I was

13 that bad."

14 Q   And if he's at your house, and you saw even -- even if you

15 didn't see him using, if you saw a change of behavior that

16 caused you concern, would you be willing to report this?

17 A   Yes.

18 Q   Okay.

19        MS. BORKOWSKI:  Your Honor, I have nothing further.

20        MS. BROWN:  Nothing further from the Government, Your

21 Honor.

22        THE COURT:  Ms. Campbell, let me ask you a few

23 questions.

24 BY THE COURT:

25 Q   One of the things, and this may have just been a slip of

Campbell - By the Court                                21

1   the tongue on your part, but Ms. Borkowski was asking you some

2   questions about your son, you said you like your son.  Do you

3   like your son or do you love your son?

4   A   I love my son.

5   Q   Okay.  So, if you said you like him, that was not to imply

6   you didn't also love him?

7   A   Oh, no.  I love my son.

8   Q   Okay.  He's obviously had some criminal history.  And that

9   began when he was 18 years old, and he's 38 now, so that's --

10  that's a pretty longstanding criminal history.  Throughout the

11  time he was engaged in that criminal history, did you maintain

12  a close relationship with him?

13  A   Normally, if he's doing something wrong, he don't want to

14  be around me because he knows I --

15  Q   Yes, ma'am.  I know he was not living with you.

16  A   Okay.

17  Q   My question is, when he was having those difficulties, did

18  you continue to communicate with him; did you continue to talk

19  to him; did you try to --

20  A   Oh, yes.

21  Q   -- counsel him; did you explain to him, as a mother, this

22  is not the way you need to go, son?

23  A   Yes, I did.

24  Q   And at -- at some point, and that may have been when he

25  went to work with you at Little John, did -- did it seem as if

Campbell - By the Court                                    22

1   his criminal conduct was in his past, that he went for a

2   period of years --

3   A    Yes.

4   Q    -- where he didn't have any -- any run-ins with the law?

5   A    I was very proud of him.

6   Q    And then, about 18 months/two years ago, he seemed to

7   start using drugs, things changed, and now he's under this

8   federal indictment?

9   A    Correct.

10  Q    But, throughout that period of time, you've maintained a

11  relationship with him; does he come over to your house for

12  holidays?

13  A    Yes.

14  Q    So, Christmastime, Thanksgiving, he's at your home?

15  A    Yes.

16  Q    And you said he's -- because, obviously, he's a grown man

17  now, he's 38 years old.

18  A    Correct.

19  Q    He's had wives.  He's got children with one wife -- exwife

20  that's now in Arizona.  So, he's obviously not lived with you

21  throughout that period of time?

22  A    No.

23  Q    But there have been intervals throughout that period of

24  time when he has spent weeks or months at your home with you?

25  A    Yes.

Campbell - By the Court                                    23

1  Q   When he has been in your house, has he complied with your

2  house rules?

3  A   Yes.

4  Q   Has he obeyed what you've told him to do about what's --

5  what can and cannot take place in your home?

6  A   Yes.

7  Q   And has he listened to you?

8  A   Yes.

9  Q   And do you feel as if you've maintained a strong

10 relationship with him through that period of time as his

11 mother, even through the ups and downs?

12 A   Yes.

13 Q   And you believe if he comes back now and lives with you,

14 and you're his third party custodian, that even though he's a

15 grown man, he's 38 years old, he's going to comply with house

16 rules, and do what you instruct him to do, and listen to you?

17 A   Absolutely.

18 Q   And you have no problem at all, as a third party

19 custodian, if you observe him do anything that's -- that

20 violates any of the conditions that might be imposed on him,

21 immediately picking up the phone and letting the Pretrial

22 Services Officer know that?

23 A   Yes, I will.

24 Q   Even though, as Ms. Borkowski has explained, that's likely

25 to lead to him being locked up and having his bond revoked?

Campbell - By the Court                                    24

1    A    I understand that.  And I'd rather him be in custody than

2    out on the street if he's going to be doing something wrong.

3    Q    Okay.  And do you know, when he's been in the ADC this

4    last time, did he do anything in the way of seeking out

5    programs in there that would help him with his drug addiction;

6    did he try to use that time to engage in some self-help to --

7    to help him to understand the addiction that he had and things

8    that he could do to help avoid that when he got released?

9    A    Yes.  He went to a drug program.

10   Q    Do you know how long that was?

11   A    It was about nine months, I believe.

12   Q    Okay.  And did he suggest, when you visited with him, that

13   that had helped him?

14   A    Oh, yes.  We talked about it.

15   Q    Okay.  So, and that was something he voluntarily sought

16   out?

17   A    Yes.

18   Q    Okay.  All right.

19        THE COURT:  That's all I've got.  Any other questions

20   from the lawyers?

21        MS. BROWN:  Your Honor, may I?

22        THE COURT:  Yes, ma'am.

23        MS. BROWN:  I've got a copy of his Pen Pack.  And

24   there is a list of if they take classes and stuff like that.

25   This is listed in here, and Ms. Borkowski has a copy of this,

1    and I've reviewed it, Your Honor, and I do not see any

2    treatment classes that he attended while he was in the ADC

3    during his last, 2016 to 2017 --

4             THE COURT:  What is -- is that a document you've got

5    that I don't have?

6             MS. BROWN:  I have a Pen Pack.  This is from the

7    Arkansas Department of Corrections.

8             THE COURT:  Okay.  Because the -- the reason that I

9    mentioned that, the Pretrial Services Officer has indicated

10   that he attended a six month treatment program voluntarily

11   while he was in the ADC.  That's the reason I brought it up.

12            MS. BROWN:  And, see, I hadn't seen any of that.

13   And, generally, they put it in the Pen Pack.

14            THE COURT:  Well, that's okay.  I --

15            MS. BROWN:  Your Honor, and that's why I wanted to

16   make sure that we've got something --

17            THE COURT:  -- I think the record is that he, in

18   fact, did do, voluntarily, a six month program while he was

19   last in the ADC to help him with his addiction problems.

20            Any other questions from the lawyers?

21            MS. BROWN:  No, Your Honor.

22            THE COURT:  All right.  Thank you, Ms. Campbell.  You

23   may stand down.

24       (Witness steps down.)

25            THE COURT:  Ms. Borkowski, do you have any other

Hensley - Direct                              26

1  witnesses?

2           MS. BORKOWSKI:  No, Your Honor, I do not.

3           THE COURT:  All right.  Ms. Brown, does the

4  Government have any witnesses?

5           MS. BROWN:  Yes, Your Honor.

6           THE COURT:  Call your first witness.

7           MS. BROWN:  Your Honor, the Government calls Agent --

8  Special Agent John Hensley.

9      (JOHN HENSLEY, GOVERNMENT'S WITNESS, SWORN.)

10          MS. BROWN:  May I proceed?

11          THE COURT:  Yes, ma'am.

12          MS. BROWN:  Thank you, Your Honor.

13                          DIRECT EXAMINATION

14  BY MS. BROWN:

15  Q   Please state your name.

16  A   Special Agent John Hensley.

17  Q   How are you currently employed?

18  A   I'm a Special Agent with the Drug Enforcement

19  Administration.

20  Q   And how long have you been employed?

21  A   Since 2012.

22  Q   Okay.  And during your time as a DEA Special Agent, have

23  you worked on a case that has been commonly referred to as "To

24  the Dirt" in Russellville, Arkansas?

25  A   Yes, ma'am.

Hensley - Direct                                    27

1  Q   And when did you all -- when did the federal government

2  get involved in this case?

3  A   During early 2016.

4  Q   And why did you all get involved in this case?

5  A   There was a murder that local authorities requested us

6  assist with.

7  Q   And that murder -- murder -- during the murder

8  investigation, who was the person that was murdered; why were

9  they murdered; what is the alleged reason?

10 A   The individual is Bruce Hurly and he was allegedly

11 murdered because of his cooperation with law enforcement as a

12 informant.

13 Q   So, a murder of a confidential informant over -- is it the

14 sale of methamphetamine --

15 A   Yes, ma'am.

16 Q   -- is what sparked -- how the DEA and ATF got involved in

17 this case; is that correct?

18 A   Yes, ma'am.

19 Q   And during the course of your investigation into this, did

20 you all identify a drug trafficking organization headed by

21 Troy Loadholt?

22 A   Yes, ma'am.

23 Q   And can you please tell the Court how the Troy Loadholt

24 DTO operated?

25 A   Troy Loadholt had resided in Russellville, Arkansas, as

Hensley - Direct                                              28

1   well as California.  We identified multiple distributors of

2   methamphetamine in the Russellville, Arkansas area who were

3   repeatedly obtaining large quantities of methamphetamine,

4   which was coordinated by this individual who would use a

5   corporate shipping account to ship large quantities of

6   methamphetamine to Arkansas, and then coordinate with various

7   individuals in the Russellville, Arkansas area to pick up

8   these packages and distribute it to customers.

9   Q    And during the course of this investigation, how many

10  packages of methamphetamine and pounds of methamphetamine did

11  you all seize that were shipped to the Russellville, Arkansas

12  area?

13  A    During the fall of 2016, we seized three separate packages

14  containing a total of approximately ten pounds of

15  methamphetamine.  During early 2017, we seized an additional

16  package containing approximately four pounds of

17  methamphetamine.  In total, what we were able to do was

18  subpoena FedEx for shipping records coming from this business

19  account, and compared that to information we obtained from Mr.

