```
1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
2                        WESTERN DIVISION

3

4   UNITED STATES OF AMERICA,     .
                                  . Case No. 4:17-CR-00293-BSM-17
5   PLAINTIFF,                    .
                                  .
6   VS.                           . Little Rock, Arkansas
                                  . November 7, 2018
7   ROBERT CHANDLER,              . 10:33 A.M.
                                  .
8   DEFENDANT.                    .
     . . . . . . . . . . . . . . .
9

10

11                      TRANSCRIPT OF

12                   REVOCATION HEARING

13          BEFORE THE HONORABLE J. THOMAS RAY

14             UNITED STATES MAGISTRATE JUDGE

15

16

17  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Tenesha Brown

18

19

20  Transcription Service:            Robin Warbritton
                                      Post Office Box 262
21                                    Vilonia, AR  72173

22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
```

```
 1   APPEARANCES:

 2   For the Government:     Ms. Liza Jane Brown
                             U.S. Attorney's Office
 3                           Eastern District of Arkansas
                             Post Office Box 1229
 4                           Little Rock, AR  72203-1229

 5   For the Defendant:      Ms. Misty Wilson Borkowski
                             Cross, Gunter, Witherspoon & Galchus,
 6                           P.C.
                             Post Office Box 3178
 7                           Little Rock, AR  72203-3178

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2                    DIRECT    CROSS    REDIRECT    RECROSS

3   GOVERNMENT'S WITNESS:

4   Sarah Hardison          5        15

5

6   DEFENDANT'S WITNESS:

7   Brenda Campbell        28        31

8

9   EXHIBITS:                      IDENTIFIED       RECEIVED

10  Government's Exhibit No. 1          14               14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2       (Call to order of the Court.)

3            THE COURT:  Good morning.  You may be seated.

4            MS. BROWN:  Good morning, Your Honor.

5            THE COURT:  We are here this morning on the

6  Government's motion to revoke OR bond in the case of *United*

7  *States of America v. Robert Chandler*, case number 4:17-CR-293.

8            Ms. Brown, are you prepared to proceed on behalf of

9  the Government?

10           MS. BROWN:  Yes, Your Honor.

11           THE COURT:  Ms. Borkowski, on behalf of the

12  Defendant?

13           MS. BORKOWSKI:  Yes, Your Honor.

14           THE COURT:  All right.  Ms. Brown, you may call your

15  first witness.

16           MS. BROWN:  Your Honor, I was just wondering if they

17  are stipulating to anything that has been in here -- or if he

18  is admitting to anything.  Otherwise, I'll call Sarah

19  Hardison.

20           MS. BORKOWSKI:  Your Honor, there are items -- listed

21  items in the United -- in the Government's motion that we are

22  willing to admit to, and then there are some that we think

23  warrants a little bit more of a discussion.

24           THE COURT:  Okay.  Let's go through so that we can

25  narrow this.  What are the items in there that Mr. Chandler is

                        Hardison - Direct                        5

1   willing to admit?

2          MS. BORKOWSKI:  Paragraph 1, we can admit.

3          THE COURT:  Okay.

4          MS. BORKOWSKI:  Paragraph 2, we can admit.  Paragraph

5   3, we will admit.  Paragraph 4, we will admit and ask that it

6   be addended to reflect that that's the Freedom House.  And

7   paragraph 6, we can admit.

8          And, Your Honor, I would note that, on paragraph 6,

9   there appears to be a typo that says -- the very last year is

10  reflected as 2015, I believe that's 2018.

11         THE COURT:  Yes, ma'am.

12         All right.  And then, all of the -- any of the

13  allegations in any of the other paragraphs, besides the ones

14  you've just admitted, you're not willing to admit to, so we'll

15  need to hear evidence on those things?

16         MS. BORKOWSKI:  Yes, Your Honor.

17         THE COURT:  All right.  Ms. Brown, that's at least

18  narrowed it down somewhat.  You may call your first witness.

19         MS. BROWN:  Thank you, Your Honor.  I'll call Sarah

20  Hardison.

21         THE COURT:  Ms. Hardison, please come forward to be

22  sworn.

23      (SARAH HARDISON, GOVERNMENT'S WITNESS, SWORN.)

24                      DIRECT EXAMINATION

25  BY MS. BROWN:

Hardison - Direct                                           6

1  Q   Please state your name.

2  A   Sarah Hardison.

3  Q   How are you currently employed?

4  A   U.S. Probation.

5  Q   And are you the U.S. Pretrial Probation Officer who is

6  assigned to the pretrial release supervision of Robert H.

7  Chandler?

8  A   Yes, ma'am.

9  Q   Okay.  And have you been on his case since the inception?

10 A   Not since the very beginning, but since he was released

11 from the 30 day residential treatment.

12 Q   Okay.  And let's walk through what Mr. Chandler has been

13 through.  So, he was released from court, and then where did

14 he go after that?

15 A   He went to the treatment at Crowley's Ridge for 30 days.

16 Q   So, a 30 day inpatient treatment?

17 A   Yes, ma'am.

18 Q   Okay.  All right.  And did he enter into Chem-Free Living

19 after that, or did he go reside somewhere else?

20 A   No, he went to go live with his mother.

21 Q   Okay.

22 A   And did outpatient substance abuse treatment.

23 Q   All right.  So, he didn't go into Chem-Free Living?

24 A   Correct.

25 Q   So, okay.  Okay.  So, and he went to live with his mom?

1  A   Yes.

2  Q   And that's in Russellville, right?

3  A   Hattieville, Arkansas.

4  Q   Hattieville?

5  A   Yes.

6  Q   Okay.  And he was doing six month outpatient treatment at

7  the Freedom House in Russellville?

8  A   Yes, I believe it was around six months.

9  Q   Okay.  Do you know how far away Hattieville is from

10 Russellville?

11 A   20 minutes or so.

12 Q   Okay.  All right.  Okay.  And while he was at treatment --

13 he started that -- do you know what date you recall that he

14 went into -- got out of Chem-Free Living?

15 A   He didn't do Chem-Free.

16 Q   I'm sorry, not Chem-Free, but out of inpatient?

17 A   I don't know exactly.  I want to say it was in January.

18 Q   Okay.  All right.  And then, now we've already gone over

19 some of your -- did you have any other issues besides the

20 March 7th, where he tested presumptively positive for

21 methamphetamine; was there anything after the March 7th,

22 before we get into the September 20th?

23 A   No.

24 Q   Okay.  So, let's go on to September 20th.  What started

25 happening -- what happened on September 20th, 2018?

Hardison - Direct                                    8

1   A    On September 20th, he failed to appear for a drug screen

2   at the Freedom House.