20  Loadholt's Facebook account regarding these drug shipments,

21  and we estimated the total to be approximately 200 pounds that

22  had been shipped of it over just the year period which we

23  obtained records for.

24  Q    Okay.  And how were you able to tie the methamphetamine

25  back to particular defendants in this case?

1   A    So, in our review of the Facebook accounts, we would see

2   multiple conspirators dealing directly with Mr. Loadholt.  We

3   had also subpoenaed the FedEx shipping records.  So, after the

4   fact, we could go to these search warrant information, see Mr.

5   Loadholt coordinating with one of the conspirators on an

6   incoming package, and then we would pull the subpoena

7   information from FedEx and corroborate that a package was

8   delivered to an address associated with that individual.

9   Then, later on, through various interviews, we would have

10  specific folks, who were there, say that's indeed what was

11  going on.

12  Q    Okay.  And during the course of this investigation, did

13  Robert Chandler's name come up?

14  A    Yes, ma'am.

15  Q    All right.  And this investigation, it goes back to

16  September -- or June of 2015, correct, through present day?

17  A    Yes, ma'am.

18  Q    Which was the October indictment, correct?

19  A    Correct.

20  Q    All right.  And how did Robert Chandler's name come into

21  play?

22  A    Some of the recipients of the methamphetamine were

23  associates of Mr. Chandler.  And as we investigated those

24  individuals, we learned that Mr. Chandler was obtaining

25  methamphetamine from one individual in particular, Mr. Wesley

Hensley - Direct                                        30

1   Gullett, and --

2   Q    And who is Wesley Gullett in accordance with this drug

3   trafficking organization; how does he fit in?

4   A    Mr. Gullett was one of the main distributors and one of

5   the main recipients of multiple pound shipments of this

6   methamphetamine.  Mr. Gullett is also reputed to be the

7   president of the New Aryan Empire in that area of Arkansas.

8   Q    And what is the New Aryan Empire?

9   A    A white supremacist organization.

10  Q    Okay.  And what else was Mr. Gullett -- how did Mr.

11  Gullett fit in with accordance with Troy Loadholt and Robert

12  Chandler?

13  A    Mr. Chandler was an associate of Gullett, had received

14  methamphetamine from Mr. Gullett, and also assisted him in

15  some of the deliveries of methamphetamine as well.

16  Q    And when you say assisted in the deliveries, what type of

17  quantities of methamphetamine are we talking about?

18  A    Pound quantities.

19  Q    Okay.  And did you -- through the course of your

20  investigation, did you have the opportunity to interview Mr.

21  Chandler?

22  A    I did.

23  Q    All right.  And that was in March of 2017; is that

24  correct?

25  A    Correct.

1   Q    And while you were speaking with Mr. Chandler, he brought

2   up someone's name.  And before you talk -- explain what his

3   statement was, he brings up the name of Singleton, David

4   Singleton.  Can you please explain to the Court who David

5   Singleton is and how he fits into this?

6   A    David Singleton is Troy Loadholt's cousin.  He --

7   Singleton also resided in Russellville, Arkansas.  However,

8   Singleton is repeatedly in and out of jail and prison.  During

9   the time of the conspiracy, at the beginning, so mid-2015, Mr.

10  Singleton was out and, for several months there, was receiving

11  and distributing methamphetamine.  Mr. Singleton was

12  incarcerated again, I think, in late 2015, and at that point

13  Mr. Loadholt became a more prominent actor in the

14  methamphetamine distribution.

15  Q    Did Mr. Singleton continue to be involved in the drug

16  distribution business even while he was in prison?

17  A    Yes, ma'am, he did.

18  Q    All right.  And let's go back to Mr. Chandler's interview.

19  Can you please tell the Court, when you were speaking with Mr.

20  Chandler, the substance of the interview?

21  A    Mr. Chandler stated that he had had an issue with

22  addiction to pills, and that the usage of pills had increased

23  to approximately 1,300 dollars per week just in obtaining the

24  pills.  And then, he began to use methamphetamine as a means

25  to alleviate the sickness he had from attempting to quit the

Hensley - Direct                                    32

1  pills.  Mr. Chandler was also an associate of Mr. Singleton.
2  Singleton would come to his shop.  And Singleton also would
3  supply personal use quantities of methamphetamine to Mr.
4  Chandler.  During the time that they were together, Mr.
5  Chandler stated he saw Single -- Singleton in possession of
6  large amounts of U.S. currency, sometimes 20,000 to 30,000
7  dollars, which Mr. Singleton had counted at the shop.
8  Q    And when he referred to the shop, whose shop was this?
9  A    Mr. Chandler's.
10 Q    And what does Mr. -- what did Mr. Chandler do for a living
11 at the time?
12 A    Auto repair.
13 Q    So, Mr. Singleton was using Mr. Chandler's shop to count
14 money from proceeds of the sale of methamphetamine?
15 A    Correct.
16 Q    All right.  And please continue.
17 A    Mr. Chandler stated that on one occasion, approximately
18 one pound of methamphetamine was found hidden under a vehicle
19 at his shop.  Chandler called Singleton and Singleton arrived
20 later to pick it up.  Mr. Loadholt would visit Mr. Chandler's
21 shop and use methamphetamine there.  And Mr. Loadholt would
22 have various females mail currency back to California, and one
23 of -- one female, which was Mr. Chandler's wife, Mr. Singleton
24 had --
25 Q    Let's -- before you go back there, so Mr. -- so, Troy

Hensley - Direct                                    33

1  Loadholt would have Chandler's wife mail U.S. currency back?

2  A   Yes, ma'am.  And the --

3  Q   And the U.S. currency -- I'm sorry -- the U.S. currency is

4  tied back from the proceeds of the sale of methamphetamine; is

5  that correct?

6  A   Yes, ma'am.

7  Q   All right.  Please continue.

8  A   Mr. Loadholt would also visit Mr. Chandler's shop and

9  would use methamphetamine there.  Mr. Singleton had paid -- or

10 tried to pay Mr. Chandler with methamphetamine.

11      And then, Mr. Gullett was also frequently at the shop.

12 And Mr. Chandler stated that he had seen Gullett in possession

13 of one-half pound to one pound of methamphetamine, and that

14 Chandler had assisted Gullett in completing multiple

15 motorcycle rides with Gullett and another conspirator.

16 Chandler stated that on one such occasion, Mr. Gullett was in

17 Little Rock, he had contacted Mr. Chandler and asked him to go

18 to another co-conspirator's house.  Chandler went there and

19 retrieved one pound of methamphetamine.  He hid it in his

20 motorcycle riding jacket, and then rode to Little Rock, where

21 he met Gullett.  And then, Gullett had paid him approximately

22 200 dollars for doing that.

23      He stated that Mr. Gullett would use Chandler as well as

24 another individual to complete motorcycle rides, and that one

25 of Mr. Chandler's roles was to act as a decoy in the event

Hensley - Direct                                    34

1   that law enforcement was encountered.  On one --

2   Q   And so, and on these motorcycle rides, what are they

3   doing?

4   A   So, if Gullett -- if one individual is transporting the

5   methamphetamine and they encounter law enforcement, the others

6   will try to get the law enforcement away from the individual

7   with methamphetamine.

8   Q   And what happened on -- did one occasion, were they

9   attempted to stop -- be stopped by law enforcement?

10  A   Yes.  Mr. Chandler related one occasion that he, Mr.

11  Gullett, and another individual, had left a methamphetamine

12  distributor's residence here in Little Rock, and state police

13  pulled over the other individual, Mr. Gullett and Chandler

14  continued on and fled.

15  Q   And they didn't stop for the police?

16  A   Correct.

17  Q   Okay.  All right.  And that's the substance of the

18  interview with Mr. Chandler regarding his involvement into

19  this case; is that correct?

20  A   Correct.

21  Q   All right.  And, so, he is responsible for multiple pounds

22  of methamphetamine being trafficking from Russellville to the

23  Little Rock area; is that correct?

24  A   Correct.

25  Q   All right.  As far as his criminal history is concerned, I

Hensley - Direct                                    35

1  want to go through a couple of the convictions.  There is a

2  1999 Conway County case that I'd like to go over.

3          MS. BROWN:  This case is for theft of property and

4  theft by receiving, Your Honor, and it is the third one down

5  on the first -- well, no -- make sure it's listed.  This is a

6  Conway County case, and the case number in this one is CR2000-

7  3A, Your Honor.  And that is the one that is listed -- that we

8  changed for the January 4th, 2000 case.

9  BY MS. BROWN:

10 Q   There are documents that you have in front of you from

11 this case.  And did Mr. Chandler make a statement in this

12 case?

13 A   Yes, ma'am.

14 Q   All right.  And could you please read to the Court about

15 the statement of what happened on October -- or December 28th,

16 1999?

17 A   The statement --

18          THE COURT:  Before we get there --

19          THE WITNESS:  Yes, sir.

20          THE COURT:  -- I want to make sure I've got the right

21 case.  Are we speaking about the Conway County charge for

22 theft of property, theft by receiving, that's January 4, 2000?

23          MS. BROWN:  Yes, Your Honor.  The -- the actual date

24 of the incident that occurred was on 12/28/1999, but he was

25 subsequently convicted of this on January 11th, 2000.

Hensley - Direct                                      36

1        THE COURT:  Okay.  I'm together with you now.  You

2   may proceed with your testimony.