3   Q    Okay.

4   A    I called him on the 21st, September 21st, and let him know

5   he had missed it and instructed him to report to the Freedom

6   House to make up the missed drug screen from the day before.

7   Q    Okay.  And then, did he go to the drug -- did he go to

8   Chem-Free -- I'm sorry -- did he go to the Freedom House?

9   A    Yes, he did.

10  Q    Okay.  And what happened on the 21st when he submitted a

11  drug screen?

12  A    I got a call from one of the therapists up there, she

13  reported that he had showed up with a deceptive urine

14  dispensing device.  The -- the male that was observing the

15  drug screen noticed that he had a deceptive device, asked him

16  about it, at which time he admitted it, that he had it, gave

17  it to the -- the male observer, and then submitted an actual

18  urine sample which tested positive for methamphetamine and

19  opiates.

20  Q    Okay.  So, that's called a Whizzinator?

21  A    Yes.

22  Q    So, he had that -- somebody else's urine attached to his

23  body?

24  A    I don't know if it was somebody else's urine or if it was

25  fake urine.  I just know, yeah, it did have some substance in

Hardison - Direct                                    9

1    it.

2    Q    Okay.  So, it had a substance in it that either was urine

3    or a substance that was similar to urine?

4    A    Correct.

5    Q    And why do they usually have these devices, what are they

6    used for?

7    A    To avoid testing positive.

8    Q    So, once he was tested and he admitted to that on

9    September 21st, what did he say about using methamphetamine?

10   A    I don't recall if he gave a reason.

11   Q    But when did he say he used it?

12   A    I don't -- I don't recall.  It may have been a couple days

13   before.

14   Q    Okay.  So, do you have your violation report in front of

15   you?

16   A    I do.

17   Q    Okay.  Would you look below, on the second page, he

18   verbally admitted to using methamphetamine?

19   A    Okay.  On September 18th.

20   Q    Okay.  All right.  So --

21   A    So, three days before.

22   Q    -- a couple days before?

23   A    Uh-huh.

24   Q    All right.  And then, on September 21st, did he also admit

25   anything else that was a violation of his conditions of

Hardison - Direct                                    10

1  release?

2  A    Yes.  The day before that, on the 20th, another officer,

3  who is supervising another pretrial defendant, she, the

4  officer, let me know that her defendant had admitted to her

5  that he had been in contact with Mr. Chandler.

6  Q    Okay.  Did Mr. Chandler ever report that to you?

7  A    No.

8  Q    Okay.  So, all right.

9  A    So --

10  Q    And then, subsequent to this, were there any other

11  violations that happened as a violation of his pretrial

12  conditions?

13  A    Before that, you're saying now?

14  Q    No, after like -- was he arrested for another --

15  A    Oh, yes.  Yes.  He was arrested on the -- a warrant was

16  issued on the 25th for theft by receiving out of Conway

17  County.

18  Q    And that's a felony arrest, correct?

19  A    Correct.

20  Q    All right.  And the allegations are that he committed the

21  offense of theft by receiving on March 13th, 2018?

22  A    Yes.

23  Q    Okay.  So, he was arrested for that case.  Do you know

24  when that's going to go to trial?

25  A    I believe it's in December.

Hardison - Direct                                                    11

1  Q   Okay.  Of this year?

2  A   Yes.

3  Q   Okay.  So, just to make sure, you, as Pretrial Services,

4  you have tools that you guys can use.  So, one of the tools

5  we've already used, which was outpatient, right?

6  A   Yes.

7  Q   Okay.  And then, I seem to recall that he was allowed,

8  instead of going to -- instead of going to Chem-Free, he was

9  just allowed to go to his mom's house?

10 A   Yes.

11 Q   And, so, the only other -- what else is there for Mr.

12 Chandler; what else can you do for him?

13 A   There's -- that's all the treatment that we -- we can

14 offer, is the inpatient, 30 days; outpatient, intensive

15 outpatient; and then, we also had him in mental health

16 treatment.

17 Q   Okay.  And, so, in the intensive outpatient, what were --

18 what were his -- what was he doing in outpatient treatment?

19 A   I believe he was being seen twice a month individually,

20 and then group -- or group therapy as well.

21 Q   Okay.  So, then, he had group therapy?

22 A   Uh-huh.

23 Q   Okay.  And then, beyond that, he also received mental

24 health treatment, right?

25 A   Correct.

Hardison - Direct                                    12

1   Q   Okay.  So, he's had all the treatment that is available

2   from Pretrial Services, correct?

3   A   Correct.

4   Q   Okay.  And he still was testing positive, and then the use

5   of the Whizzinator, and his new charges?

6   A   Yes.

7   Q   Those are his violations, correct?

8   A   Yes.

9   Q   Is there anything else as far as Mr. Chandler that you

10  believe the Court needs to hear today that has been going on

11  with him?

12  A   No.  That's -- that's all.

13          MS. BROWN:  Okay.  Your Honor, I'll pass the witness.

14          THE COURT:  All right, Ms. Brown.

15          You may cross, Ms. Borkowski.  I'll tell you what,

16  Ms. Borkowksi, before you start, just to make sure that we

17  have it in the record.  Ms. Brown, would you like to put

18  anything in the record that relates to the Defendant's prior

19  criminal history?

20          MS. BROWN:  Your Honor, I do not have the original

21  Pretrial Services Report.

22          THE COURT:  I have that report which lists that

23  criminal history.  It would seem to me that it would be

24  something that, to the extent I have looked at it and I deem

25  it to be relevant, that the Government might want to put in

1  the file here.

2        MS. BROWN:  Yes, if we could argue from the Pretrial

3  Services Report as well.

4        THE COURT:  Ms. Borkowski, have you got that criminal

5  history?

6        MS. BORKOWSKI:  Your Honor, I have the criminal

7  history.  I haven't reviewed -- I haven't reviewed it of

8  recent, quite frankly.

9        THE COURT:  Let's do this, because I do think it is

10  of some relevance to the decision that I have to make, and

11  I'll give you a few minutes, if you want to take a few minutes

12  to look at it.

13        The thing that, as I went through it, that I was

14  struck with is Mr. Chandler has got seven prior felony

15  convictions for either residential burglary or theft by

16  receiving, not counting the pending theft by receiving that he

17  has.

18        In addition, he has seven separate residential

19  burglaries or theft by receivings, apart from the convictions,

20  where he was charged and they were *nol prossed*.

21        So, that -- that totals 14, either 7 convictions and

22  7 *nol prosses*.  I think -- I think that's relevant.  It's

23  something that I had considered.