3        THE WITNESS:  On December 29th, 1999, Mr. --

4   BY MS. BROWN:

5   Q   What date was it?  I'm sorry.  December?

6   A   December 29th, 1999.

7   Q   Okay.

8   A   Mr. Chandler was interviewed.  He stated that on Tuesday,

9   the previous day, December 28th, 1999, at approximately 8:00

10  p.m.:

11                  "Mike Keller and myself went to

12                  Alan Simpson's house, just down

13                  the road from my house.  The door

14                  under the carport was unlocked.

15                  Mike Keller and I went in the

16                  house, we got one of the pistols,

17                  some change, and a watch.  Then,

18                  approximately 8:30 p.m., Daniel

19                  Garrett, myself, went back to Alan

20                  Simpson's house.  This time we

21                  took a CD player, a VCR, a short

22                  shotgun, a .22 rifle, two pistols,

23                  25 dollars in cash, and .22

24                  shells."

25  Q   Okay.  And on this case, subsequent to that interview, Mr.

Hensley - Direct                                    37

1  Chandler pled guilty to theft of property and theft by

2  receiving; is that correct?

3  A    Correct.

4  Q    And he was sentenced to 60 months with a suspended

5  imposition of 36 months, and sentenced to the Regional

6  Punishment Facility; is that correct?

7  A    Yes, ma'am.

8  Q    And subsequent to this conviction, did you obtain a -- was

9  a report from the Osceola Police Department obtained?

10 A    Yes, ma'am.

11 Q    All right.  And could you please --

12         MS. BROWN:  Your Honor, this is on the 12/29/2000,

13 the Mississippi County Circuit Court, but Osceola Police

14 Department is located in -- it is in Mississippi, so, but I

15 don't know if this case was actually charged, so it's very

16 confusing on this --

17         THE COURT:  Now, when you say Osceola -- Osceola is

18 in Mississippi County?

19         MS. BROWN:  Yes, it's in Mississippi County.  Yes,

20 sir.

21         THE COURT:  So, we're talking about now the charge

22 that is -- that he received in Mississippi County Circuit

23 Court, in Osceola, Arkansas, on February the 29th of 2000?

24         MS. BROWN:  Yes, Your Honor.

25         THE COURT:  Okay.

1          MS. BROWN:  And I think she has part of it in here,

2    but I do not think she has the entirety of the police report.

3    BY MS. BROWN:

4    Q   Could you please read the police report regarding the

5    offense of escape, burglary, and auto theft, and breaking and

6    entering, please?

7    A   Yes, ma'am.

8                     "On February 27th, 2000, around

9                     9:50 p.m., officers of the Osceola

10                    Police Department were notified by

11                    officials of the Department of

12                    Community Punishment that a back

13                    door alarm sounded.  After a

14                    roster check was done, Robert

15                    Chandler, Steven Pruitt, and David

16                    Brownsfield, all inmates at DCP,

17                    could not be accounted for.  A

18                    search of the area revealed that a

19                    residence on South County Road

20                    572, the home of Tim Pillow, had

21                    been entered.  Officers located

22                    several sets of footprints that

23                    led away from the Community

24                    Punishment Center to this

25                    residence, which was located to

1          the east of the complex, less than

2          one-eighth of a mile away.  Entry

3          had apparently been made through a

4          window.  The residence was found

5          in a state of disarray.  Sergeant

6          Tom Scrivner spoke with Tim Pillow

7          over the phone, he stated that the

8          house was neat when he left

9          earlier that day.  He also stated

10         that he knew of a window that he

11         had left unlocked.  It was further

12         learned that Gary Parker, an

13         employee at the Southwire

14         Specialty Products, noticed his

15         vehicle was gone from the parking

16         lot.  Southwire Specialty is in

17         very close proximity to the

18         complex.  Buddy Wright, who is

19         also an employee at Southwire,

20         will testify that he found that

21         his vehicle was entered, a small

22         knife was found in the vehicle

23         with blood on it.  One of the

24         blades was broken and stuck in the

25         ignition the vehicle.  As a

Hensley - Direct                                                40

1               result of the statewide BOLO and

2               possible sitings of the escapees,

3               two of the three were arrested in

4               the early morning hours of

5               February 28th, 2000, in Jonesboro.

6               According to Jonesboro officers,

7               the suspects admitted to stealing

8               the car from a factory in Osceola,

9               taking it to Memphis, Tennessee,

10              dropping it off and stealing

11              another car while there.  The

12              other escapee, Robert Chandler,

13              was also apprehended on the

14              morning of February 28th, 2000."

15  Q    And so, the date -- they took a car and they went to

16  Jonesboro, which would be Craighead County, correct, on the

17  28th?

18  A    Correct.

19         MS. BROWN:  So, Your Honor, and that's -- it was kind

20  of confusing on this, because I think it -- it holds 29th on

21  Mississippi County Circuit Court, but they also refer to the

22  Craighead arrest of the 28th, which is directly above it.

23  BY MS. BROWN:

24  Q    All right.  And then, he's got several other arrests and

25  convictions that are listed in here.  But, I want to go back

Hensley - Direct                                          41

1   to the two -- I want to go forward to 2016, his most recent

2   arrests.  And you've reviewed the documents regarding these

3   arrests, correct?

4   A   Yes, ma'am.

5   Q   Okay.  And can you please read for the Court the

6   attachment that was filed with the information in this case

7   regarding the February -- interesting --

8        MS. BROWN:  Your Honor, the -- and, so, this is

9   regarding the first Pope County case, the 2/23/2016 case.

10  BY MS. BROWN:

11  Q   Could you please read the narrative for the Court?

12  A   Yes, ma'am.

13              "On or about February 9th, 2016,

14              the Van Buren Police Department

15              arrested a suspect who was in

16              possession of a vehicle stolen

17              from Avis Rentals out of Little

18              Rock.  The search warrant was

19              executed on the suspect's cellular

20              phone, and it contained a text

21              message from Robert Chandler, who

22              lives in Russellville, along with

23              a photo of a black Ford Mustang

24              with a Texas license plate.  The

25              Russellville Police Department

1    began surveillance of Robert

2    Chandler's residence and observed

3    a female drive up to the

4    residence, which also served as a

5    business address, in a Toyota

6    vehicle which returned as stolen.

7    A second vehicle parked at the

8    residence also returned as stolen

9    and was identified as the black

10   Ford Mustang pictured in the

11   aforementioned text message.

12   Officers responded to the

13   residence of Chandler, secured the

14   scene, and located a gray BMW SUV

15   that was reported stolen out of

16   Little Rock and a red Ford pickup

17   truck which had been partially

18   disassembled.  During the sweep of

19   the residence, a loft area was

20   located where suspects Wesley

21   Gullett, Jesse Shreckhise, Sunny

22   Spicer, and another person were

23   located.  A search warrant was

24   secured for the residence and

25   executed.  During the search,

Hensley - Direct                                    43

1      officers located a white Ford
2      Mustang that contained Robert
3      Chandler's Arkansas identification
4      card and contained a 9-millimeter
5      pistol.  Chandler has a felony
6      conviction in 58CR2005-215.
7      Officers also located a
8      disassembled Harley Davidson
9      motorcycle that had been reported
10     stolen.  In the bedroom of the
11     residence, they located two
12     plastic baggies containing
13     methamphetamine, along with a
14     debit card in the name of Robert
15     Chandler and photos of Robert
16     Chandler.  In a bathroom, officers
17     located the keys to the
18     aforementioned stolen BMW.  All of
19     the vehicles except the motorcycle
20     had been reported by Avis Rental
21     Cars and were less than three
22     years old.  During a search of the
23     loft at the residence, officers
24     located approximately 15 grams of
25     methamphetamine, along with

Hensley - Direct                                         44

1                     personal items identified as

2                     belonging to Wesley Gullett.

3                     During a search of the black Ford

4                     Mustang, paperwork belonging to

5                     Wesley Gullett was found, and

6                     2,442 dollars in U.S. currency was

7                     in the center console, and an

8                     envelope labeled 'Mr. Gullett'

9                     containing 90 dollars in U.S.

10                    currency was in the glove box."

11   Q    Okay.  And, so, the incident date on this is February 9th,

12   2016, correct?

13   A    Yes, ma'am.

14   Q    And he was actually arrested on February 23rd, 2016,

15   correct?

16   A    Yes, ma'am.

17   Q    All right.  And then, if you'll go to case 16-627?  This

18   is for the failure to appear.  Did Mr. Chandler fail to appear

19   in -- for sentencing in the Pope County Circuit Court?

20   A    Correct.

21   Q    And did the -- was he subsequently convicted of this

22   failure to appear?

23   A    Yes, ma'am.

24   Q    And he was sentenced to 36 months in the ADC, correct?

25   A    Correct.

1  Q   So, he was arrested on the 2/9/2016 case.  He bonded out,

2  failed to appear.  When he failed to appear, did officers

3  subsequently locate him?

4  A   They did.

5  Q   All right.  And let's go to the narrative regarding the

6  September 27th, 2016 stop.  Could you please read the

7  narrative to the Court as to what happened in this case?

8  A   Yes, ma'am.

9                "On September 27th, 2016, Officer

10                Michael Nuckols of the

11                Russellville Police Department

12                observed a white male in the

13                driver's seat of a Nissan pickup

14                parked at convenience store at

15                2403 North Arkansas Avenue, who

16                appeared to be attempting to hide

17                his face from the officer.