24        I'm going to -- and, so, I want you to take a look at

25  the criminal history before you cross examine the Pretrial

1  Services Officer, just so you'll be aware that that's

2  something that -- that I think needs to be in the record and

3  that is relevant for me to consider in making my decision at

4  this point.  How much time do you think, five minutes, ten

5  minutes; how much time would you like to take?

6          MS. BORKOWSKI:  Just five minutes will be sufficient.

7          THE COURT:  Okay.  We'll come back out in five

8  minutes and resume the hearing.

9      (Recess.)

10                        AFTER RECESS

11      (Call to Order of the Court.)

12          THE COURT:  You may be seated.

13          Ms. Brown, I guess to the extent we're going to

14  consider his prior criminal history, does the Government want

15  to move to have that introduced into evidence?

16          MS. BROWN:  Yes, Your Honor, if we could move to

17  introduce the Pretrial Services Report into evidence so that

18  we can argue from it.

19          THE COURT:  Okay.  And that will be marked as

20  Government's Exhibit 1.  Is there any objection, Ms.

21  Borkowski?

22          MS. BORKOWSKI:  No, Your Honor.

23          THE COURT:  All right.  It will be received without

24  objection as Government's Exhibit 1.

25      (Government's Exhibit No. 1 identified and received.)

Hardison - Cross                                    15

1    THE COURT:  And, Ms. Borkowski, you may now cross

2  examine Ms. Hardison.  Ms. Hardison, would you please come

3  back to the stand?

4    (SARAH HARDISON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

5  RETAKES THE WITNESS STAND.)

6                        CROSS EXAMINATION

7  BY MS. BORKOWSKI:

8  Q   Ms. Hardison, I want to go back over a couple of the items

9  listed on the motion to revoke, specifically on paragraph 15,

10  it says that Mr. Chandler failed to submit a urine specimen.

11  Was he tested the -- the previous day?

12  A   Yes, I think two days before.

13  Q   Two days before.  And in the typical course of him being

14  tested, was he tested on a weekly basis or --

15  A   It's random.  They call a number at night.  It's called

16  Code-A-Phone and it tells them whether or not to report the

17  next day.  It's computer generated.  So, like they're just

18  random throughout the month.

19  Q   Okay.  So, specifically, on September 20th, had he been --

20  had he called in to the Code-A-Phone?

21  A   I didn't get an e-mail that he didn't call.  Usually, if

22  they're scheduled for a test, and they didn't call in, I'll

23  get an e-mail saying the defendant is scheduled for tomorrow

24  and they did not call.  I did not get that e-mail.  So, I

25  don't -- as far as I know, he did call.

Hardison - Cross                                          16

1  Q   Okay.  And then, specifically, on paragraph 7, the first

2  part of the first sentence refers to him failing to

3  participate in substance abuse treatment at the Freedom House.

4  Was -- at that time, was he still in ongoing substance abuse

5  treatment, or was he only being tested at the Freedom House?

6  A   I don't -- I don't have whatever document you're looking

7  at.  All I have is the report that we do, the violation memo.

8  Q   Okay.  Well, that's fine --

9  A   So, I'm not sure which one --

10 Q   -- let's look --

11 A   -- you're talking about.

12 Q   I'm sorry.  I did not mean to speak over you.

13 A   Oh, that's okay.

14 Q   Let's look then at your -- at your violation report.

15 Specifically, on the second page, the very last paragraph and

16 next to last sentence says that on July 30th, 2018, Defendant

17 successfully pleated (sic) -- completed a six month outpatient

18 substance abuse treatment at Freedom House in Russellville?

19 A   Correct.

20 Q   So, when he was going to Freedom House and being drug

21 tested, was that part of treatment, or was that a location for

22 drug testing?

23 A   That was a location for drug testing.

24 Q   Okay.  So, the statement that he failed to participate in

25 substance abuse treatment program at Freedom House, would that

1  be inaccurate?

2  A    Where do you see it says he failed to participate?

3  Q    That was the Government's allegation.

4  A    On September 20th?

5  Q    On September 21st.

6        THE COURT:  It's in paragraph 7.

7  BY MS. BORKOWSKI:

8  Q    Of the motion.

9        THE COURT:  Of the Government's motion.

10        THE WITNESS:  Okay.

11        MS. BORKOWSKI:  Your Honor, may I approach?

12        THE COURT:  Yes, ma'am.  Please do.  Let her -- let

13  her see it.

14        MS. BROWN:  Your Honor, it's also on page 2,

15  paragraph -- it's under the description of apparent

16  violations, the second paragraph:

17              "On September 21st, 2018, the

18              Defendant failed to participate in

19              a substance abuse treatment

20              program at Freedom House."

21        THE COURT:  Yes, ma'am.

22        MS. BROWN:  So, it's on her report as well.

23        THE WITNESS:  Oh, I see.  I see.  He -- he was not in

24  treatment.  Right.  He failed -- I guess that should say he

25  failed to participate in substance abuse testing, instead of

1   treatment.

2   BY MS. BORKOWSKI:

3   Q   Okay.  At the time, he was getting treatment at Counseling

4   Associates?

5   A   Yes, ma'am.

6   Q   Okay.

7           THE COURT:  And that was mental health, not drug

8   treatment, right?

9           MS. BORKOWSKI:  Yes, Your Honor.

10           THE WITNESS:  Correct.

11   BY MS. BORKOWSKI:

12   Q   Is that correct?

13   A   Mental health treatment.  Uh-huh.

14   Q   On the -- the following paragraph, paragraph 8, it

15   references being in contact with a co-defendant, Christopher

16   Helms.  Was his contact by Facebook Messenger Marketplace

17   about purchasing a vehicle?

18   A   That, I don't know.  I knew that it was over Facebook, but

19   I don't know if it was -- what it was regarding.

20   Q   The agent -- I'm sorry, the officer regarding Christopher

21   Helms that notified you that they were -- they had been in

22   contact, did he elaborate on that contact?

23   A   No.

24   Q   Okay.  So, there was no discussion about the extent?

25   A   Not with me.  Now, whether or not he went into details

Hardison - Cross                                      19

1   with his officer about it, I don't know.  The only information

2   I got was that they had been in contact.

3   Q   And did you speak to Mr. Chandler about that?

4   A   Yes.

5   Q   And what was his explanation?

6   A   That they had talked -- that they had been in contact over

7   Facebook.

8   Q   About a vehicle?

9   A   I don't remember say -- saying about a vehicle, but he

10  does buy vehicles a lot, so it could be.

11  Q   Okay.  Okay.  On paragraph 9 of the motion to revoke, it

12  says that on March 13th, 2018, the Defendant committed the

13  offense.  Should that have been "allegedly committed"?