18                Nuckols recognized the man to be

19                Robert Chandler and ran his name

20                through dispatch and discovered

21                that Chandler had an active

22                warrant for failure to appear.

23                Nuckols made contact with Chandler

24                at the Nissan pickup.  And

25                Chandler's wife, Elizabeth, then

Hensley - Direct                                    46

1        came out of the convenience store
2        to the pickup.  She also had an
3        active arrest warrant.  Nuckols
4        placed both into custody and
5        conducted a search of the vehicle
6        and located a bag containing a
7        loaded pistol in the floorboard
8        where Robert had been seated.  The
9        firearm returned as stolen.
10       Inside a smaller bag located under
11       the driver's seat, Office --
12       Officer Nuckols found a clear
13       plastic bag containing
14       methamphetamine.  Pope County
15       Sheriff's Office confirmed that
16       the pistol was taken in a burglary
17       in their jurisdiction on September
18       26th.  Officer Nuckols located a
19       large number of collector type
20       coins in the console of the truck
21       that had also been taken during
22       the burglary.  In the passenger's
23       seat, beside Elizabeth's purse,
24       Nuckols located a cloth case
25       containing a methamphetamine pipe

1                    with light residue."

2   Q    And subsequent -- so, he gets arrested on the first one,

3   FTAs, and then he gets arrested on the FTA warrant, and also

4   has another gun, some more methamphetamine, and the gun is

5   stolen; is that correct?

6   A    Correct.

7   Q    And subsequent to this, he was sentenced to prison,

8   correct?

9   A    Correct.

10  Q    And he was found guilty of the possession of a controlled

11  substance, methamphetamine; the theft by receiving of the

12  firearm; and possession of firearms by certain persons,

13  correct?

14  A    Yes, ma'am.

15  Q    And he was sentenced to the Arkansas Department of

16  Corrections for a period of 60 months, and he had been in jail

17  since 10/4 of 2006 (sic), that's when he went into status for

18  the ADC, correct?

19             THE COURT:  I'm sorry.  I'm not following that

20  question you just asked.

21             MS. BROWN:  Sorry.  He went into -- he was

22  subsequently convicted, Your Honor, of the 2/9/2016, the first

23  one in Pope County, he was convicted of that on October --

24  sorry -- November -- oh, I'm sorry -- October -- it's right

25  here, October 12th, and then he went into the ADC custody at

                    Hensley - Cross                         48

1   that point, Your Honor.

2   BY MS. BROWN:

3   Q   So, he's been in ADC custody since October 12th of 2016,

4   correct?

5           THE COURT:  You --

6           MS. BROWN:  Sorry.

7           THE COURT:  You had said a date, I thought, of 2006.

8           MS. BROWN:  I'm sorry.

9           THE COURT:  So, he's -- he's been in custody from

10  some time in October of 2016 until November 21st of this year

11  when he was released?

12          MS. BROWN:  Yes, Your Honor.  I just wanted to make

13  sure that that was clear, that that's -- he's been -- since

14  this arrest, he has been in custody ever since.

15          THE COURT:  Yes, ma'am.

16          MS. BROWN:  So, Your Honor, I have no further

17  questions.  I'll pass the witness at this time.

18          THE COURT:  All right.  Ms. Borkowski, you may cross.

19                      CROSS EXAMINATION

20  BY MS. BORKOWSKI:

21  Q   Agent Hensley, I just have a few follow up questions.  I

22  want to make sure the Court has a clear understanding.  When

23  you were talking about the investigation and Wesley Gullett,

24  you referred to him as being, I guess, a member of the New

25  Aryan Empire?

Hensley - Cross                    49

1  A   Yes, ma'am.

2  Q   And is it clear to the Court that this defendant has no

3  affiliation with the New Aryan Empire?

4  A   I -- I do not have any information that would indicate Mr.

5  Chandler is affiliated with that group.

6  Q   Okay.  So, I just wanted to make that clear.  And then,

7  there was a discussion that you interviewed Mr. Chandler in

8  March of 2017.  Were you part of the interview?

9  A   Yes, ma'am.

10 Q   Okay.  And where was Mr. Chandler when you went to

11 interview him?

12 A   I believe it was Newport.  He was in custody.

13 Q   He was in custody with the Arkansas Department of

14 Corrections?

15 A   Yes, ma'am.

16 Q   Was it clear to him that he did not have to talk to you at

17 that time?

18 A   Yes, ma'am.

19 Q   Was it clear to him that he was not under arrest for any

20 other offense, other than what he was in custody for,

21 obviously?

22 A   Correct.

23 Q   Okay.  And did Mr. Chandler cooperate?

24 A   He did provide a statement.  Yes, ma'am.

25 Q   Was he cooperative?

1  A   Yes, ma'am.

2  Q   And was he -- his testimony -- or his statement to you was

3  in March of 2017?

4  A   Correct.

5  Q   And this indictment that was handed down for the offense

6  he's been charged with was handed down in October of 2017?

7  A   Yes, ma'am.

8  Q   And was his information helpful to the investigation that

9  was going on?

10 A   Yes, ma'am, it was.

11 Q   Did his information lead to the arrests of other co-

12 defendants?

13 A   It -- it was helpful.  No defendant was arrested based

14 solely on what Mr. Chandler stated.

15 Q   Okay.  There was a reference, I guess, to the murder.  And

16 again, just to be clear for the Court, there is no association

17 of Mr. Chandler to that murder as far as you are aware?

18 A   Correct.

19 Q   And did you have any interaction with Mr. Chandler prior

20 to his incarceration?

21 A   No, ma'am.

22 Q   So, his drug use, you're not aware of how he may have been

23 during his time of admitted drug use?

24 A   Other than his own statement.

25 Q   And is it your understanding that, in large part, Mr.

1  Chandler was using methamphetamine during the time?

2  A    Using methamphetamine and pills, yes, ma'am.

3  Q    Okay.  And his part, in large, was that people were

4  basically using him and providing him with personal use of

5  methamphetamine?

6  A    His association with Mr. Gullett to assist in the delivery

7  of methamphetamine, as well as actively carrying, according to

8  his own admission, a pound of methamphetamine for delivery to

9  Little Rock, and then subsequently being arrested with stolen

10 firearms, while he was only with his wife during 2016, would

11 indicate that he wasn't solely being used.  If that -- if that

12 makes sense.  I may be unclear as to your question.

13 Q    Well, okay.  I guess what I'm asking is, in large part, he

14 was a personal user?

15 A    He -- he did use methamphetamine, but he also had some big

16 violations there in carrying a pound of methamphetamine on his

17 own to Little Rock with the associates.

18 Q    Okay.  And I want to also follow up on part of the

19 investigation, my understanding of your testimony was there

20 were corporate -- corporate shipping accounts that were

21 facilitating receiving packages of methamphetamine.  I just

22 want to be clear, because Mr. Chandler does -- has worked for

23 and has been offered employment with a trucking company, that

24 there is no association with Mr. Chandler and his employer, or

25 his employment, for these corporate shipments?

Hensley - Redirect                                    52

1   A    The only association we found was that Mr. Chandler stated

2   that he was with his wife when she had sent back money to

3   California.  But, no, no association to the company that Mr.

4   Chandler stated he worked for.

5   Q    Okay.  Thank you.

6        MS. BROWN:  Just one follow up question.  Just so

7   it's clear for the Court.

8                        REDIRECT EXAMINATION

9   BY MS. BROWN:

10  Q    When you interviewed Mr. Chandler at the Grimes Unit in

11  ADC, did you advise him of his rights?

12  A    Yes, ma'am.

13  Q    All right.  And you -- and he initialed all those and he

14  was very clear on his statement and he agreed to speak with

15  you all, correct?

16  A    I don't recall if he initialed it, but he -- he agreed to

17  speak with investigators without the presence of an attorney.

18       MS. BROWN:  Your Honor, may I approach?

19       THE COURT:  Yes, ma'am.

20       MS. BROWN:  Thank you.

21  BY MS. BROWN:

22  Q    I'm going to show you what I have here labeled as an

23  "Event of Rights."  Are you familiar with this document?

24  A    Yes, ma'am.

25  Q    And what is this document?

Hensley - Redirect                    53

1   A    That is our advice of rights form.  And I recall Mr.

2   Chandler did initial and sign.

3   Q    And then, whose signature is below?

4   A    It's my signature as a witness, as well as another

5   investigator.

6   Q    Okay.  And, so, and Mr. Chandler, he did sign this,

7   correct?

8   A    Correct.

9        MS. BROWN:  Your Honor, I'd like to admit this as

10  Government's Exhibit No. 1.

11       THE COURT:  Any objection?

12       MS. BORKOWSKI:  No, Your Honor.

13       MS. BROWN:  Your Honor, I have no further questions.

14  I just want to make sure it's admitted.  I just wanted to make

15  sure it was clear for the Court that he was fully advised of

16  his rights, it was signed, and it was waived.

17       THE COURT:  Yes, ma'am.

18    (Government's Exhibit No. 1 identified and received.)

19       THE COURT:  You know, in -- you know, Agent Hensley

20  works for the DEA, and the FBI DEA just turns square corners.