14  A   Possibly.  They are allegations at this point, yes.

15  Q   Okay.  So, the fact that he's been charged does not mean

16  that he committed the offense?

17  A   Correct.

18  Q   And to be fair, in your petition to the Court, in your

19  revocation violation memorandum, if I can point your attention

20  to the middle of the second page, it says in your violation

21  memorandum that March 13th, 2018 he committed the offense.

22  Should that have been allegedly committed?

23  A   Possibly, yes.

24  Q   Did you know whether he committed the offense?

25  A   I don't know.  All I have is the police report.

Hardison - Cross                                    20

1  Q    Okay.  So, again, if someone is charged, that is not a
2  violation that they have been convicted of?
3  A    He's not been convicted, no.
4  Q    Okay.  When you were -- how long have you been his
5  officer, his Probation Officer?
6  A    I believe it's been since January of this year.
7  Q    Okay.  So, and in your contact with him, has he been
8  responsive?
9  A    Yes.
10 Q    When you've asked to see him, has he made himself
11 available?
12 A    Yes.
13 Q    Has he been at places where he was supposed to be when he
14 was supposed to be there; for example, work?
15 A    Yes.
16 Q    And in his home, if you've needed to see him in the home,
17 has he been there?
18 A    Yes.
19 Q    And when you have told him that you want to see him;
20 again, he's been available?
21 A    Yes.
22 Q    Have you had any issues and concerns for your safety with
23 Mr. Chandler?
24 A    No.
25 Q    Have you had any issues or concerns that Mr. Chandler

1  might flee?

2  A    No.

3  Q    Do you know why the Government may have stated in its

4  motion that this revocation motion would be filed under seal

5  for the safety of -- of the U.S. Probation Officer?

6  A    I believe that's just their protocol, that's just the way

7  that it's always done.

8  Q    They always file these motions to revoke under seal?

9  A    As far as I know, yes.

10  Q    Okay.  And is your -- is it your information that Mr.

11  Chandler is working and maintaining gainful employment?

12  A    Yes.  Up until his arrest, yes.

13  Q    Okay.  And was -- as part of his income, was he paying

14  child support to his -- the mother of his children?

15  A    I -- I don't know about that.

16  Q    Do you know if he had his children over the summer?

17  A    I believe they were here for a couple of weeks, yes,

18  ma'am.

19  Q    A couple of weeks?

20  A    I believe so.

21  Q    So, it's not your --

22  A    Maybe a -- it could be a month.  I don't know the exact

23  dates.  They were here for an extended period of time this

24  summer, yes.

25  Q    Okay.  Did -- were you aware that they were here from some

1  time late in May, until August, basically their summer

2  vacation?

3  A    I was aware when they were here.  I don't remember right

4  now exactly how long it was, but I do -- I was made aware that

5  they were in town.  Yes.

6  Q    And in your contact with the counselor at Counseling

7  Associates, where he was getting treatment, were you made

8  aware that Mr. Chandler was -- was needing to see --

9  continuing his treatment?

10  A    The first I heard of him wanting continued substance abuse

11  treatment was after the incident on the 21st.

12  Q    And what was -- what was your understanding about that?

13  A    That he wanted to be back in treatment after he was caught

14  with the Whizzinator and tested positive.

15  Q    Okay.  And was he -- was he told that if he wanted to go

16  back into treatment, substance abuse treatment, he would need

17  to pay for that out of pocket or with insurance?

18  A    Yes.

19  Q    And was he willing to do that?

20  A    I believe so, yes.

21  Q    I believe in your testimony earlier you were saying that

22  you didn't think that there were any other options for Mr.

23  Chandler?

24  A    As far as what we can provide.

25  Q    Is an option for him to go into Chem-Free Living?

Hardison - Cross                                    23

1  A    Yes.

2  Q    And what would that entail?  What would that be like?

3  A    Chemical Free Living is a place where they live, they're

4  drug tested periodically -- or they're doing outpatient

5  treatment.  It's basically just long term treatment where they

6  can still come and go to work and things like that.

7  Q    And is -- is there a Chem-Free Living facility in

8  Russellville or in Pope County?

9  A    Yes, in Russellville.

10  Q    And there -- is there also one here in Central Arkansas?

11  A    Yes.

12  Q    And if he is working and living in the Chem-Free Living

13  facility, he will be living there and under their rules?

14  A    Correct.

15  Q    So, is it fair to say that this would be an option for

16  him?

17  A    Yes.

18  Q    And that would allow him to continue with mental health

19  treatment and substance abuse treatment?

20  A    Yes.

21  Q    And is it fair to say that from the date of Mr. Chandler's

22  release in November, November 29th of 2017, when he was

23  released on pretrial, until his first testing, that's

24  approximately three months until his first positive test?

25  A    Right.  And he was in residential for 30 days of that,

1  residential substance abuse treatment.

2  Q   Okay.  And then, is it fair to calculate again from the

3  date of that positive test until his most recent positive test

4  in September 21st of 2018, is that approximately a six months

5  period of time?

6  A   Yes.

7  Q   And, so, during that period of time, since you've been

8  with him, these are the two main violations that he has had?

9  A   Yes.

10  Q   And, again, that's over -- we're not quite at the end of

11  November, but that's almost an entire year's time of him being

12  released from this Court?

13  A   Are you asking me if it's been a year since November of

14  last year?

15  Q   Yes.  Yes.

16  A   Yes, it's been a year.

17  Q   Okay.  Have you had an opportunity -- going back to this

18  alleged offense that he was involved in, allegedly involved

19  in, regarding the four-wheelers, have you had an opportunity

20  to look at the incident report and the affidavit attached

21  thereto?

22  A   I did review the incident report when I received it.  I

23  have not seen the affidavit.

24  Q   You have it in your file, correct?

25  A   The incident report?

1    Q    Yes.

2    A    Yes.

3    Q    Can I ask you to pull it out, please?

4    A    It's actually over there.

5    Q    You have it in front of you?

6    A    Yes, ma'am.

7    Q    Okay.  So, this incident report is attached to an

8    affidavit for warrant of arrest for Mr. Chandler, correct?

9    A    The copy I have does not have the affidavit.  It's just

10   the incident report.

11   Q    Okay.  And I will direct your attention on the incident

12   report to, at the top, it says page 8 of 10.

13   A    Okay.

14   Q    The very last paragraph, what is the date of that entry?

15   A    The March 24th?

16   Q    Yes.  Of what year?

17   A    2018.

18   Q    And who is the narrative written by?

19   A    Looks like Randall -- I don't know how you pronounce it,

20   E-O-F-F, the investigator.

21   Q    Okay.  And in that paragraph, did he advise that he had

22   spoken with Mr. Chandler about this alleged incident?