21  I don't think that Ms. Borkowski was ever suggesting that he

22  was not warned of his rights.  I think the only point she was

23  trying to make was that after being advised of his rights, he

24  voluntarily decided to cooperate and help, and I think that

25  was the only point --

Hensley - By the Court                                          54

1          MS. BROWN:  Okay.

2          THE COURT:  -- that she was trying to get clear.

3          MS. BROWN:  Your Honor, I have no further questions.

4          THE COURT:  All right.

5   BY THE COURT:

6   Q    Agent Hensley, I want to make sure.  Do you have his

7   criminal history in front of you?

8   A    I have several of the arrest reports and then a summation

9   of the history.

10  Q    All right.  I just want to make sure that I am reading and

11  construing his criminal history correctly.  You testified

12  about a theft by receiving that Mr. Chandler got back in

13  January of 2000, when he was 20 years old, where he broke in

14  to Mr. Simpson's home, and pistols and shotguns and a rifle

15  and ammunition were taken.  That would have been when he was

16  20.

17       And then, you talked about an event that happened in

18  Osceola, Arkansas, when he was 21, in 2000 -- same year, in

19  2000, he's now 21, where he was arrested after escaping from

20  the Department of Community Punishment.

21       And then, there are number of other charges that are *nol*

22  *prossed* and dismissed, in 2001, 2002, 2003, and that

23  culminates in 2005.  Those are -- again, they're either *nol*

24  *prossed* or dismissed.  He was certainly being arrested on

25  charges that didn't result in any kind of convictions.

Hensley - By the Court                          55

1      And then, in 2005, when he's 26, he's convicted of theft

2  by receiving, and he gets a six year term of imprisonment with

3  -- with four years suspended.  And then, he would have served

4  probably in the neighborhood of 12 to no more than 18 months

5  on that, which would have meant he would have gotten out some

6  time probably in or about July maybe of 2007.

7      As I read -- at least based upon the criminal history that

8  I have before me, between July of 2007 and his arrest in

9  February of 2016, which was the arrest you talked about,

10  that's a period of about nine years, there is no other

11  criminal conduct at all.

12      Is that consistent with your understanding of his criminal

13  history?

14  A   Your Honor, I wish I would have reviewed that criminal

15  history prior.

16          THE COURT:  All right.  Ms. Brown, I mean, am I

17  looking at --

18          MS. BROWN:  No, I believe that's correct, Your Honor.

19          THE COURT:  Okay.

20          MS. BROWN:  I was looking through this as well, as

21  you were -- you were discussing it.

22          THE COURT:  All right.  And --

23          MS. BROWN:  I believe that's correct --

24          THE COURT:  And, so --

25          MS. BROWN:  -- during that period, he didn't have any

Hensley - By the Court                                      56

1   arrests that I could see.

2           THE COURT:  We've got some period there, from the

3   time he's 26 until he's 37 -- when he's 26 or 27 to -- it's

4   about a nine year window.  I can't tell exactly.  But, when

5   there don't appear to be any charges or any arrests.  And

6   based on his mother's testimony, that's a period of time when

7   he's working for a trucking company.

8   BY THE COURT:

9   Q    And then, you pick up with new criminal conduct that's

10  charged in the indictment.  And that conspiracy begins, you've

11  testified, some time in 2016, right?

12  A    Yes.

13  Q    And then, based on your investigation of that alleged

14  conspiracy, did Mr. Chandler's involvement in that conspiracy

15  begin shortly after the conspiracy started in 2016, or did you

16  start to first see him -- his involvement in 2015, or did you

17  start to see him enter the picture in 2016?

18  A    The conspiracy started mid two thousand -- mid to late

19  2015, and that's based in part on Mr. Singleton being out of

20  prison.  And, so, in that -- Mr. Chandler's initial statement

21  when I interviewed him was that while Mr. Singleton was out of

22  prison, he had associated with Mr. Chandler, so that would put

23  Mr. Chandler in the conspiracy right at the beginning.

24  Q    Okay.  And -- and, at that time, he had some kind of a

25  garage or --

Hensley - By the Court                                          57

1   A   Yes, sir.

2   Q   -- or was this like a repair shop, where he did car

3   repair?

4   A   Yes, sir.

5   Q   And during that period of time, was he also working for

6   either Little John's or that other trucking company?

7   A    I don't believe he was.  I believe that employment had

8   terminated and he had started his own shop.

9   Q   Okay.  And based on your interview with him, he made it

10  clear that at the time of his involvement with the alleged

11  conspiracy, he had begun to use methamphetamine and was

12  addicted to that drug at that time?

13  A   Yes, sir, and -- and during the -- during the interview,

14  he indicated that he had a stronger addiction to pills and

15  would use methamphetamine and -- and sell methamphetamine to

16  pay for the pill habit.

17  Q   So, he -- and the pills he's referring to are opioids?

18  A   Correct.

19  Q   So, he's got a opioid addiction and he uses meth to start

20  to help him maybe wean off the opioids, but -- but he starts

21  using meth also, and then he's selling meth to help support

22  the drug habit for both the opioids and -- and the meth that

23  he's using?

24  A   Yes, sir.

25           THE COURT:  Okay.  All right.  That's everything I've

1    got.  Any other questions from the lawyers?

2           MS. BORKOWSKI:  No, Your Honor.

3           MS. BROWN:  No, Your Honor.

4           THE COURT:  All right.  Thank you very much, Agent

5    Hensley.  You may stand down.

6        (Witness steps down.)

7           THE COURT:  Any other witnesses, Ms. Brown?

8           MS. BROWN:  No, Your Honor.

9           THE COURT:  All right.  I'll now hear arguments of

10   counsel, beginning with you, Ms. Borkowski.

11          MS. BORKOWSKI:  Your Honor, as we're here today for

12   the detention hearing, we are looking for the least

13   restrictive means and way of restricting Mr. Chandler pending

14   the outcome of this criminal charge.  So, of course, the Court

15   has a number of options, and it's on the whole spectrum.  And

16   I think that, you know, we put Ms. Campbell, his mother, on

17   the witness stand as a third party custodian.  That,

18   obviously, would be Mr. Chandler's preferred manner of being

19   released pending the outcome of this case.  This allows him a

20   number of things.  It allows him to live in a home with his

21   mother where he has an employment opportunity.  And, you know,

22   obviously, this Court will impose the restrictions of a law

23   abiding life and he will be drug tested.  The Probation

24   Office, during that time, will have the option and ability to

25   put him in drug -- obviously, drug rehabilitation programs.

1    In addition to that, we have the option of ankle

2 monitoring.  Being in the home, but maybe not being allowed to

3 go out of the home, and that he will be subject to the ankle

4 monitoring.

5    Another option that this Court will hopefully

6 consider, if those two are not available or are not agreeable

7 with the Court, is to release Mr. Chandler into a in -- in --

8 in custody -- I guess you wouldn't call it in custody -- but

9 an in residential treatment program -- I'm sorry, Your Honor

10 -- where he could get a 30 day program of drug treatment.  And

11 then, after he has completed the drug treatment program, that

12 the Court would then consider the other options of being

13 released into the home so that he can live in the home with

14 his mother or go into -- also be able to work.

15    I'll point out some other considerations for the

16 Court in allowing him to live at home with the mom and -- and

17 be allowed to work, is that Mr. Chandler has two children, two

18 young children.  And the mother, who lives in Arizona, I'm

19 sure would appreciate him being able to make income and being

20 able to support those children financially.

21    So, hopefully, those are some considerations for the

22 Court.  And I think that Ms. Campbell has proven on the

23 witness stand, at least in my eyes, that if there is a

24 violation, if there is a suspicion to violation, she wouldn't

25 hesitate to come forward to this Court and to his Probation

1   Officer, because she wants what's best for him.  And,

2   obviously, being on the street, using drugs, which has been --

3   I think it's apparent to everybody, especially this Court,

4   that this has been his downfall.

5          So, we would ask the Court to consider those options.

6          THE COURT:  Thank you, Ms. Borkowski.

7          Ms. Brown?

8          MS. BROWN:  Your Honor, with regard to Mr. Chandler,

9   I don't believe sending him back to his mom's house is the

10  appropriate release plan for him at this point.  Mr. Chandler

11  has been involved in the criminal justice system since he was

12  18 years old.  And he does have a stint where he did not have

13  any offenses.  But, as the agent said, in 2015, when this came

14  about, you know, he's back into the game.

15         What troubles the Court -- what troubles the

16  Government at this point is, first, is the escape from prison.

17  Prison is prison and you have to follow rules in prison.  And

18  Mr. Chandler didn't want to stay there and he escaped from

19  prison.  That shows a clear risk of flight.

20         The other one that shows risk of flight is, more

21  recently, is the FTA from circuit court.

22         So, you've got one from 17 years ago.  And I know

23  it's from 17 years ago, but it's still from prison.  It's not

24  from a local jail.  It's from a facility that is supposed to

25  keep people locked down.

1        And, more recently, in 2016, the court told him to

2  show up on a day and he directly disobeyed that court.

3        And, so, you also have Mr. Chandler's statement that

4  when he gets -- when the police officers are getting him, when

5  he's on a motorcycle, he's fleeing, he's running.  He didn't

6  stop for the cops that time.

7        So, you've got three clear instances where he's fled.

8  So, that -- that concerns the Government with regard to his

9  risk of flight.

10        The other thing is, you know, establishing parameters

11  for him, where he's going to -- his likelihood for him to come

12  back and to show up.