23   A    Yes.

24   Q    And did he state in his report that Mr. Chandler advised

25   that he had spoken to Brandis Enos, reference some

1  four-wheelers, but he wouldn't advise that they were stolen,

2  and so Mr. Chandler did not buy them?

3  A    That's what the report says, yes.

4  Q    Can you turn to the next page, page 9 of 10?  And I would

5  direct your attention to the narrative entry dated April 2nd

6  of 2018.  Can you read for the Court the next to last sentence

7  in that narrative?  I'm sorry.  And this is -- let me -- let

8  me back up.  This is a statement -- an interview of Mr. James

9  Reed by Investigator Randall Eoff.

10  A    So, "Mr. Reed advised" --

11  Q    Yes.

12  A    -- "that the four-wheelers were," that part?

13  Q    Yes.

14  A              "Mr. Reed advised that the

15                  four-wheelers were then sold to

16                  Robbie Chandler, who had asked --

17                  who had them taken to the Moreland

18                  area.  James advised that they

19                  tried to get him to take them over

20                  there, but he refused."

21  Q    So, this statement is made by an individual who was being

22  interviewed and alleging that Mr. Chandler had something to do

23  with the four-wheelers?

24  A    Correct.

25  Q    Can you look at the last paragraph, the narrative entered

1  by Investigator Eoff, dated August 17 of 2018?

2  A    Uh-huh.

3  Q    And this is an interview of Sean Arnold.  Okay.  I'm

4  sorry.  And the next to last sentence, "I asked him about,"

5  can you read that sentence for the Court?

6  A              "I asked him if he lived in the

7                 Moreland area"?

8  Q    The sentence above.

9  A              "I asked him about the

10                 four-wheelers and how he got them.

11                 He advised he traded with Robbie

12                 -- with Robbie Chandler and that

13                 who he got them from."

14  Q    Okay.  Does there appear in these -- in this incident

15  report any -- any other allegation, other than two individuals

16  who are being interviewed?

17  A    Right, it's just two -- right, yeah.  No.

18  Q    Okay.  So, those are allegations, but not convictions?

19  A    Correct.

20           MS. BORKOWSKI:  Your Honor, I have nothing further.

21           THE COURT:  Ms. Brown?

22           MS. BROWN:  Nothing further, Your Honor.

23           THE COURT:  All right.  You may stand down.  Thank

24  you.

25       (Witness steps down.)

1        THE COURT:  Any other witnesses for the Government?

2        MS. BROWN:  No, Your Honor.

3        THE COURT:  All right.  Ms. Borkowski, you may call

4   your first witness.

5        MS. BORKOWSKI:  Your Honor, I would call Brenda

6   Campbell to the stand.

7        THE COURT:  Ms. Campbell, please come forward to be

8   sworn.

9      (BRENDA CAMPBELL, DEFENDANT'S WITNESS, SWORN.)

10                      DIRECT EXAMINATION

11  BY MS. BORKOWSKI:

12  Q   Can you state your name and your relationship with Mr.

13  Chandler?

14  A   Brenda Campbell.  And I'm Robert Chandler's mother.

15  Q   And has Mr. Chandler been living with you while he's been

16  on pretrial release?

17  A   Yes.

18  Q   Is he regularly and consistently living in the home?

19  A   Yes.

20  Q   Has he been working regularly?

21  A   Yes.

22  Q   And where does he work -- or where has he been working?

23  A   Little John's Transportation in Russellville, Arkansas.

24  Q   Did he have his children with him over the summer?

25  A   Yes.

Campbell - Direct                                        29

1   Q   And do you remember, you don't have to be exact, but do

2   you remember roughly when they were in town?

3   A   I believe it was the end of May.  They stayed about two

4   months.

5   Q   Okay.  And, so, they lived in the home with you?

6   A   Yes.

7   Q   How was Robbie during the time that his children were

8   here?

9   A   He was great.

10  Q   And once they left, did Robbie have any issues?

11  A   He was depressed.  He got upset.  He was -- all the worry

12  with him going to court and thinking about his kids being

13  grown when he got out, he was depressed over it, upset.

14  Q   Okay.  And did Robbie ever discuss with you needing or

15  wanting to get some medical treatment for his depression?

16  A   Yes.

17  Q   And had you encouraged him to -- to try to get with a

18  physician and get on medical treatment?

19  A   Yes, I did.

20  Q   And he -- had he made efforts in that?

21  A   He went to the doctor and I think they prescribed him some

22  -- some type of anxiety pill.

23  Q   Okay.  When he was living with you -- or throughout this

24  time that he was living with you, was he regularly and

25  consistently at home and when he should have been?

Campbell - Direct                                    30

1    A    Yes.

2    Q    And you recall that you -- he was released to your custody

3    as a third party custodian?

4    A    Yes.

5    Q    And it was your obligation, if you saw Robbie violate the

6    conditions of his release, that you report him?

7    A    Correct.

8    Q    Were you ever aware that he had violated and you did not

9    report him?

10   A    I did not report him.  I asked him, I think it was two

11   days before they showed up to pick him up, if he had been

12   doing drugs, because a couple of actions I saw.  And I -- I

13   just called him, you know, to me, and I said, "I want to ask

14   you something."  I said, "Have you done any drugs?"  He said,

15   "Do you want the truth or do you want me to lie to you?"  I

16   said, "I want the truth."  He said, "I have, twice."  I said

17   -- and I got on to him heavily, and I told him I wasn't going

18   to have it, and that if he -- if I hear of anything else, I

19   was going to report him.  And the day that they showed up with

20   him in handcuffs, I called the probation -- Renee was the

21   state probation officer, I called her off to the side.  I had

22   no idea he had tested positive for drugs at that time.  I

23   called her off to the side, and I told her about our

24   conversation and him admitting it.

25   Q    Okay.  And you -- you know that you were under an

Campbell - Direct/Cross                                          31

1   obligation to report him to his U.S. Probation Officer?

2   A    Yes.

3   Q    Okay.  You -- do you feel like that -- do you feel like

4   Robbie should go into Chem-Free Living?

5   A    I think it would help him, yes.  I mean, he -- he says --

6   you know, he was telling me that he was just depressed and

7   worried about that and he couldn't handle it.  And I told him

8   he had to.

9   Q    Okay.

10            MS. BORKOWSKI:  Thank you, Your Honor.  I have

11   nothing further.