13        To go to his mom's house, he's -- he's even admitted,

14  self admitted, that he has a very bad drug problem.  And this

15  drug problem has stemmed from opioids and from methamphetamine

16  addiction.  And even in his -- his -- in his bail report, he

17  admits to having a problem with these -- these substances.  To

18  send him without treatment, I think is -- is peril, it's

19  detrimental to him.  So, if -- the risk of flight really

20  concerns the Government.

21        The other thing that concerns the Government is the

22  fact, in 2016, he is arrested with a substantial amount of

23  methamphetamine at his -- his shop, he's knowingly trafficking

24  pound quantities of methamphetamine with Wesley Gullett,

25  evading the police, and he gets caught with a gun, knowing

1    that he is a felon.  Then, he fails to show up.  Then, when he

2    gets arrested on the failure to appear and the new offense,

3    what does he have more of?  Methamphetamine, stolen firearm,

4    and a firearm.  So, it's a stolen firearm.

5            So, now, you've got somebody who is escalating from

6    your breaking and enterings.  Not only did he escape from

7    prison, he then goes and breaks -- with these two people, he

8    goes and breaks into a house and burglarizes a house and

9    steals a car.

10           So, you've got a person who has escaped, breaks into

11   a house, steals a car.  Fast-forward, you have a person who

12   has got methamphetamine, a firearm, trafficking pound

13   quantities to Little Rock, evading the police, failing to

14   appear, and then getting caught subsequently with

15   methamphetamine and another gun.

16           And, so, Your Honor, I -- I believe that it's clear

17   that Mr. Chandler is a danger to this community.  He -- he has

18   not abided by the Circuit Court's orders.  And I don't know a

19   set of circumstances that could propose to have Mr. Chandler

20   show up at this court.

21           But, at the very least, the Government would ask that

22   he would go to inpatient rehab.  And if he does go to

23   inpatient rehab, the Government would also request, as it has

24   requested on all of the other people, that it not be in Pope

25   County, not put him back in the place where we -- he has had

1  so many problems.

2          But, the Government believes, in this case, that

3  detention is warranted, just upon the fact of his entire

4  criminal history and the fact that he's been involved in the

5  criminal justice system since he was 18 years old, and then,

6  more recently, all of his arrests with the guns and the

7  failing to appear.

8          I believe he poses a danger to the community and I

9  believe he is a risk of flight.

10          THE COURT:  Thank you, Ms. Brown.

11          This is a presumption case.  The case begins with the

12  presumption that there is no condition or combination of

13  conditions I can impose that would reasonably assure the

14  safety of the community or that -- that Mr. Chandler would not

15  flee.  The Defendant has put on, certainly, some evidence to

16  rebut that presumption.  As a result, the presumption just

17  simply becomes one of the many factors that I have to consider

18  under the Bail Reform Act in making my decision.

19          As far as flight risk is concerned, there is

20  certainly not, in  -- in my evaluation of the evidence, a

21  preponderance of the evidence that Mr. Chandler is a flight

22  risk.  When he was -- had just turned 21 years old, he escaped

23  from the -- an ADC facility, along with two of his other --

24  two other prisoners.  That -- that took place 17 years ago.

25  And criminal conduct that a defendant engages in when they're

64

1   18, 20, 21 years old, that involves bad decision making, that

2   is then followed by a period of time, once some -- some age

3   and wisdom has been imparted to that defendant, that suggests

4   they can follow the rules and -- and conform their behavior to

5   lawful behavior, I think has to be given much less weight.

6          And, here, we have that kind of a situation, because

7   we had a nine year period between some time in the summer of

8   2007 and early 2016 when Mr. Chandler lived in the Pope County

9   area, worked, had a job, was married, stable, and for that

10  nine year period did not receive any kind of criminal charges

11  at all.

12         So, that is strong evidence that once he was released

13  from the Arkansas Department of Corrections in 2005, he

14  decided that that was not a life that he wanted to pursue and

15  lived a -- a life in which he was a member of the community,

16  married, had kids, had a job, and didn't engage in any

17  criminal conduct for a period of nine or ten years.

18         He then became addicted to drugs.  And drug addicts

19  make bad decisions.  And in connection with the failure to

20  appear that he had in September of 2016, when he was supposed

21  to show up for his sentencing, he was addicted to drugs.  All

22  the evidence shows he's on drugs.  And drug addicts make bad

23  decisions.  I think it is very significant that, for purposes

24  of flight risk, he did not show up for court when he was

25  supposed to, to be sentenced, but he didn't leave the town of

1   Russellville.  There was no flight to avoid being sentenced.

2   There was no flight to leave the country or leave the state.

3   He simply stayed in Russellville.  And ultimately, shortly --

4   very shortly after his sentencing, he was arrested and

5   sentenced on those charges.  So, there is nothing to suggest

6   that -- that he -- what that suggests is, again, he's addicted

7   to drugs and drug addicts make bad decisions, like not showing

8   up to court when they're supposed to.  But he did not flee

9   Pope County.  He did not flee Russellville.  And he was

10  arrested in short order after he failed to appear, and he was

11  sentenced.

12          Once he went back into the ADC, it certainly is

13  something that is -- counts in his favor, that he voluntarily

14  enrolled in a six month drug treatment program, indicating

15  that once he went back to -- to the ADC in 2016, he recognized

16  that the central problem in his life was he was a horrible

17  drug addict, and he went through a six month treatment program

18  in prison, because that would suggest he wanted to return to

19  the life that he had for the nine years or so between 2005 and

20  -- and -- or between 2007 and 2016 when he lived in

21  Russellville and didn't engage in any kind of criminal

22  conduct.

23          So, I don't -- I don't see anything here that would

24  suggest that Mr. Chandler is a -- a flight risk or that he

25  will not appear for proceedings in this case.

1          As far as danger to the community is concerned, that

2    requires clear and convincing evidence that he is a danger to

3    the community.  In looking at his criminal history, he is not

4    charged with any crimes that have ever involved any violence,

5    no crimes that have ever involved him using a firearm, no

6    aggravated assaults, no domestic charges, no batteries.

7    There's nothing that suggests that kind of violent behavior in

8    his past.

9          I am always concerned any time I have a defendant who

10    is found to be in possession of firearms.  The reality is, if

11    you're in the drug trafficking business -- and certainly the

12    indictment alleges and the Government has presented a strong

13    case that -- that Mr. Chandler was involved with dealing drugs

14    in a conspiracy for about an 18 month period of time.  He's

15    presumed innocent on those charges, but the Government is

16    going to have a strong case there.  During that period of

17    time, he had a firearm.  A drug dealer without a firearm is a

18    little bit like a carpenter without a hammer.  If you're going

19    to deal drugs, if you're going to be in a drug conspiracy with

20    the kind of people that were involved in this one, people that

21    are in a -- the Aryan -- New Aryan Nation, whatever that

22    horribly racist organization is, that -- that it appears Mr.

23    Loadholt, the leader, was involved with, those people tend to

24    be very violent and very dangerous.  There is one person that

25    is alleged to have died who was an informant in that group.

1   The whole notion of -- of anybody being involved in that group

2   of violent people that doesn't have a pistol would be pretty

3   remarkable, because those are violent, dangerous people, that

4   probably can't much be trusted.  You're in a very dangerous

5   business, which is dealing drugs.  And, so, the fact that he

6   had a pistol worries me, but not nearly as much as if there

7   was anything in his history that would suggest he had ever

8   used a pistol before, either to hold somebody up, to rob

9   somebody, to commit an aggravated assault, or commit a

10  battery.  And I don't have that.  So, I've got someone that

11  was -- was found twice to be in possession of a pistol.  But,

12  given the group of people he chose to associate himself with

13  while he was a drug addict, utterly unsurprising that he's --

14  that he's got that gun, which would -- you know, there's a

15  reasonable inference that's drawn, he has that gun, not

16  because he's committing crimes with it, but because he's

17  deathly afraid that one day somebody may walk in that has a

18  gun and he doesn't and he's going to get killed.

19         So, I -- that's not sufficient to rise to the level

20  of -- of clear and convincing evidence that there is no

21  condition or a combination of conditions that I could impose

22  in this case that can't reasonably assure the safety of the

23  community.

24         It's important to understand that phrase.  The Bail

25  Reform Act does not require me to guarantee the safety of the

68

1  community.  If I was required to guarantee the safety of the

2  community, there would never be a person that left my

3  courtroom, because the only way I could guarantee it is to

4  lock them up, because anybody that appears before me may hurt

5  somebody when they leave.

6        And that's the heaviest weight I bear as a judge,

7  trying to separate who those people are that are so dangerous

8  that there is no condition I can impose that will reasonably

9  assure the safety of the community.  And that's the standard

10 that I have to apply here.

11       And I believe that with Mr. Chandler, given his

12 criminal history, given all the evidence that the Government

13 has presented -- and, by the way, the strength of the

14 Government's case, and this is a strong case, of the factors

15 under the Bail Reform Act, by statute, I'm required to weigh

16 that one the lightest, the least.  That factor does weigh in

17 the Government's favor, but it's the one that I have to weigh

18 the -- that I have to assign the least weight to among the

19 other factors.  And there are many other factors here, that I

20 just outlined, that suggest that I can set conditions in this

21 case.

22       So, Mr. Chandler, I want you to come to the lectern

23 with your attorney, Ms. Borkowski.  And, Ms. Campbell, I also

24 want you to come forward, because I'm going to make you the

25 third party custodian.

69

1            Mr. Chandler, before I set these conditions, I want

2    to make really sure that you understand one thing.  This is

3    the first time in your life you've ever been charged under a

4    federal indictment.  You've got a long history in state court.