12            THE COURT:  Ms. Brown, you may cross.

13            MS. BROWN:  Thank you, Your Honor.

14                       CROSS EXAMINATION

15   BY MS. BROWN:

16   Q    Let's go back to September.  So, because that's when he --

17   that's when he first -- when we first noticed that he used the

18   Whizzinator.  So, let's talk about his behavior in September.

19   So, his kids leave.  And then, you're familiar with Robbie and

20   using meth, right?

21   A    Right.

22   Q    Because you've seen him?

23   A    Right.

24   Q    You've seen what it does to him.  You've seen him on

25   opioids, too.  Remember?  We talked all about this in that

Campbell - Cross                                                32

1   last hearing, remember that?

2   A    Yes.

3   Q    Okay.  So, tell me about his behavior in September.  Let's

4   talk about it.

5   A    He just -- I noticed he -- he was acting different.

6   Q    Like what?  Like his old self, where he'd be jittery, he'd

7   get mad easier?

8   A    He got not real mad, no, but he was jittery and he -- he

9   just was more upset and emotional.  And --

10  Q    So, he went back to his highs and lows again, right?

11  A    Yeah.

12  Q    So, he's doing this roller coaster, same signs as last

13  time, right?

14  A    Right.

15  Q    Right.

16  A    But I didn't notice it but just, you know, maybe a week or

17  two that I had noticed him doing that.

18  Q    Okay.  So, for a week or two, you'd known your son's

19  behavior and you didn't call Sarah Hardison, did you, to think

20  there might be a chance?

21  A    Well, I wasn't sure, and then I confronted him.

22  Q    Okay.

23  A    And it was like two days before he got arrested.

24  Q    Okay.  And, so, Judge Ray, when he was up here, and we

25  were here last time, and you sat right over here and you said,

1  "If he's -- if he violates, I will call."  And you never

2  called, did you?

3  A    No.

4         MS. BROWN:  I don't have any further questions, Your

5  Honor.

6         MS. BORKOWSKI:  I have nothing further, Your Honor.

7         THE COURT:  All right.  Thank you, ma'am.  Ms.

8  Campbell, you may stand down.

9     (Witness steps down.)

10         THE COURT:  Any other witnesses?

11         MS. BORKOWSKI:  No, Your Honor.

12         THE COURT:  All right.  I'll now hear arguments of

13  counsel, beginning with you, Ms. Brown.

14         MS. BROWN:  Thank you, Your Honor.  Your Honor, I

15  want to go back to the detention hearing that we had on Mr.

16  Chandler on 11/29/2017.  During that detention hearing, I

17  recall, and I wrote this down, during that detention hearing

18  that you said, "If I find you didn't comply with the

19  conditions, I am going to lock you up."  Those were -- those

20  were the Court's words that day.

21         And so, now, if we look at his violations, so, in

22  March -- we can go back to March, and we look at that.  In

23  March, he tested positive for methamphetamine.  And then,

24  September, he fails to come in and submit a test.  And then,

25  September 21st, he goes to Freedom House to get tested, he

34

 1   tests positive for methamphetamine, opioids --

 2           THE COURT:  Let me just interrupt you for just one

 3   second, because I'm confused.  You said in the last detention

 4   hearing, and you said that was November the 29th?

 5           MS. BROWN:  I believe it was November --

 6           THE COURT:  November the 29th of last year was when I

 7   set conditions for him?

 8           MS. BROWN:  Yes.  We had a detention hearing that

 9   day, and I argued for his -- to be detained.

10           THE COURT:  Oh, okay.

11           MS. BROWN:  Yeah.

12           THE COURT:  I thought -- I thought that detention

13   hearing was about a week later, but that -- that was the date

14   we had that hearing?

15           MS. BROWN:  Yes, Your Honor.  We had a hearing on

16   that day.

17           THE COURT:  And I remember the hearing.

18           MS. BROWN:  Okay.

19           THE COURT:  But, okay, I just wanted to make sure we

20   had the right date on it.

21           MS. BROWN:  Yes, sir.  That was -- those were my

22   notes when we had the detention hearing on that day.

23           So, and then, we go into September, just a couple

24   months ago, where he goes into the Freedom House, and he

25   doesn't go in -- knowing he's going to get tested, he doesn't

1  just go in and go pee in a cup.  What does he do?  He takes

2  fake urine or urine of somebody else's urine, attaches it to

3  his leg to be deceptive so he can pass another test so he can

4  keep using methamphetamine and he can stay out.

5          So, it's not just he's testing positive, Your Honor.

6  Now, he's used a deceptive device to evade anybody knowing

7  about what he's doing.

8      (Cell phone ringing.)

9          THE COURT:  I'm really sorry about that.

10          MS. BROWN:  I'm glad it wasn't me.

11          THE COURT:  This is actually a phone call that I had

12  it here --

13          MS. BROWN:  Go ahead.

14          THE COURT:  -- because I need to take the call.

15          MS. BROWN:  It's all right.

16          THE COURT:  I might be able to complete -- I really

17  apologize, Ms. Brown.  It's an important phone call that I

18  need to take, but I -- and I interrupted your argument.  But,

19  I remember right where you were.  So, just pick it up there.

20          MS. BROWN:  Well, I have no doubt about it, Your

21  Honor.

22          So, anyway, he's using this deceptive device.  He's

23  not -- he's not being honest, he's not telling the truth.  So,

24  until he's confronted with it, then he's like, "Oh, I did

25  this."  So, you know, that's -- that's a problem in itself,

36

1    because he's not just using, he's lying about it and trying to

2    deceive.  And we're trying to sit here giving him all the

3    options.  We've given him 30 days inpatient treatment.  I

4    argued for Chem-Free.  The Court allowed him to go live with

5    his mom.  I thought it was a bad idea because he's not going

6    to have the structure that somebody needs to get off of it.

7         Why does he need Chem-Free now?  He doesn't care,

8    because he's -- he's beyond that, Your Honor.  That's for

9    somebody who actually comes out of 30 days clean, then they

10   can come into Chem-Free to rehabilitate themselves and to the

11   environment.  Didn't happen here.  And I don't think Chem-Free

12   is a good option here, because he continues to use.

13        Not only that though, does he -- he never even told

14   Sarah Hardison that he had contact with a co-defendant.  That

15   came from another co-defendant's mouth.  Until confronted with

16   it, he didn't come forward and tell Officer Hardison.  Not at

17   all.  And it doesn't matter if it's about a car, or whatever

18   it's about.  The Court's order says, "No contact with a

19   co-defendant."  None.  He violated it there.

20        So, then, this theft by receiving.  Your Honor, I --

21   I don't know what the charges are.  It's about some

22   four-wheeler.  All I know is there was a felony arrest warrant

23   issued.  He got arrested for it.  Those are new charges.