5    One of the things that I was not surprised by, but

6    disappointed, was the fact that with so many of the state

7    charges that were brought against you from a young age, the

8    judges in the state system that saw you repeatedly showed

9    leniency toward you.  They repeatedly gave you five year

10   sentences, six year sentences, and either suspended imposition

11   of all time in jail or suspended most of that time in jail.

12   As a consequence, it took you a number of years, until about

13   2005 or 2006, that a state court judge finally said enough of

14   this and actually gave you a jail sentence where you went to

15   jail.  Please understand this, the federal system is not like

16   the state system.  There is no parole.  There is no early

17   release.  There are swift, immediate, and horribly draconian

18   sanctions that are going to come down on your head if you

19   don't do what you're supposed to do while you're on this bond.

20   Do you understand that?

21            THE DEFENDANT:  Yes, sir.

22            THE COURT:  There will be no leniency whatsoever

23   shown by me.  There will be no leniency shown by the District

24   Judge if you ultimately plead guilty or you're found guilty on

25   these charges.  And things that you do while you're on this

70

1  bond, if you violate this bond, can be considered by your

2  sentencing judge, the United States District Court Judge, that

3  ultimately hears this case, if you're found guilty or you

4  plead guilty, and they can use the fact you violated this bond

5  and hold that against you in increasing the length of time

6  that you serve in federal prison.

7        So, understand the seriousness of this.  I tell

8  everybody in your situation the old Chinese proverb, "Be very

9  careful what you wish for, you may get it."  You want to be

10  released on bond, and I'm going to release you on bond, but,

11  understand, if while you're on this OR bond you engage in new

12  federal criminal conduct, you violate the law, you fail to

13  comply and honor the conditions that I'm imposing, you're

14  going to be revoked, you're going to be locked up.  And then,

15  if you plead guilty or you're found guilty, your sentencing

16  judge will hold the fact that you violated these conditions

17  against you in imposing any sentence that's ultimately imposed

18  on you in the case.

19        Do you understand all that?

20        THE DEFENDANT:  Yes, sir.

21        THE COURT:  So, it will be extremely important for

22  you to comply with each and every one of the conditions that I

23  have imposed.  I think Ms. Brown has made it pretty clear

24  here, if you violate any of these conditions, it will be a

25  matter of hours before a motion to revoke is on my desk and

1   we're going to have a hearing to decide whether we should lock

2   you up.  And if I find you didn't comply with the conditions,

3   I'm locking you up.  Okay?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  Now, as far as the central condition that

6   you're going to have to comply with, because it's what -- it's

7   what worries me most about you, you were addicted to opioids

8   for about 18 months or two years.  In the course of all that,

9   you also used -- started to use meth daily.  Meth and opioids

10  are extremely difficult drugs to stay off of.  You went

11  through about a six month program, voluntarily, when you were

12  in the ADC.  That got you clean and sober.  Hopefully, you

13  have your faculties about you now.  But, you should

14  understand, once you get out, it -- it is not going to be easy

15  for you to stay away from those drugs.  Those drugs are still

16  going to want to pull you back in.  You are not, in my

17  opinion, in a good position now to go directly into your

18  mother's home.  I think you would benefit from an inpatient

19  treatment program for 30 days, where independent folks in that

20  inpatient treatment facility can assess you, help you, give

21  you tools to be successful.  And then, once you complete that

22  30 day program, then you will be in a position, I believe, to

23  go back to live with your mother, work at Little John

24  Trucking, and try to stay off drugs.  But, understand, if you

25  -- we're going to be testing you throughout this period of

72

1   time, you're going to be screened after you leave inpatient

2   drug treatment.  If you test positive, if you use drugs, you

3   are going to get locked up.  Do you understand all that?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  And you think that after a 30 day

6   inpatient treatment program, you're going to -- and the help

7   you got when you were in the ADC, you think you're going to be

8   in a position to stay off opioids and methamphetamine?

9          THE DEFENDANT:  Absolutely.

10          THE COURT:  All right.  These are going to be the

11   conditions that I'm going to impose on you.  I'm required to

12   go over these with you to make sure you understand these

13   conditions.  In addition to me orally going over the

14   conditions with you today in court, you're going to have bond

15   papers that have all these conditions noted on it.  And, so,

16   you don't have to try to remember or keep in mind everything

17   that I'm about to tell you.

18          Yes, ma'am, Ms. Brown?

19          MS. BROWN:  But, Your Honor, the Government requests

20   that he would go to 30 days of Chem-Free Living subsequent to

21   his 30 days in there, and then he can be released to a third

22   party, if that's -- if that's the Court's recommendation.  I

23   think 60 days after coming out of prison, in order to get on

24   the right path, is a better step than 30 days, and then go to

25   your mom's house, so that way he can continue his recovery

73

1  prior to going back to his mom's.

2       THE COURT:  And, Ms. Brown, I'm not going to accept

3  that recommendation.  He's done six months in the ADC,

4  voluntarily.  He's now clean and sober.  He has a job.  If he

5  didn't have a job -- if he didn't have a place to go to work,

6  if he didn't have a good solid third party custodian, I'd put

7  him in Chem-Free Living for the rest of the time these charges

8  are pending.  That's not my case.  He's got structure with his

9  mother.

10       And you -- and you do understand, Mr. Chandler, that

11  your mother, who has been put through a lot with you from the

12  time you were 18 years old in terms of bad decisions you've

13  made, is still at your side, she still loves you, she's still

14  willing to help you.  I would hope somewhere in your heart you

15  can find the grace to understand what a good mother you've got

16  and make sure that in her willingness to still stand beside

17  you and still try to help you, that you need to make sure,

18  while you live with her, you do everything she requires of you

19  to do to live in her home and that you also do everything to

20  comply with this bond, because that's the least you can do for

21  your momma, who is at your side now, after what you've put her

22  through from the time you were 18 years old.

23       THE DEFENDANT:  Yes, sir.

24       THE COURT:  Okay.  So, this is -- these are going to

25  be the conditions that you're going to be required to comply

74

with.

First, while you're on this OR bond, you must not commit any offense in violation of federal, state, or local law. In a few minutes, I'm going to explain to you just how bad the consequences are going to be for you if you engage in new federal criminal conduct while you on this bond.

You must immediately advise your Probation Officer if you have any contact of any kind with state or federal law enforcement. That means, if it's something as minor, if once you're back with your mom, you get pulled over for a traffic citation, you've got to pick up the phone and immediately let your Pretrial Services Officer know, "Hey, a police officer just pulled me over because I ran a stop sign." All police cars now have computers in it. The second that they run your driver's license, if they stop you, they will see on their computer that you are under federal indictment. That police officer will, at some point in the next day or two or three, call your Pretrial Services Officer and say, "Hey, I pulled over Mr. Chandler two days ago for running a stop sign." You make very sure you let that Pretrial Services Officer know you've had contact with law enforcement immediately so the first news they get of it is not when the state trooper calls, because that would suggest to the Pretrial Services Officer that you failed to -- to report contact with law enforcement. And that would be what it would appear to me, too. So, make

1    sure, if you do have contact, regardless of how minor it is,

2    with state or federal law enforcement, you've got to

3    immediately let your Pretrial Services Officer know that.

4           You must immediately advise the Court, your attorney,

5    and the United States Attorney, in writing, if there is going

6    to be any change in your address or phone number.

7           Now, Ms. Campbell, you've lived at that address for

8    some time.  You have no plans to change or leave that address?

9           MS. CAMPBELL:  No.

10          THE COURT:  Okay.  And once you're out, if you get a

11   cell phone, decide to get a cell phone, you must let your

12   Pretrial Services Officer know your cell phone number.  Again,

13   we have to know how to get in contact with you the entire time

14   that you're out on this bond.

15          You must appear at all proceedings in this case and

16   voluntarily surrender for imposition of any sentence.  You've

17   had one situation, back in 2016, where you failed to appear

18   for a state court judge.  You later got arrested.  If you fail

19   to appear in this case, for anything, that's a felony.  That

20   will be a consecutive sentence on top of any sentence you

21   receive in this case.  Make very certain that you appear and

22   are present for all court proceedings in this case, because

23   there will be very harsh consequences for you if you are not.

24          I want you to work while you're on this bond.  Again,

25   you've got -- you're fortunate, the owners of Little John are

76

1  willing to let you to come back there and work there.  I want

2  you to work there.  I want you to stay employed.  And Ms.

3  Borkowski has suggested that you've got a couple of kids.

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Are you under a support order or anything

6  like that?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  You make sure that while you're on this

9  bond, you send money and whatever that support obligation

10  calls for to your kids that are in Arizona.  Do you understand

11  that?

12          THE DEFENDANT:  (No audible response.)

13          THE COURT:  You must report to the Probation Officer

14  at all times that he or she directs for you to report.

15          You no longer -- you know this, you can't possess a

16  firearm.

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  If you were found to be in possession of

19  a firearm while you're on this OR bond, that would be a new

20  federal crime committed while on OR bond.  And I'm going tell

21  you in a few minutes just how bad that would be for you in

22  terms of the number of years you'd be in federal prison if you

23  were found to be in possession of a gun.  You make very sure

24  while you're on this OR bond you're not in possession of a

25  firearm or ammunition for a firearm.

1          Now, Ms. Campbell, are there any weapons of any kind

2    in your home; firearms or ammunition for firearms?