24   Whether he's guilty or not, that's for a state court to

25   determine.  We're not here to look at the facts of that case.

37

1  We're here to determine whether or not he's violated

2  conditions of release.  The state figured out there was enough

3  information, so they charged him.

4          So, when looking at whether or not to revoke --

5  revoke somebody, the first thing is -- that the Government

6  looks at is, "What has he done wrong?"  If he just tests

7  positive, fine, you know, maybe there are other chances to

8  give him.  But, we don't have that just here.

9          And, so, look at the totality of the circumstances.

10  If we look at everything, you look at his criminal history,

11  and there's a lot of it, and there is a lot of theft by

12  receivings, there's a lot of theft of properties, and he

13  explained that.  It was explained in the previous one, "Oh, he

14  went through a bad time.  He got into a car accident and had

15  all of these problems, got on opioids."  Problem after problem

16  after problem with his drug abuse.

17          But, there is a bigger problem here, Your Honor, is

18  whether or not Mr. Chandler is going to show up in April and

19  he's going to come forward and he's going to be able to be

20  sober, he's going to be able to coherent.  You put him in

21  Chem-Free in Russellville, back in this situation where I

22  didn't want him to be in the first place, which is in

23  Russellville, which is where all of the co-defendants are,

24  which is where people, places, and things -- he never changed

25  anything.

1      And, so, I'll go back to the Court's wording on that
2  day; if he didn't comply with the conditions, you said you
3  would lock him up at that point.  Your Honor, he has violated.
4  He has lied.  He has been deceptive to the Probation Officer.
5  I don't know if there is a set of circumstances where you --
6  where the Court can release him to, even Chem-Free Living,
7  without his being deceptive again and using some sort of
8  device.
9      So, for those reasons, Your Honor, the Government
10  asks that Mr. Chandler be detained for the rest of the time
11  pending the trial, which is set for April of 2019, Your Honor.
12      THE COURT:  Thank you, Ms. Brown.
13      MS. BROWN:  Thank you, Your Honor.
14      THE COURT:  Ms. Borkowski?
15      MS. BORKOWSKI:  Your Honor, I think that the
16  Government is making -- and I'm not trying to minimize the
17  fact that Mr. Chandler has tested positive twice -- but I do
18  want to impress upon the Court that drug addiction, as we all
19  know, is a very powerful thing that is very challenging for
20  someone who is addicted to overcome.  And this is why the
21  Government and the Probation Office has the means to put
22  someone in out -- in -- in 30 day inpatient treatment, and
23  they have the means to put them into substance abuse
24  treatment, and they have the means to put them into mental
25  health treatment.

1    And, Your Honor, on this case, there are two

2  violations.  There is the one in March, that happened after he

3  had been released for 30 (sic) months.  That was one occasion

4  that happened one time in March.  And as a result of that, his

5  conditions were modified so that he would go back in and get

6  additional mental health treatment.  And he had done that.

7  Not only was he getting mental health treatment, but he was

8  also able to successfully complete outpatient substance abuse

9  at Freedom House, which he completed in the summer.

10    I would also point out that he, after the testing

11  positive in March, he had his kids for the summer and he was

12  able to spend time with his children over the summer, and that

13  was a very positive thing.  And when they were -- when they

14  returned home to Arizona to live with their mother and start

15  back to school, then, as his mom testified, he started

16  suffering from depression.  And he was in the process of

17  getting in to a -- to a physician to get on some medication to

18  -- to deal with his depression.  So, and then, instead of

19  being able to successfully get on medicine, and he was willing

20  to pay for that out of pocket or through his insurance, he

21  basically self -- self-medicated again in September.

22    So, I think, in the big picture, this individual has

23  had two relapses.  And I'm not trying to minimize that.  But,

24  in -- in the course of this case, in the whole almost a year's

25  time, he has been pretty successful, and he has been

1  maintaining his employment, which allows him to send money to

2  the mother of his children for child support, and he has been

3  living at home with his mother and complying.  As the -- as

4  the U.S. Probation Officer said, when she wanted to see him,

5  he made himself available.  When she went to check in on him,

6  whether it was at his work or his home, he was where he was

7  supposed to be when he was supposed to be there.

8       So, I think if we put all of this in perspective,

9  there are additional conditions.  There are additional options

10  for this individual.  And we would ask that he go into

11  Chem-Free Living.  I would also suggest that, instead of

12  sending him to the Chem-Free Living facility in Russellville,

13  in Pope County, that we put him in Little Rock, where he is

14  away and apart from those individuals.  If his mom wants to

15  come visit him, I'm sure she's more than willing to come and

16  see him in Little Rock.  But that this would be a location and

17  this would be an opportunity for him to continue getting the

18  substance abuse treatment, to continue getting the mental

19  health treatment, and also to continue working and able to

20  provide financially for his children.  I think that that is a

21  very important thing.

22       Your Honor, this four-wheeler incident, you know,

23  given Mr. Chandler, what he's been accused of, and all of the

24  cases that he's been charged with that have been *nol prossed*,

25  it's very easy to see that it's easy to throw Mr. Chandler

1   under the bus.  And I think in the -- in the felony charges

2   that he's under right now, what we see is not that he was

3   caught or seen in possession, or anything like that, but we

4   have two individuals who are in trouble of their own, and

5   that's what they have done, is they have picked out a name of

6   someone and thrown him under the bus without any additional

7   evidence in this file to support those charges.

8          I would also -- I know the Court has mentioned his

9   criminal history and is concerned about it, but I would also

10  point to the Court that as far as convictions go, he had issue

11  -- he had an issue in 2000 where he was convicted.  The next

12  conviction was in 2005.  And then, his next conviction was in

13  2016.  So, yes, there are lots of charges against him, but if

14  we focus in on his convictions, he has had long periods where

15  there has been nothing that has -- that has been against him.

16  And, certainly, this has gotten his attention and this is why

17  he would ask the Court to set the condition of allowing him to

18  go into Chem-Free Living.

19         Thank you.

20         THE COURT:  Thank you, Ms. Borkowski.

21         This is a -- this is a case that I remember well the

22  detention hearing that we had in late November.  It's one of

23  those cases where, because there was a -- Ms. Campbell struck

24  me as someone who would really be an outstanding third party

25  custodian, that I believed that there was a basis for giving

1   Mr. Chandler a chance to be successful on his OR bond.

2          I was concerned at that time, simply because he had

3   such a -- you know, seven prior convictions, felony

4   convictions for theft of property, residential burglary, theft

5   by receiving.  That worried me, even though, as Ms. Borkowski

6   has properly pointed out, there were breaks, there tended to

7   be flare-ups where he did this, with years in between.  That's

8   a lot of convictions.  And the fact that he had eight *nol*

9   *prossed* charges in the same vein, which I'm allowed to

10  consider under the Bail Reform Act, also concern me.