3          MS. CAMPBELL:  No.

4          THE COURT:  Okay.  Make very certain that while Mr.

5    Chandler is in your home, there are no firearms or ammunition

6    for firearms in that home.

7          I don't want you to use any alcohol.  Once you leave

8    Chemical Free Living (sic), I want you sober, I want you to

9    have your faculties about you.  People that have addiction

10   problems, that get -- that drink too much, make bad decisions

11   and sometimes use drugs, so you're not going to be allowed to

12   use any alcohol.

13         You must refrain from any use or unlawful possession

14   of narcotic drugs or other controlled substances unless

15   they're prescribed by a licensed physician.  You must submit

16   -- you're going to be required to submit to random drug

17   screening.  I'm going to require that you be taken by your

18   mother, directly from the courthouse, to the Crowley's Ridge

19   Drug Treatment Facility in Jonesboro.  I agree with Ms. Brown,

20   you don't need to be in any kind of treatment facility in Pope

21   County.  You're going to be living in Conway County.

22         One of your conditions is I don't want you have any

23   contact with anybody that's named in that indictment.  Those

24   people need to be dead to you.

25         THE DEFENDANT:  Yes, sir.

1    THE COURT:  Are we clear?  I don't want -- by

2  contact, I mean no texts, no phone calls, no e-mails, no

3  regular mail, no contact with anybody named in that

4  indictment.  Are we clear?

5    THE DEFENDANT:  Yes, sir.

6    THE COURT:  I want you to maintain regular contact

7  with Ms. Borkowski, which means you must be in regular contact

8  with her no less often than once every two weeks.

9    And you must report to the Pretrial Services Office

10  at least 30 minutes before all scheduled proceedings in this

11  case.

12    Now, Mr. Chandler, do you understand all those

13  conditions that I have just imposed on you?

14    THE DEFENDANT:  Yes, sir.

15    THE COURT:  All right.  There is going to be a place

16  on here for you to sign and also a place for Ms. Campbell to

17  sign.

18    And, Ms. Campbell, as your son's third party

19  custodian, you understand you're assuming an independent

20  obligation directly to this Court to do what you swore under

21  oath you would do, which is if you suspicion your son is using

22  drugs, if he starts acting erratically, if he starts sleeping

23  in, he -- you've seen how he is under the influence of drugs

24  once before, if you see anything that suggests to you a

25  violation of any of these conditions, you're promising, and

1  you understand you've got to immediately pick the phone up and

2  let his Pretrial Services Officer know that, right?

3            MS. CAMPBELL:  Yes.

4            THE COURT:  And you're willing to do that?

5            MS. CAMPBELL:  Yes.

6            THE COURT:  All right.  By signing those bond papers,

7  you're promising, committing, to comply with your obligations

8  as third party custodian.

9            Now, before I get to a discussion of penalties and

10  sanctions, there is one subject that always concerns me in

11  cases like this.  I don't believe there is anybody from the

12  press in the courtroom.  I think everybody here is either

13  United States Marshals, Court Security Officers, or parties.

14  One of the things that Agent Hensley testified about was Mr.

15  Chandler's cooperation in an interview and the fact that

16  information that he provided was used by them to name and

17  arrest other people in this conspiracy.  There's certainly a

18  strong suggestion that the people that the indictment alleges

19  -- and one them is you, Mr. Chandler -- that were involved in

20  this drug distribution network were some dangerous people.

21  Somebody is alleged to have been killed that was involved in

22  that.  I want you to evaluate what, if any, danger you feel

23  like you may be in.  I don't know how well known it is that

24  you interviewed or that you may have cooperated.  I don't

25  think anything is going to come out of this hearing, because I

80

1  don't think anybody was here that would carry that information

2  back.  But, I want you to be candid with Ms. Borkowski and I

3  want you to be candid with the United States Attorney, if you

4  feel like that there are -- if you're in danger, if you feel

5  like there are other people that may believe or understand

6  that you cooperated, you need to let -- let folks know about

7  that.  Do you understand that, Mr. Chandler?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  All right.  And just -- just be cognizant

10  of that and communicate with Ms. Borkowski.  If -- if you feel

11  that way, Ms. Borkowski can -- can take some steps that may be

12  designed to help you on that.

13           Now, let me go over the penalties and sanctions, Mr.

14  Chandler, and make sure you understand this.  As I've told

15  you, this system does not work like the state system that

16  you've got long experience with.  We -- there is no play in

17  the joints here.  If you -- if you do things that violate

18  conditions, there are swift and immediate consequences.

19           First, if you violate any of those conditions as I've

20  explained to you, the Government is going to file a motion to

21  revoke, we're going to have a bond hearing -- a -- a

22  revocation hearing, and if I find you've violated any of those

23  conditions, I'm going to lock you up.  Charges like this often

24  take 18 months to two years to resolve.  That is a very long

25  time for you to lose your liberty because you can't do

1  something as simple as comply with the conditions.  But, that

2  will be the first sanction for you, you're going to be locked

3  up for like up to 18 months to two years.

4          In addition, your sentencing judge can consider the

5  fact -- if you later plead guilty or you're found guilty, your

6  sentencing judge can consider the fact you violated conditions

7  and hold that against you under the guidelines and enhance or

8  increase the sentence that you receive.  The Bureau of Prisons

9  will also consider the fact you violated conditions of your

10  bond, and that will be held against you in deciding what level

11  security facility you should be incarcerated in and what kind

12  of privileges should be made available to you once you are

13  incarcerated.

14          So, remember, I reminded you about the old Chinese

15  proverb; be careful, you've wished for this.  I'm giving you

16  this, but understand if you violate these conditions there are

17  just a whole host of really bad consequences that are going to

18  come down on your head.  Are you clear on that?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  All right.  Now, the second thing, and I

21  emphasize this to every defendant that appears before me,

22  there is a specific federal statute that provides if, while

23  you're on OR bond, you engage in new federal criminal conduct,

24  the penalty for that is a statutory maximum minimum of ten

25  years in prison, and that ten year sentence must be imposed

82

1    consecutive to any sentence you receive on these underlying

2    charges.  And if you're later found guilty on these underlying

3    charges, and found to have committed a federal crime while

4    you're on OR bond, your sentencing judge can dramatically

5    enhance the sentence you receive on these underlying charges.

6           Typically, if someone commits new federal criminal

7    conduct while on an OR bond, it can lead to between ten and 20

8    years of additional time in the federal prison.  And that

9    second sentence for committing new federal criminal conduct,

10   by statute, has to be consecutive.

11          So, no matter what else you do while you're on this

12   OR bond, do not do anything that could lead to new federal

13   criminal charges being brought against you, because the

14   penalties for that would be so severe.

15          Finally, there is a federal statute that makes it a

16   crime punishable by up to five to ten years of imprisonment, a

17   fine of 250,000 dollars, or both, if, while you're on this OR

18   bond, you attempt to intimidate, tamper with, or retaliate

19   against a witness, juror, informant, or Officer of the Court.

20          Now, do you understand those penalties and sanctions?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  And all those penalties and sanctions are

23   on the last page of your bond papers.

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  So, this is what we're going to do now.

1  You're going to leave the courthouse on that bond.  But,

2  before you leave, has he been processed?

3          Has he been processed?

4          THE U.S. MARSHAL:  He has to be processed out, Your

5  Honor.

6          THE COURT:  All right.  You'll need to go by the

7  Marshals Service.  Ms. Borkowski can help you -- they'll take

8  you to the Marshals Service.  Ms. Borkowski will go up there.

9          Once you're processed out, if you would please see

10  your Pretrial Services Officer, she'll give you last minute

11  reporting instructions.

12          Ms. Campbell, I want you to transport your son

13  directly from the courthouse to Jonesboro, Arkansas, to the

14  Crowley's Ridge inpatient treatment facility.  His Pretrial

15  Services Officer will notify them that your son is on the way,

16  and he needs to get up there promptly to get enrolled in that

17  inpatient treatment program.

18          And once you're in that program, Mr. Chandler, you

19  need to do every single thing that is required of you in that

20  program so that you can successfully complete that program.

21          Once you've completed it, assuming that the treatment

22  facility indicates you've done well, you've progressed, you've

23  made progress, you've complied with all the rules, once you've

24  completed that program, I'm going to allow you to be released

25  to your mother.  She'll be your third party custodian.  And

1  you can go back to your job at Little John Trucking.

2            Once you're back, you're going to be living in Conway

3  County.  You're going to be commuting back and forth to Pope

4  County.  When you finish your job every day, you need to get

5  in that car and drive straight back to Conway County and --

6  and get out of -- of Russellville.  And make sure you're not

7  around that group of people that are named in the indictment

8  that got you in the situation you're in now.  Are you clear on

9  that?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  All right.  Is there anything further for

12 the Government?

13           MS. BROWN:  No, Your Honor.

14           THE COURT:  For the defense?

15           MS. BORKOWSKI:  No, Your Honor.

16           THE COURT:  Very well.  Court is adjourned.

17      (Adjournment at 12:44 p.m.)

18           ELECTRONIC SOUND RECORDING CERTIFICATION:

19 I, court approved transcriber, certify that the foregoing is a

20 correct transcript from the official electronic sound

21 recording of the proceedings in the above-entitled matter.

22

23 /s/Robin Warbritton                February 9, 2020
   Signature of Approved Transcriber    Date

24

25 Robin Warbritton
   Typed or Printed Name