11         Now, once Mr. Chandler went on bond, I again agree

12  with Ms. Borkowski, this is not a case where Mr. Chandler is

13  not to be credited with trying to -- trying to comply with his

14  conditions.  He successfully complied with conditions for

15  three months.  He relapsed and tested positive.  He

16  acknowledged, "I used meth."  That's not unusual.  And he was

17  given a chance to go into six months of intensive outpatient

18  treatment.  He successfully completed that.  Clearly, while he

19  was on his bond, he was trying.  Sadly, I put a lot of people

20  on bond and they go out of inpatient treatment and within two

21  weeks they've tested positive six times and I have to lock

22  them up.  Mr. Chandler was trying.  He should be credited with

23  that, and I do credit him with that.

24         I have a lot of sympathy for people who are drug

25  addicts, that have a long history of drug addiction, when they

1  relapse and they test positive and they square their shoulders

2  and accept responsibility and say, "I need more help."

3        The -- the first serious problem Mr. Chandler has got

4  to overcome in his case is what he did the second time that he

5  tested positive, and that was to try to be deceptive and wear

6  a Whizzinator.  Because any time I have a defendant who does

7  that, I have someone who is trying to be allowed to continue

8  to use drugs and get away with it.  And that's somebody that

9  worries me greatly, because that is -- that's -- you don't

10 strap a Whizzinator on unless you have a lot of -- of thought

11 you give to what you're going to do.  That's premeditated.

12 That's not, "Oh, gosh, there's a Whizzinator I find in my

13 front seat, I think I'll strap it on."  Mr. -- Mr. Chandler

14 went through the thought process and said, "I'm going to try

15 to beat detection because I enjoy using meth and I want to

16 continue to use meth and I want to try to get away with using

17 meth."

18       And in a situation like this, this was a close case

19 when I had that detention hearing, because of Mr. Chandler's

20 criminal history and the concerns I had, and what tipped in

21 his favor, ultimately, my decision to release him, was the

22 fact that I thought that Ms. Campbell would be an outstanding

23 third party custodian; he had a good job; he was making good

24 money at his job; and it was worth giving him a chance.  If,

25 on the 21st, he had acknowledged use, not used a Whizzinator,

1   we'd be in a different situation than we're in today.  That is

2   -- any time I have a defendant that attempts to evade testing

3   positive by using a deceptive device, it raises great concerns

4   with me about whether I can trust that defendant to comply

5   with any conditions I can impose, because the defendant is not

6   only trying to fool the -- the person that's administering the

7   test, the defendant is trying to evade conditions that I've

8   imposed, that they promised me they're going to comply with,

9   which immediately raises problems of trust.

10          And then, the second issue that we have here is the

11  stolen four-wheeler.  And, Ms. Borkowski, you've done an

12  excellent job of explaining that that may be a charge that

13  ultimately may get *nol prossed* or that may go to trial and --

14  and Mr. Chandler may be acquitted on.  Who knows how that

15  testimony may shake out with the stolen four-wheeler?

16          Under the Bail Reform Act, however, this is where we

17  are, I'm -- my decision today has to be guided by 18 U.S.C. §

18  3148, and that specifically provides that at a hearing such as

19  the one we have here today, where a defendant has been accused

20  of committing a new federal or state offense, a crime, while

21  on OR bond, the first finding that I have to make is whether

22  there is probable cause to believe the person has committed

23  the state crime.  Here, there is probable cause to believe

24  that, supported by the fact that the charges were filed.

25  That's a determination by the prosecutor that there is

1  probable cause.  So, that -- that finding has been met.

2          Then, the other finding that I have to make is

3  whether or not Mr. Chandler, at this point, is a person who is

4  likely to abide by any condition or combination of conditions

5  that I can impose.

6          The fact that he used a Whizzinator certainly greatly

7  erodes the ability for me to place any trust or confidence in

8  him that if he goes into Chemical Free Living, that while in

9  Chemical Free Living, he's going to do what he's supposed to

10 do in there.  And, certainly, if I considered it at all, I

11 would consider it for Little Rock, not Russellville, because

12 he needs to get out of that environment, but in a Chemical

13 Free Living program in Little Rock.

14         Where he has previously tried to use a Whizzinator to

15 avoid testing positive for meth, there's simply that, coupled

16 with picking up -- again, there is probable cause, based on

17 the fact the charge was filed, to believe that it's more

18 likely than not that he was involved in receiving stolen

19 property, which is an offense he has seven prior convictions

20 for, that I simply can't trust Mr. Chandler at this point.

21         I think his mother has tried.  I think she's been a

22 good third party custodian with a son that she loves dearly,

23 that she's tried to help and -- and get on the right track,

24 and Mr. Chandler has not been able to be successful.

25         Because it was a close case when we had the earlier

1  detention hearing, when I tell a defendant -- and I tried to

2  make that very clear to Mr. Chandler, this was a close case,

3  I'm going to give you a chance, but don't let me see you

4  again, comply with these conditions, because if you don't

5  comply with all of these conditions, as close as the case is,

6  back when we had the hearing in late November, I'm going to

7  have to lock you up.  When I say those things, I mean it.

8          And, here, based on the fact that he tried to defeat

9  a drug test with a Whizzinator, the fact that he picked up new

10  charges that are currently pending against him for theft by

11  receiving, which is an offense that he's had seven prior

12  felony convictions for, all of that, under the -- under the

13  Bail Reform Act, and the statute that I'm working under, cause

14  me to find that there are simply no conditions that I can

15  impose, including inpatient drug treatment, that I could

16  reasonably believe he would comply with, because I simply

17  don't have a basis for believing, at this point, based on the

18  Whizzinator and the theft by receiving, that -- that I can

19  trust him.

20          And, as a result, it will be the decision of this

21  Court that he be detained until all charges in this case have

22  been resolved.

23          Anything further for the Government?

24          MS. BROWN:  No, Your Honor.

25          THE COURT:  Ms. Borkowski?

1          MS. BORKOWSKI:  No, Your Honor.

2          THE COURT:  Very well.  Court is adjourned.

3      (Adjournment at 11:35 a.m.)

4              ELECTRONIC SOUND RECORDING CERTIFICATION:

5  I, court approved transcriber, certify that the foregoing is a

6  correct transcript from the official electronic sound

7  recording of the proceedings in the above-entitled matter.

8

9  /s/Robin Warbritton                February 9, 2020
   Signature of Approved Transcriber   Date

10

11  Robin Warbritton
    Typed or Printed Name

12

13

14

15

16

17

18

19

20

21

22

23

24

25